# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RONALD PORTIS, MADRIC E. LANCE, AND
EMMETT LYNCH, individually and on behalf of
a class,

                Plaintiffs,

    vs.

CITY OF CHICAGO, et al.,

                Defendants.

Case No.  02 C 3139

Judge Gettleman

Magistrate Judge Nolan

**DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF UNDISPUTED
FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Dated:  February 9, 2007

June K. Ghezzi, Bar No. 6185506
  jkghezzi@jonesday.com
Brian J. Murray, Bar No. 6272767
  bjmurray@jonesday.com
Morgan R. Hirst, Bar No. 6275128
  mhirst@jonesday.com
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601-1692
(312) 782-3939

Attorneys for Defendants

## RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS[1]

1.      This Court has jurisdiction under 28 U.S.C. §§1331 and 1343, and 42 U.S.C. §§1983 and 1988.  Venue is proper pursuant to 28 U.S.C. §1391(b).

**Response:**      Not controverted, but immaterial.

2.      On August 20, 2001, the City of Chicago charged plaintiff Ronald Portis with violating a municipal ordinance by peddling without a license and by failing to display a peddler's badge.  Ordinance §4-244-030, §4-244-100; Exh. 1 (Portis arrest report).  Violations of this ordinance are punishable only by a fine, i.e., no jail time may be imposed.  Exh. 2 (ordinance).

**Response:**      Unsupported,[2] immaterial, misleading and objectionable.  Further, ¶ 2 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph.[3]  Immaterial in that plaintiffs are not challenging the propriety of Mr. Portis's arrest, only the length of his detention. Misleading in that plaintiffs' implication in the second sentence that individuals arrested for violation of municipal ordinances that are punishable by fine only should not be

---

[1] Plaintiffs include a number of unsupported and argumentative headings throughout their Rule 56.1 Statement.  The City has not restated these headings in its Response, nor responded to them here, and respectfully requests that this Court either strike or disregard these headings in ruling on plaintiffs' motion for summary judgment.  *See* LR 56.1(b)(3)(B) (requiring statements be supported by "references to the affidavits, parts of the record, and other supporting materials relied upon").

[2] Assertions without specific reference to the record violate LR 56.1(b)(3)(B), which requires "references to the affidavits, parts of the record, and other supporting materials relied upon." *See Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities."); *see also Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("district courts are not obliged in our adversary system to scour the record looking for factual disputes"); *id.* at 923 (Rule 56.1 statements are "roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own.").  Consequently, each time that defendants point out that one of plaintiffs' facts is unsupported, defendants respectfully request that this Court either strike or disregard that fact in ruling on plaintiffs' summary judgment motion.

[3] Courts in this district have ordered strict compliance with Local Rule 56.1, and held that the "compounding of facts into an amalgamated paragraph is not permissible." *Maclin v. A.M. Bus Co., Inc.*, No. 04 C 4176, 2006 WL 463370, *2 (N.D.Ill. Feb. 22, 2006) (disregarding all paragraphs including more than one statement of fact); *Malec*, 191 F.R.D. at 583 ("it is inappropriate to confuse the issues by alleging multiple facts in a single paragraph in hopes of one's opponent missing one").  Consequently, each time that defendants point out that one of plaintiffs' paragraphs includes multiple statements of fact in violation of Local Rule 56.1, they respectfully request that this Court either strike or disregard that fact in ruling on plaintiffs' summary judgment motion.

detained or placed in a jail cell at the time of processing has been specifically rejected by the

United States Supreme Court.  *See Atwater v. City of Lago Vista*, 532 U.S. 318 (2001).

      3.     Chicago's municipal code provides a ticketing procedure for violation of fine-only city ordinances.  Section 2-14-010 *et seq.*, of Chicago Municipal Code.  Under the procedure adopted by the Chicago Police Department ("CPD"), alleged violators of an ordinance for which jail time is not the only penalty but which carry a penalty of a fine or both a fine and a jail sentence may be stopped by police and issued a ticket (called an Administrative Notice of Ordinance Violation, or "ANOV"), and released, in much the same manner as with minor traffic violations.  Group Exh. 3 (General Order ("GO") 99-02, at 5-6; GO 01-07, at 5; Department Special Order ("DSO") 03-12, at 3-4); Exh. X, Obuchowski dep. II, at 113:18-24.  These GOs and DSO "encourage[]" the use of tickets in lieu of officers making actual physical arrests. Group Exh. 3 (DSO 03-12, at 1-2; GO 01-07, at 1-2; GO 99-02, at 1-2).  The ticket requires the alleged violator to appear at an administrative hearing to adjudicate whether the violation occurred and, if so, the appropriate fine.  Group Exh. 3 (DSO 03-12 at 2; GO 01-07, at 2; GO 99-02, at 6).

**Response:**      Controverted, misleading, unsupported and objectionable.  Further, ¶ 3 violates

Local Rule 56.1 by including multiple statements of fact within the same paragraph.  Section 2-

14-010 addresses administrative hearings and does not, in any way, provide a ticketing procedure

for violations of a fine-only offense.  A review of G.O. 99-02 at 7-9, G.O. 01-07 at 8-9, and

D.S.O. 03-12 at 8-9 shows the different procedures for dealing with minor traffic violations and

violations of ordinances that carry a penalty of a fine or both a fine and a jail sentence, and thus

the two are not "issued a ticket" and "released" in "much the same manner."  The testimony that

plaintiffs refer to in Pls. Ex. X at 113:18-24[4] was taken over objection and only refers to whether

"name checks" are performed when "issuing a ticket" without reference to when such name

checks are performed.  Whether the ticket "requires" an alleged violator to appear states a legal

conclusion and therefore should be disregarded.[5]  Finally, ¶ 3 is incomplete in violation of Fed.

---

[4] Citations to Exhibits are as follows:  Exhibits to Plaintiffs' Statement of Undisputed Facts ("Pls. Ex. __"); Exhibits to Defendants' Responses to Plaintiffs' Statement of Undisputed Facts and Statement of Additional Material Facts ("Def. Ex. __").

[5] It is inappropriate to allege legal conclusions in a Local Rule 56.1 statement of facts.  *See Malec*, 191 F.R.D. at 583, 584.  Consequently, each time that the City points out that one of plaintiffs' facts is a legal conclusion, the City respectfully requests that this Court either strike or disregard that fact in ruling on plaintiffs' summary judgment motion.

R. Evid. 106, since D.S.O. 03-12-01 provides that a ticket may not be issued and a physical arrest must be made in cases where: (1) the violator is less than 17 years of age; (2) the violator cannot or will not produce a valid picture identification card; (3) the violator exhibits behavior which requires an officer to exert physical force to effect the arrest; (4) there is a reasonable likelihood that the offense will continue, or recur, or that life or property will be endangered if the violator is not arrested and removed from the scene of the occurrence; (5) there is a reasonable likelihood that the violator will fail to appear at the hearing; (6) there is reason to believe that a warrant may be outstanding against the violator; or (7) the violator refuses to sign the ANOV citation. Def. Ex. 1, G.O. 03-12-01 at 2.

4. The CPD also gives its officers "discretionary authority" to make arrests for violating fine-only ordinances. Group Exh. 3 (GO 99-02, at 1-2; GO 01-07, at 1-2; DSO 03-12, at 1-2); Exh. G, Obuchowski dep., at 106-11.

**Response:** Controverted, misleading, unsupported and objectionable. Plaintiffs' Ex. G does not contain pages 106-11. To the extent the plaintiffs instead are referring to Pls. Ex. X at 106-11, that testimony was taken subject to objection as beyond the scope of the deposition, as ordered by Magistrate Judge Nolan. Further, plaintiffs mischaracterize Officer Obuchowski's testimony in that he does not identify "discretionary acts," but rather responds to a series of hypothetical questions posed by plaintiffs' counsel regarding what factors impact his actions. Pls. Ex. X at 106-111. Misleading in that officers actually have no discretion but to make a physical arrest of individuals violating fine-only ordinances under D.S.O. 03-12-01 in cases where: (1) the violator is less than 17 years of age; (2) the violator cannot or will not produce a valid picture identification card; (3) the violator exhibits behavior which requires an officer to exert physical force to effect the arrest; (4) there is a reasonable likelihood that the offense will continue or recur, or that life or property will be endangered if the violator is not arrested and removed from the scene of the occurrence; (5) there is a reasonable likelihood that the violator

will fail to appear at the hearing; (6) there is reason to believe that a warrant may be outstanding against the violator; or (7) the violator refuses to sign the ANOV citation. Def. Ex. 1, G.O. 03-12-01 at 2.

     5.     Mr. Portis was arrested pursuant to that provision on August 20, 2001 at approximately 8:40 p.m. Exh. 1 (Portis arrest report). He was taken to the 18th district CPD police station, processed, given a central booking ("CB") number at 10:52 p.m. (Exh. 4, affidavit), and then detained in a CPD lockup cell (Exh. 1, Portis arrest report). He was not released until 7:15 a.m. the next day (*id.*), or almost 11 hours following his arrest and almost 8.5 hours after he was given a CB number on the fine-only ordinance violation. The charges against him were eventually dismissed by the prosecution. Exh. 4, affidavit.

**Response:**     Controverted, misleading, unsupported and objectionable. Multiple officers have testified that arrestees are not necessarily "processed," "given a central booking number" and "then detained in CPD lockup cell" in any particular order. Def. Ex. 2, Skahill Dep. at 84:9-84:20 (issuance of a CB number can occur when an arrestee is in a cell or before the arrestee is placed in a cell); Def. Ex. 3, Sodini 8/22/05 Dep. at 60:16-21, 61:9-14 (same). Multiple officers have also testified that "processing" is not completed before an arrestee is "given a central booking number" or "detained in a CPD lockup cell." Def. Ex. 4, Defendants' Answers and Objections to Plaintiffs Twelfth (Thirteenth) Set of Interrogatories at ¶ 2; Def. Ex. 5, Defendant City of Chicago's Amended Answers and Objections to Plaintiffs' Interrogatories at ¶ 14; Def. Ex. 6, Sodini 10/29/03 Dep. at 56:7-66:14 (describing steps of processing arrestee under departmental control, including numerous steps in processing after the arrestee is given a CB number); Def. Ex. 7, Miceli Dep. at 54:22-55:4 (describing the steps in processing an arrestee); Pls. Ex. 16, G.O. 92-05; Pls. Ex. 17, G.O. 02-03. Further, ¶ 5 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph. It also relies on the affidavit of Whitman T. Soule, which is inadmissible under Fed. R. Evid. 802 because his declaration lacks foundation and relies on hearsay.[6] The statement that Mr. Portis's "processing" occurred

---

[6] Fed. R. Civ. P. 56(e) requires that facts opposing summary judgment be admissible in evidence. *See Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). Thus, courts have refused to consider such

between when he "arrived at the police station" and when he was "given a central booking

number," and the statement that Mr. Portis was "given a central booking number at 10:52 p.m.

and then detained in a CPD lockup cell," are not supported by any citation to the record.  Finally,

the statement that the "charges" against Mr. Portis were "eventually dismissed" is unsupported as

the record only identifies whether cases were "non-suited" by an administrative law judge.

    6.    Defendants have offered no testimony or documented explanation for Mr. Portis'
8.5- hour detention after he was processed and issued a CB number.  Exh. G, Obuchowski dep.,
at 8:9-17; Exh. P, Serpe dep., at 21:1-22; Exh. Z, Wedster dep., at 104:11-24; Exh. Q, Griffin
dep., at 28:17-22; Exh. C, Richmond dep., at 104:11-14; Exh. H, Malinowski dep., at 15:12-14;
Group Exh. 18, defs.' responses concerning named plaintiffs; Exh. 20, defendants' answers and
objections to plaintiffs' seventh set of interrogatories.

**Response:**    Move to strike this paragraph as argumentative in violation of LR 56.1.[7]

Controverted, misleading, unsupported, and objectionable.  The statement that defendants have

"offered no testimony or documented explanation" for the length of Mr. Portis's detention is

argumentative and a legal conclusion as to what constitutes "testimony" or a "documented

explanation," and has no place in a Local Rule 56.1 statement, and should therefore be stricken.

Plaintiffs' statement that Mr. Portis was detained for 8.5 hours "after he was processed and

_____
(continued…)

evidence as unauthenticated documents and hearsay evidence when ruling on summary judgment
motions.  *See Woods v. City of Chicago*, 234 F.3d 979 (7th Cir. 2000) (courts generally cannot consider
unauthenticated documents); *Toney v. St. Francis Hosp.*, No. 00 C 5298, 2001 WL 428154, at *2 (N.D.
Ill. Apr. 26, 2001) ("[A] party may not rely upon inadmissible hearsay in an affidavit or deposition to
oppose a motion for summary judgment.") (citing *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir.
1995).  Consequently, each time that the City raises the inadmissibility of evidence, it respectfully
requests that this Court either strike or disregard that evidence in ruling on plaintiffs' summary judgment
motion.

[7] It is inappropriate to make argumentative statements in a Local Rule 56.1 statement of facts.  *See Cady
v. Sheahan*, 467 F.3d 1057,1060 (7th Cir. 2006) (affirming District Court's striking and disregarding the
plaintiff's Rule 56.1 statement because it "did not comply with Rule 56.1 as it failed to adequately cite the
record and was filled with irrelevant information, legal arguments, and conjecture."); s*ee also Greer v.
Board of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) ("generalized self-serving legal
conclusions, rather than particularized statements of fact" are improper and have no place in a Rule 56.1
statement).  Consequently, each time that the City points out that one of plaintiffs' facts is argumentative,
the City respectfully requests that this Court either strike or disregard that fact in ruling on plaintiffs'
summary judgment motion.

issued a CB number" is unsupported by any citation to the record, as plaintiffs have provided no

citation establishing when Mr. Portis's processing was completed. Plaintiffs' Exs. G, P, and Z

only establish the deponent's lack of knowledge regarding this topic and therefore any inference

that this constitutes a lack of "explanation" would require an improper inference against the non-

movant. The City has offered both testimony and documentation explaining the length of Mr.

Portis's detention after he was issued a CB number. Def. Ex. 8, Defendants' Answers and

Objections to Plaintiffs' Third Supplemental Interrogatories at 4-5 (explanations listed in ¶ 35 of

Defendants' Additional Material Facts *infra*);[8] *see also* Def. Ex. 7, Miceli Dep. at 115:20-117:12.

Multiple officers have also testified that arrestees, like Mr. Portis, are not fully "processed" at the

time they are given a CB number, and therefore, the fact that Mr. Portis was held in police

custody for 8.5 hours after he was given a CB number is not evidence that he was held in police

custody for 8.5 hours after his processing was completed. Def. Ex. 4, Defendants' Answers and

Objections to Plaintiffs Twelfth (Thirteenth) Set of Interrogatories at ¶ 2; Def. Ex. 5, Defendant

City of Chicago's Amended Answers and Objections to Plaintiffs' Interrogatories at ¶ 14; Def.

Ex. 6, Sodini 10/29/03 Dep. at 56:7-66:14 (describing steps of processing arrestee under

departmental control, including numerous steps in processing after the arrestee is given a CB

number); Def. Ex. 7, Miceli Dep. at 54:22-55:4 (describing the steps in processing an arrestee);

Pls. Ex. 16, G.O. 92-05; Pls. Ex. 17, G.O. 02-03.

      7.      On May 6, 2002, the City of Chicago charged plaintiff Emmett F. Lynch with
violating a municipal ordinance (§10-8-505) by scalping a ticket outside Wrigley Field. Exh. 5,
Lynch arrest report. Violations of this ordinance are punishable only by a fine. Exh. 6,
ordinance.

---

[8] Defendants subsequently informed plaintiffs that they had determined after further investigation that the
shooting death of on-duty Chicago Police officer Eric Lee, originally identified as one of the possible
reasons for the length of Mr. Portis detention in subpart (c) of its Answers and Objections to Plaintiffs
Third Supplemental Interrogatories, did not in fact contribute to the length of his detention.

**Response:**     Unsupported, immaterial, misleading and objectionable.  Plaintiffs' Exhibit 6 does not contain § 10-8-505 or any provision regarding the potential punishment for violating such section or for scalping tickets in violation of a municipal ordinance.  Further, ¶ 7 also violates Local Rule 56.1 by including multiple statements of fact within the same paragraph.  Immaterial in that plaintiffs are not challenging the propriety of Mr. Lynch's arrest, only the length of his detention.  Misleading in that plaintiffs' implication in the second sentence that individuals arrested for violation of municipal ordinances that are punishable by fine only should not be detained or placed in a jail cell in connection with processing has been specifically rejected by the United States Supreme Court.  *See Atwater v. City of Lago Vista*, 532 U.S. 318 (2001).

8.     As with Mr. Portis, CPD officers chose to arrest Mr. Lynch rather than ticket him. Exh. 5, Lynch arrest report.  Mr. Lynch was arrested at 5:59 p.m. and then transported to the 19th district police station, processed, given a CB number at 8:28 p.m.  (Exh. 4, affidavit), and then detained in a CPD lockup cell (Exh. 5, Lynch arrest report).  He was not released until 2:00 a.m. *Id*.  Accordingly, he spent approximately eight hours in custody (5.5 hours after he received his CB number) due to the alleged violation of a fine-only ordinance.  The charges against him were eventually dismissed by the prosecution.  Exh. 4, affidavit.

**Response:**     Controverted, misleading, immaterial, unsupported and objectionable.  Paragraph 8 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph. The first sentence is immaterial in that plaintiffs are not challenging the propriety of Mr. Lynch's arrest, only the length of his detention.  The first sentence is also not supported by any citation to the record, as there is no evidence that CPD officers "chose" to arrest Mr. Lynch, rather than were compelled to place Mr. Lynch under arrest pursuant to the provisions D.S.O. 03-12-01. Further, it relies on the affidavit of Whitman T. Soule, which is inadmissible under Fed. R. Evid. 802 because his declaration lacks foundation and relies only on hearsay.  The statement that Mr. Lynch's "processing" occurred between when he arrived at the "police station" and when he was "given a CB number" and the statement that Mr. Lynch was "given a central booking number at 8:28 p.m. and then detained in a CPD lockup cell," are not supported by any citation to the

record. Multiple officers have testified that arrestees are not necessarily "processed," "given a central booking number" and "then detained in CPD lockup cell" in any particular order. Def. Ex. 2, Skahill Dep. at 84:9-84:20 (issuance of a CB number can occur when an arrestee is in a cell or before the arrestee is placed in a cell); Def. Ex. 3, Sodini 8/22/05 Dep. at 60:16-21, 61:9-14 (same). Multiple officers have also testified that "processing" is not completed when an arrestee is "given a central booking number" or "detained in a CPD lockup cell." Def. Ex. 4, Defendants' Answers and Objections to Plaintiffs Twelfth (Thirteenth) Set of Interrogatories at ¶ 2; Def. Ex. 5, Defendant City of Chicago's Amended Answers and Objections to Plaintiffs' Interrogatories at ¶ 14; Def. Ex. 6, Sodini 10/29/03 Dep. at 56:7-66:14 (describing steps of processing arrestee under departmental control, including numerous steps in processing after the arrestee is given a CB number); Def. Ex. 7, Miceli Dep. at 54:22-55:4 (describing the steps in processing an arrestee); Pls. Ex. 16, G.O. 92-05; Pls. Ex. 17, G.O. 02-03. The statement that the "charges" against Mr. Lynch were "eventually dismissed" is unsupported, as the record only identifies whether cases were "non-suited" by an administrative law judge.

9. Defendants have offered no testimony or documented explanation for Mr. Lynch's 5.5-hour detention after he was processed and issued a CB number. Exh. N, Bay dep., at 6:5-16; Exh. D, Kehoe dep., at 63:12-19; Group Exh. 18, defendants' responses concerning named plaintiffs; Exh. 20, defendants' answers and objections to plaintiffs' seventh set of interrogatories.

**Response:** Move to strike this paragraph as argumentative in violation of LR 56.1. Controverted, misleading, unsupported and objectionable. The statement that defendants have "offered no testimony or documented explanation" for the length of Mr. Lynch's detention is argumentative and a legal conclusion as to what constitutes "testimony" or a "documented explanation," and has no place in a Local Rule 56.1 statement, and should therefore be stricken. Plaintiffs' statement that Mr. Lynch was detained for 5.5 hours "after he was processed and issued a CB number" is unsupported by any citation to the record, as plaintiffs have provided no evidence of when Mr. Lynch's processing was completed. Plaintiffs' Ex. N does not contain

page 6 and therefore any reliance on it for any fact, let alone one the non-movant controverts (as

stated below), is improper.  Plaintiffs' Ex. D only establishes the deponent's lack of knowledge

regarding Mr. Lynch's detention and therefore any inference that this constitutes a lack of

"explanation" would require an improper inference against the non-movant.  Defendants have

offered both testimony and documentation explaining the length of Mr. Lynch's detention after

he was issued a CB number.  Def. Ex. 8, Defendants' Answers and Objections to Plaintiffs'

Third Supplemental Interrogatories at 4 (explanations listed in ¶ 33 of Defendants' Additional

Material Facts *infra*)   Multiple officers have testified that arrestees, like Mr. Lynch, are not fully

"processed" at the time they are given a CB number, and therefore, the fact that Mr. Lynch was

held in police custody for 5.5 hours after he was given a CB number is not evidence that he was

held in police custody for 5.5 hours after he was "processed."  Def. Ex. 4, Defendants' Answers

and Objections to Plaintiffs' Twelfth (Thirteenth) Set of Interrogatories at ¶ 2; Def. Ex. 5,

Defendant City of Chicago's Amended Answers and Objections to Plaintiffs' Interrogatories at ¶

30; Def. Ex. 6, Sodini 10/29/03 Dep. at 56:7-66:14 (describing steps of processing arrestee under

departmental control, including numerous steps in processing after the arrestee is given a CB

number); Def. Ex. 7, Miceli Dep. at 54:22-55:4 (describing the steps in processing an arrestee);

Pls. Ex. 16, G.O. 92-05; Pls. Ex. 17, G.O. 02-03.

       10.    On February 27, 2002, the City of Chicago charged plaintiff Madric E. Lance
with violating a municipal ordinance by soliciting donations for his church on the CTA in
violation of §98-126-12 of the CTA rules, pursuant to §10-8-526 of the Chicago municipal code.
Violations of this ordinance are punishable only by a fine.  Exh. 7, ordinance.

**Response:**      Unsupported, immaterial, misleading and objectionable.  Further, ¶ 10 violates

Local Rule 56.1 by including multiple statements of fact within the same paragraph.

Unsupported in that none of plaintiffs' exhibits contains § 98-126-12 or any provision regarding

the potential punishment for violating such section or for soliciting donations for his "church" on

the CTA in violation of a municipal ordinance.  Immaterial in that plaintiffs are not challenging

the propriety of Mr. Lance's arrest, only the length of his detention. Misleading in that

plaintiffs' implication in the second sentence that individuals arrested for violation of municipal

ordinances that are punishable by fine only should not be detained or placed in a jail cell during

processing has been specifically rejected by the United States Supreme Court. *See Atwater v.*

*City of Lago Vista*, 532 U.S. 318 (2001).

11.     As with Mr. Portis and Mr. Lynch, CPD officers chose to arrest Mr. Lance rather
than ticket him. Exh. 8, Lance arrest report. Mr. Lance was arrested at approximately 1:00 p.m.
and then transported to the sixth district police station, processed, given a CB number at 2:36
p.m. (Exh. 4, affidavit), and then detained in a CPD lockup cell (Exh. 8, Lance arrest report).
He was not released until 5:15 a.m. the next morning. *Id.* Accordingly, he spent more than 16
hours in custody (14.5 hours after he was issued a CB number) due to the alleged violation of a
fine only ordinance. Exh. 7, ordinance. The charges against him were eventually dismissed by
the prosecution. Exh. 4, affidavit.

**Response:**     Controverted, misleading, immaterial, unsupported and objectionable. Paragraph

11 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph.

The first sentence is controverted, as the officer arresting Mr. Lance testified that Mr. Lance was

arrested because he did not meet the criteria to qualify for a ticket. Def. Ex 9, Smith Dep. at

13:9-11. The first sentence is also immaterial in that plaintiffs are not challenging the propriety

of Mr. Lance's arrest, only the length of his detention. The first sentence is also not supported

by any citation to the record, as there is no evidence that CPD officers "chose" to arrest Mr.

Lance, rather than were compelled to place Mr. Lance under arrest pursuant to the provisions

D.S.O. 03-12-01. Further it relies on the affidavit of Whitman T. Soule, which is inadmissible

under Fed. R. Evid. 802 because his declaration lacks foundation and relies only on hearsay. The

statement that Mr. Lance's "processing" occurred between when he "was transported to the sixth

district police station" and when he was "given a CB number," and the statement that Mr. Lance

was "given a central booking number at 2:36 p.m. and then detained in a CPD lockup cell," are

not supported by any citation to the record. Multiple officers have testified that arrestees are not

necessarily "processed," "given a central booking number" and "then detained in CPD lockup

cell" in any particular order.  Def. Ex. 2, Skahill Dep. at 84:9-84:20 (issuance of a CB number

can occur when an arrestee is in a cell or before the arrestee is placed in a cell); Def. Ex. 3,

Sodini 8/22/05 Dep. at 60:16-21, 61:9-14 (same).  Multiple officers have also testified that

"processing" is not completed when an arrestee is "given a central booking number" or "detained

in a CPD lockup cell."  Def. Ex. 4, Defendants' Answers and Objections to Plaintiffs Twelfth

(Thirteenth) Set of Interrogatories at ¶ 2;  Def. Ex. 5, Defendant City of Chicago's Amended

Answers and Objections to Plaintiffs' Interrogatories at ¶ 14; Def. Ex. 6, Sodini 10/29/03 Dep. at

56:7-66:14 (describing steps of processing arrestee under departmental control, including

numerous steps in processing after the arrestee is given a CB number); Def. Ex. 7, Miceli Dep. at

54:22-55:4 (describing the steps in processing an arrestee); Pls. Ex. 16, G.O. 92-05; Pls. Ex. 17,

G.O. 02-03.  The statement that the "charges" against Mr. Lance were "eventually dismissed" is

unsupported as the record only identifies whether cases were "non-suited" by an administrative

law judge.

       12.     Defendants have offered no testimony or documented explanation for Mr. Lance's
14.5-hour detention after he was processed and issued a CB number.  Exh. Y, Hughes dep., at
11:15-12:5; Exh. M, Mitchell dep., at 9:15-10:3; Exh. T, Johnson dep., at 39:21-23; Exh. R,
Caver-Elder dep., at 115:13-17; Exh. J, Cobb dep., at 14:12-18; Group Exh. 18, defendants'
responses concerning named plaintiffs; Exh. 20, defendants' answers and objections to plaintiffs'
seventh set of interrogatories.

**<u>Response:</u>**     Move to strike this paragraph as argumentative in violation of LR 56.1.

Controverted, misleading, unsupported and objectionable.  The statement that defendants have

"offered no testimony or documented explanation" for the length of Mr. Lance's detention is

argumentative and states a legal conclusion as to what constitutes "testimony" or a "documented

explanation."  It has no place in a Local Rule 56.1 statement, and should therefore be stricken.

Plaintiffs' statement that Mr. Lance was detained for 14.5 hours "after he was processed and

issued a CB number" is unsupported by any citation to the record, as plaintiffs have failed to

provide any evidence establishing when Mr. Lance's processing was completed.  Objectionable

in that the testimony from Pls. Exs. J, T, R, Y and M was all taken subject to objection, lacks proper foundation, and only establishes the deponent's lack of knowledge regarding this topic. Defendants have offered both testimony and documentation explaining the length of Mr. Lance's detention after he was issued a CB number.  Def. Ex. 8, Defendants' Answers and Objections to Plaintiffs' Third Supplemental Interrogatories at 5-6 (explanations listed in ¶ 37 of Defendants' Additional Material Facts *infra*)[9]; *see also* Def. Ex. 10, Caver-Elder Dep. at 113:2-22 (explaining that it appeared that officers were mistakenly awaiting fingerprint results from Mr. Lance, when he had not been fingerprinted); Def. Ex. 11, R. Johnson Dep. at 54:6-22 (explaining that one cause for the length of Mr. Lance's detention may have been that he was fingerprinted). Multiple officers have testified that arrestees, like Mr. Lance, are not "processed" at the time they are given a CB number, and therefore, the fact that Mr. Lance was held in police custody for 14.5 hours after he was given a CB number is not evidence that he was held in police custody for 14.5 hours after he was "processed."  Def. Ex. 4, Defendants' Answers and Objections to Plaintiffs Twelfth (Thirteenth) Set of Interrogatories at ¶ 2; Def. Ex. 5, Defendant City of Chicago's Amended Answers and Objections to Plaintiffs' Interrogatories at ¶ 30; Def. Ex. 6, Sodini 10/29/03 Dep. at 56:7-66:14 (describing steps of processing arrestee under departmental control, including numerous steps in processing after the arrestee is given a CB number); Def. Ex. 7, Miceli Dep. at 54:22-55:4 (describing the steps in processing an arrestee); Pls. Ex. 16, G.O. 92-05; Pls. Ex. 17, G.O. 02-03.

13.    Each of the named plaintiffs was eligible for, and each was eventually released pursuant to a personal recognizance bond ("I-bond").  Group Exh. 9, I-bonds.

---

[9] Defendants subsequently informed plaintiffs that they had determined after further investigation that the bomb threat, identified as one of the possible reasons for the length of Mr. Lance's detention in subpart (c) of its Answers and Objections to Plaintiffs' Third Supplemental Interrogatories, did not in fact contribute to the length of his detention.

**Response:**     Unsupported and objectionable.  Plaintiffs' Group Ex. 9 is unauthenticated.  There

is no citation to the record establishing that Mr. Lynch received an I-Bond and thus any finding

based on this exhibit would require that impermissible inferences be made against the non-

movant.  While it is not controverted that Mr. Lance and Mr. Portis were at some point

determined to be eligible for, and subsequently released on, an I-Bond, there is no evidence

supporting at what point this occurred.

> 14.     The named plaintiffs represent a class of:
>
>> all persons who, from May 1, 2000 through September 3, 2004,
>> were arrested on ordinance violations which carry no jail time in
>> the City of Chicago and who were detained for more than two
>> hours after all administrative steps incident to the arrest, except
>> non-discretionary ministerial acts, were completed.  The class is
>> further limited to those persons who (1) were not fingerprinted by
>> defendants after being brought into custody; and (2) were eligible
>> for release on personal recognizance bond pursuant to Rule 553(d)
>> of the Illinois Supreme Court.

Order, Dkt. No. 380; Dkt. No. 378-1, at 4.

**Response:**     Controverted and objectionable.  The City disputes that this class action should

have been certified (*see* Dkt. No. 95), disputes that two hours has any constitutional significance

and disputes that plaintiffs' characterization of administrative steps has any legal basis.

Paragraph 14 states a legal conclusion as to whether the named plaintiffs "represent" the class

certified in this lawsuit.

> 15.     Illinois Supreme Court Rule 528 sets the amount of bail for persons charged with
> fine-only ordinance violations.  Exh. 10, S.Ct.R. 528.

**Response:**     Immaterial and irrelevant because there is no allegation concerning bail in this

lawsuit.

> 16.     Illinois Supreme Court Rule 553(d) further provides that:
>
>> Persons arrested for or charged with an offense covered by Rules
>> 526, 527 and 528 who are unable to secure release from custody
>> under these rules may be released by giving individual bond (in the

> amount required by this article) by those law enforcement officers designated by name or office by the chief judge of the circuit, except when the accused is (1) unable or unwilling to establish his identity or submit to being fingerprinted as required by law, (2) is charged with an offense punishable by imprisonment and will pose a danger to any person or to the community, or (3) elects release on separate bail under Rule 503(a)(3) or 503(a)(4). Persons required to deposit both bail and driver's license under Rule 526(e) may be released on $1,000 individual bond and their current Illinois driver's license. If authorized by the chief judge of the circuit, individual bonds under this paragraph (d) may be executed by signing the citation or complaint agreeing to comply with its conditions.

Exh. 11, S.Ct.R. 553(d).

**Response:**      Immaterial and irrelevant. To the extent plaintiffs purport to allege a violation of this rule to support their § 1983 claims, "the violation of … a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established."

*Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006).

17.    For all law enforcement agencies in Cook County (including the CPD), the Chief Judge of the Cook County Circuit Court has authorized inter alia "[a]ny police officer or watch commander designated by the commanding officer of a police department of any village, city, town or other municipality" to issue I-bonds. Exh. 12, Cook County Circuit GO No. 8 ("Pretrial Release").

**Response:**      Immaterial and objectionable. Incomplete in violation of Fed. R. Evid. 106 in that it does not provide the complete language of the county general order, which actually provides that these individuals "may release on bail any persons arrested or charged with violations where bail has been preset under Supreme Court Rules 526, 527 and 528 and may be released from custody on cash bail or Individual Recognizance in the amount required by that article." Pls. Ex. 12, Cook County Circuit G.O. 8. To the extent plaintiffs purport to allege a violation of this rule to support their § 1983 claims, "the violation of … a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006).

18.     Under S.Ct.R. 553(d), the only requirement for a person "arrested for or charged with" a fine-only ordinance violation to receive an I-bond is that the person must be able to establish his identity or submit to being fingerprinted.  Exh. 11, S.Ct.R. 553(d).

**Response:**     Controverted, immaterial and unsupported.  Ill. S. Ct. R. 553(d) addresses all the

offenses "covered by 526, 527, and 528" and the plaintiffs have made no effort to prove or

explain what constitutes a "fine-only ordinance violation" that would entitle one to an I-bond.

Ill. S. Ct. R. 553(d) also states that the person must also be "unable to secure release from

custody under these rules," but the plaintiffs make no effort to show what factual scenario would

satisfy this provision.  To the extent plaintiffs purport to allege a violation of this rule to support

their § 1983 claims, "the violation of … a state law is completely immaterial as to the question of

whether a violation of the federal constitution has been established."  *Thompson v. City of*

*Chicago*, 472 F.3d 444, 454 (7th Cir. 2006).

19.     Prior to the commencement of the class period, the superintendent of police, the highest-ranking official of the CPD, issued DSO 94-09, entitled "Bond Procedures." That order provides that CPD watch commanders "will" issue I-bonds to persons arrested for fine-only ordinance violations "after concluding on the basis of available information that the offender has established identity and is not wanted on an outstanding warrant." Exh. 13, DSO 94-09, at §V.

**Response:**     Unsupported, incomplete, misleading and objectionable.  Paragraph 19 violates

Local Rule 56.1 by including multiple statements of fact within the same paragraph.  Paragraph

19 is also incomplete in violation of Fed. R. Evid. 106 in that it does not provide the complete

language of the D.S.O. 94-09 at § V(A), which states "the watch commander will, as soon as

reasonably possible, authorize the release of such person [charged with a non-felony offense who

cannot post bond]."  Misleading in that plaintiffs have not even attempted to show what

constitutes "as soon as reasonably possible" or what scenario would be unreasonable; and to the

extent plaintiffs suggest that the superintendent of police is the City's policymaker, Seventh

Circuit precedent holds that he is not.  *See Auriemma v. Rice*, 957 F.2d 397, 400-401 (7th Cir.

1992) (establishing that the Superintendent of Police in Chicago is not the final policy maker to

establish municipal liability because he has "no power to countermand the statutes regulating the operation of the department"); *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993) (noting City's error in conceding prematurely, in light of *Auriemma*, that the Superintendent of Police is responsible for formulating City policy regarding treatment of suspects).

20.     All class members were eligible for release on an I-bond.  Order, docket no. 380; docket no. 378-1, at 4; Exh. 11, S.Ct. Rule 553(d); Exh. S, McMahon dep. II, at 116-17.

**Response:**     Unsupported, misleading and objectionable.  States a legal conclusion and not a statement of fact.  Plaintiffs' Ex. S only shows the deponents' knowledge regarding whether or not I-bonds issue and in what circumstances they might not, and does not support any contention regarding the class members.  Misleading and unsupported to the extent the plaintiffs assert any facts regarding "all class members," as plaintiffs have cited no evidence to support this statement.

21.     Upon being arrested and searched, arrestees are brought to the police station, searched a second time, and then taken to a processing area where an arresting officer prepares portions of two forms: (a) a two-page arrest report; and (b) a one-page court complaint form.  Exh. 16, GO 92-05, at §IV.D.2; Exh. 17, GO 02-03, at §IV.A.2; Exh. B, Sodini dep., at 56:22-2, 57:9, 58:19.

**Response:**     Controverted, misleading, unsupported and objectionable.  Nothing in the cited evidence indicates that these procedures occur in the order described in all arrests, let alone the arrests of the class members, and any application to all arrests requires an impermissible inference to be made against the non-movant.  Nothing in the cited provisions of Pls. Exs. 16 or 17 identifies the number of pages of paperwork an arresting officer must prepare.  In Pls. Ex. B, the deponent testifies only to the procedures he can personally remember from memory, Pls. Ex. B at 56:11-15.  Incomplete in violation of Fed. R. Evid. 106; while defendants do not dispute that Commander Sodini testified that those steps listed above take place, he also testified that additionally, an arresting officer may be required to:  (a) complete a case report; (b) complete a felony minute sheet in cases where an ordinance violator is arrested with someone else who is

charged with a felony; (c) take a complete inventory of the arrestees' personal property or

evidence; and (d) involve follow-up investigators, detectives, or notify various specialized units.

Pls. Ex. B at 57:8-12, 58:5-18, 115:21-116:6. Misleading in that it fails to take into account what

else is going on in the police station or with the arrestee that may require additional tasks for the

arresting officer to perform. Multiple officers have testified that the "second search" taking

place inside a police station is generally more thorough than the initial search, based on the

ability to do a better search in the controlled environment of the police station. Def. Ex. 12,

Cobb Dep. at 21:2-24; Def. Ex. 13, Coleman Dep. at 61:14-62:20.

 22.     The arresting officer completes the arrest report by filling in biographical
information about the arrestee, a narrative describing the offense, and a listing of the legal
citation(s) with which the arrestee is charged. Exh. 17, GO 02-03, §§IV.A.2, 3; Exh. 16, GO 92-
05, §IV.D.2. A copy of the arrest report with the portions completed by the arresting officer
(boxes 1-5, 7-46, 59-61) highlighted, is attached as Exh. 14.

**Response:**     Controverted, misleading, unsupported and objectionable. None of these citations

offers adequate authentication of Pls. Ex. 14, and it also contains inadmissible hearsay.

Unsupported and misleading in that nothing in the cited evidence indicates that these procedures

occur in all arrests, let alone the arrests of the class members, and any application to all arrests

requires an impermissible inference to be made against the non-movant. Nothing in the cited

provisions of Pls. Exs. 16 or 17 identifies the portions of an arrest report an arresting officer

must prepare. The highlighted portions of the arrest report in Pls. Ex. 14 that plaintiffs allege

constitute those portions of the arrest report completed by the arresting officer include numerous

additional categories of information beyond the biographical information about the arrestee, a

narrative describing the offense, and a listing of the legal citations with which the arrestee is

charged.

 23.     The complaint form lists the legal elements of the offense on the arrest report.
Exh. A, Sodini dep. III, at 74:12-75:13. A copy of the complaint form is attached as Group Exh.
15 (complaints for the three named plaintiffs Portis, Lynch, and Lance).

**Response:**     Controverted in that it is misleading, unsupported, and objectionable.  Plaintiffs'

Ex. 15 is unauthenticated and contains inadmissible hearsay.  Misleading in giving the

impression that the legal elements of an offense are already present on a blank complaint form.

The testimony relied on in Pls. Ex. A was taken subject to objection and lacks proper foundation.

Incomplete in violation of Fed. R. Evid. 106, as the complaint form also includes other

categories of information to be obtained, including:  (1) biographical information about the

arrestee; (2) information about the incident causing the arrest; and (3) information about the

arrestee's condition.  Pls. Ex. 15.

24.     The arresting officer is responsible for performing a name check on the arrestee to
confirm the arrestee's identity and to check if there are any outstanding warrants for the person or
if s/he is otherwise wanted in connection with a crime (the "name/warrant check").  Exh. B,
Sodini dep., at 72:19-73:13; Exh. D, Kehoe dep., at 28:10-29:22, 32:23-33:6; Exh. C, Richmond
dep., at 58:13-60:21; Exh. 16, GO 92-05, §IV.B.1; Exh. 17, GO 02-03, §IV.A.4.1

**Response:**     Misleading, unsupported, and objectionable.  Uncontroverted to the extent that the

General Orders provide that one of the many responsibilities of an arresting officer is to perform

a name check.  Unsupported and misleading in that nothing in the cited evidence indicates that it

was the arresting officer, and not another CPD member, who performed all of these procedures

in all arrests, let alone in all the arrests of the class members, and any application to all arrests

requires an impermissible inference to be made against the non-movant.  Further misleading in

giving the impression that the arresting officer is the only person responsible for confirming the

arrestee's identity.  Pls. Ex. 17, G.O. 02-03-07C at 5 (describing role of desk sergeants and watch

commanders in identification).  All of the deposition testimony cited in support of the statement

was taken subject to objection and lacks proper foundation as to what happened during the

specific arrests of all class members.  Incomplete in violation of Fed. R. Evid. 106 because it

fails to include obstacles to performing a name check, such as when the arrestee has no form of

identification and refuses or is unwilling to provide a name.  Def. Ex. 2, Skahill Dep. at 141:15-

22; Def. Ex. 14, Greene 9/26/06 Dep. at 75:7-12 ("John Jones comes in and identified himself as

John Jones and there are 50 John Joneses that come up on the screen and maybe its Ray Jones.

So there may be multiple checks through the same system as one begins to challenge the offered

identity of the person who comes in.").

> 25. The name/warrant check is performed by entering the arrestee's name and/or other identifying information into a terminal that can access the CPD's "hot desk" system. Exh. E, Maris dep. at 51:1-19; Exh. F, Perfetti dep., at 18:20, 24:9-17. The hot desk is linked to three computer systems: the CPD's CHRIS system, the Law Enforcement Agency Data System ("LEADS"), and the National Crime Information Center system ("NCIC"). Exh. E, Maris dep., at 61:19-62:1; Exh. F, Perfetti dep., at 25:22-26:23. The CHRIS system contains criminal history information and information about warrants issued by the CPD. Exh. E, Maris dep., at 9:22-10:8. LEADS is a statewide system that contains warrant information and is not controlled by the CPD. *Id.*, at 16:20-17:2. NCIC is a nationwide system that contains warrant information and is not controlled by the CPD. *Id.*, at 60:16-19.

**Response:**      Controverted, unsupported, misleading and objectionable. Mr. Maris testified that

the CPD's CHRIS system is a separate system consisting of a different software interface than

the hot desk system. Def. Ex. 15, Maris Dep. at 57:18-58:5, 58:21-59:1, 59:21-60:1. He also

testified that officers would run a name/warrant check only on the hot desk system, and not on

the CHRIS system. Def. Ex. 15, Maris Dep. at 37:21-38:9. Paragraph 25 violates Local Rule

56.1 by including multiple statements of fact within the same paragraph.

> 26. The "hot desk" system can be accessed by terminals in police cars (called "portable data terminals") (Exh. E, Maris dep., at 141:14-19; Exh. X, Obuchowski dep. II, at 114:1-8, 114:9-115:2); by terminals in CPD police stations (Exh. E, Maris dep., at 137:12-20); and by terminals in the field inquiry section of the CPD's records division (*id.*, at 142:10-143:1; Exh. F, Perfetti dep., at 9:9-17, 24). The arresting officers can perform the check by accessing the terminals on their own or, if the terminals are down or unavailable, by telephoning the records division or by radio dispatch to the office of emergency communications. Exh. F, Perfetti dep., at 13:15-17:19; Exh. G, Obuchowski dep., at 15:19-17:4; Exh. B, Sodini dep., at 75.

**Response:**      Controverted, unsupported, misleading and objectionable. Multiple CPD

employees testified that the "portable data terminals" are not available in all cars and are unable

to access all of the same information as those terminals in the stationhouse. Def. Ex. 12, Cobb

Dep. at 16:11-23; Def. Ex. 16, Kehoe Dep. at 34:19-35:5; Def. Ex. 15, Maris Dep. at 135:22-24.

Paragraph 26 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph.

27.     All name/warrant checks for individuals arrested for fine-only ordinance violations were performed on the hot desk in the police car (Exh. D, Kehoe dep., at 34:19-23) or the police station, with two exceptions: first, if the hot desk computer in the police station was down, the arresting officer can call the records department of the CPD and ask them to do a check, or could radio dispatch the office of emergency communications. Second, prior to June 7, 2002, it was the practice to send by telefax a white copy of the arrest report to the field inquiry section to perform a name/warrant check. See ¶¶56-62, infra. Exh. F, Perfetti dep., at 46:10-47:11; Exh. G, Obuchowski dep., at 15:19-17:4. Calls to the records department occur very rarely (Exh. F, Perfetti dep., at 16:4-10), and radio dispatches normally produce a response in "less than a minute" (Exh. G, Obuchowski dep., at 17:3-4).

**Response:**     Controverted, unsupported, misleading and objectionable. Joseph Perfetti, the Manager of the Field Services Section of the Records Division for CPD, testified that the response time for inquiries to the Field Inquiry Division "varies" and could take up to 50 minutes or longer depending on the variables. Def. Ex. 17, Perfetti Dep. at 19:14-20:20. Incomplete in violation of Fed. R. Evid. 106 because it fails to include obstacles to performing a name check, such as when the arrestee has no form of identification and refuses or is unwilling to provide a name. Def. Ex. 2, Skahill Dep. at 141:15-22; Def. Ex. 14 Greene 9/26/06 Dep. at 75:7-12 ("John Jones comes in and identified himself as John Jones and there are 50 John Joneses that come up on the screen and maybe its Ray Jones. So there may be multiple checks through the same system as one begins to challenge the offered identity of the person who comes in."). Paragraph 27 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph. Objectionable in referencing other paragraphs in a Rule 56.1 statement as evidence in the record that supports this statement is as misleading as it is improper (*see* N.D. Ill. L.R. 56.1; *see also* the improper nature of ¶¶ 56-62, infra). The deposition testimony cited in Pls. Ex. D does not, in any way, establish what happened for "all" name/warrant checks for individuals arrested for fine-only ordinance violations. The testimony in Pls. Ex. D at 34:19-23 merely states that some name/warrant checks "can be done in the field." *Id.* at 23. The deposition testimony contained in

Pls. Exs. F and G does not contain any proper foundation as to what happens "rarely" and "normally."

28.     If an arrestee has no identification and/or if the arrestee has identification but the arresting officer is still unsure of the arrestee's identity, the arresting officer can confirm the arrestee's identity through the CHRIS and CHRIS Warehouse systems (or by the ICAM system) by pulling up pictures of prior arrests as well as identifying information such as scars, complexion, height, weight, etc. Exh. E, Maris dep., at 58:13-59:1; Exh. 17, GO 02-03, at §IV.c.12. Moreover, if an arrestee is unable to be satisfactorily identified, the watch commander can order that the arrestee be fingerprinted. See ¶¶42-43.

**Response:**     Controverted in part, unsupported, misleading and objectionable.  The last sentence of ¶ 28 is not controverted.  Multiple CPD officers testified that the ICAM system does not "pull up" pictures of arrestees in order to help confirm their identities.  Def. Ex. 18, Bay Dep. at 18:14-19:10; Def. Ex. 6, Sodini 10/29/03 Dep. at 73:23-74:2 ("the ICAM system would never suffice in conducting a name check").  Multiple witnesses have also testified that arrestees can provide incorrect names, aliases, and other identifying information, and plaintiffs provide no evidence that these systems are able to confirm the identities of arrestees who do so.  Def. Ex. 2, Skahill Dep. 141:15-22; Def. Ex. 25, Greene 10/24/06 Dep. at 93:21-94:4.  Paragraph 28 also violates Local Rule 56.1 by including multiple statements of fact within the same paragraph. Objectionable in referencing other paragraphs in a Rule 56.1 statement as evidence in the record that supports this statement is as misleading as it is improper (*see* N.D. Ill. L.R. 56.1; *see also* the improper nature of ¶¶ 42-43, infra).  Further, the evidence cited from Pls. Exs. E and 17 does not directly support plaintiffs' assertion that an arresting officer "can" indeed confirm the arrestee's identity through the CHRIS and CHRIS Warehouse systems.

29.     Once the arresting officer is satisfied that the arrestee is properly identified and that there are no outstanding warrants, the arresting officer generally indicates in the narrative section of the arrest report that the name check is "clear." Exh. H, Malinowski dep., at 21-22; Exh. C, Richmond dep., at 58:13-60:21; Exh. I, Miceli dep., at 37, 86.

**Response:**     Controverted, unsupported, misleading and objectionable.  Deputy Chief Francis Kehoe testified that the indication in the narrative section that a name check is "clear" could be

entered at any time while an arrestee is in custody, and does not necessarily occur "once the arresting officer is satisfied that the arrestee is properly identified and that there are no outstanding warrants." Def. Ex. 16, Kehoe Dep. at 31:4-10. The deposition testimony cited in Pls. Ex. H lacks proper foundation, and is explicitly limited to the deponent's personal experience. The deposition testimony cited in Pls. Ex. I was taken subject to objection, lacks proper foundation, and, in fact, the deponent states "you are asking me to draw conclusions I can't draw" when asked the general application of the deponent's cited testimony to "everybody," Pls. Ex. C at 86:19-21; and thus the deposition testimony does not support the plaintiffs' assertion as to what "generally" occurs.

30.     It is the responsibility of the arresting officer to ensure that "there is a valid basis for charges placed" (Exh. 16, GO 92-05, at §IV.D.1; GO 02-03, at §IV.A.1) and that the arrestee is not charged until a name check has been completed. Exh. B, Sodini dep., at 76:17-21; Exh. D, Kehoe dep., at 41; Exh. 17, GO 02-03, §IV.A.4.

**Response:**     Objectionable and misleading. Paragraph 30 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph and the deposition testimony cited lacks proper foundation in the record. Misleading in giving the impression that the arresting officer is the only person responsible for confirming the arrestee's identity. Pls. Ex. 17, G.O. 02-03-07C at 5 (describing role of desk sergeants and watch commanders in identification). Incomplete in violation of Fed. R. Evid. 106 because it fails to refer to the remainder of G.O. 02-03, § IV.B and § IV.C showing that watch commanders and desk sergeants have responsibilities in these areas as well. *See* Pls. Ex. 17, G.O. 02-03, § IV.B, § IV.C; Def. Ex. 2, Skahill Dep. at 143:9-19 (describing role of other officers in determining that arrestee sufficiently identified); Def. Ex. 3, Sodini 8/22/05 Dep. at 140:8-14 (same). Uncontroverted that the General Orders provide that one of the many responsibilities of an arresting officer is to ensure these things take place.

31.     If the arresting officer is satisfied with the identification and the absence of any warrant, s/he could issue a ticket and release the arrestee.  Exh. D, Kehoe dep., at 46; Group Exh. 3 (GO 99-02, at §IV.A).

**Response:**     Controverted, misleading, unsupported and objectionable.  CPD officers have testified that there is no procedure by which a ticket could be issued to an individual after an custodial arrest has already taken place.  Def. Ex. 9, Smith Dep. at 51:11-20.  The deposition testimony in Pls. Ex. D was taken subject to objection, lacks proper foundation, and calls for a legal conclusion.  Incomplete in violation of Fed. R. Evid. 106 as it relies on Pls. Ex. D, in that Deputy Chief Kehoe testified that he "suppose[d]" this procedure could take place "if all the other conditions for a citation were met."  *See* Pls. Ex. D at 46.  Unsupported in that Pls. Ex. 3 does not support the statement that officers have any authority under the CPD's general orders to issue a ticket *after* executing a custodial arrest and any application of the cited evidence to a class member, if any, requires an impermissible inference to be made against the non-movant.  Further disputed in that there is no provision within the general orders for processing persons under departmental control which would warrant issuing a ticket to an individual already arrested and taken into custody.  *See generally* Pls. Exs. 16 and 17.  Additionally, Deputy Chief Kehoe later testified in his deposition that no police officer had the authority to issue a ticket and release the arrestee if the arrestee were awaiting final approval of charges from the watch commander.  Def. Ex. 16, Kehoe Dep. at 168:3-169:1.

32.     After the arresting officer has completed the pertinent portions of the arrest report (boxes 1-5, 7-46, and 59-61) and the complaint (Exh. 14, arrest report; Exh. 15, complaint form) and has verified the arrestee's identity and completed the warrant check (Exh. 17, GO 02-03, at §IV.A.4), the arresting officer presents the arrest report and the complaint to the desk sergeant for review and signature.  Exh. 16, GO 92-05, at §IV.D.5; Exh. 17, GO 02-03, at §IV.A.8; Exh. B, Sodini dep., at 58:19-59:13, 109:19-24; Exh. J, Cobb dep., at 25:9-26:5; Exh. N, Bay dep., at 12:16-14:19; Exh. G, Obuchowski dep., at 12:1-17:12.

**Response:**     Controverted, unsupported, misleading and objectionable.  Multiple officers have testified that the arrestee's identity or the absence of any warrants has not necessarily been

verified at the time the arrest report is brought to the desk sergeant. Def. Ex. 3, Sodini 8/22/05 Dep. at 103:13-16; Def. Ex. 6, Sodini 10/29/03 Dep. at 67:8-16; Def. Ex. 19, Wedster 9/20/05 Dep. at 129:20-130:6; Def. Ex. 10, Caver-Elder Dep. at 65:7-14. Multiple officers have also testified that many of these tasks performed by the arresting officer may not be completed until after he has handed control of the arrestee over to lockup personnel. Def. Ex. 18, Bay Dep. at 57:24-58:8 (completion of criminal complaints and "plethora of other documents" may be taken care of after arrestee is placed in lockup); Def. Ex. 3, Sodini 8/22/05 Dep. at 71:19-23 (criminal complaint form may be completed after the issuance of a CB number); Def. Ex. 9, Smith Dep. at 24:8-12 (in effort to "expedite," name check may be performed after the desk officer has clerked the arrest report). None of these citations adequately authenticates either of Pls. Exs. 14 and 15, and both contain inadmissible hearsay. The deposition testimony cited was taken subject to objection and lacks proper foundation. Unsupported and misleading in that nothing in the cited evidence indicates that these procedures always occur in the order described with respect to all arrests, let alone the class members' arrests, and any application of the cited evidence to establish the statement requires impermissible inferences to be made against the non-movant.

33. As a part of this review, the desk sergeant is required to check: (a) that the name check has been performed; (b) that the court complaint and arrest report are properly completed and the case assigned to the proper court; (c) that the court complaint is properly sworn to by the arresting officer and witnessed by a member of the police department (generally a sergeant) sworn as a deputy clerk of the circuit court; and (d) that the legal citation for the alleged offense(s) in the signed complaint is on all copies of the arrest report. Exh. 16, GO 92-05, §§IV.B.1-6; Exh. 17, GO 02-03, §§IV.C.1-3; Exh. C, Richmond dep., at 60:3-21; Exh. B, Sodini dep., at 58:19-59:13; 103:13-104:21.

**Response:**     Objectionable in that the deposition testimony cited was taken subject to objection, and lacks proper foundation. Otherwise not controverted to the extent it accurately quotes the general orders, but unsupported and misleading because nothing in the cited evidence indicates when these procedures occur or in what order they occur in all arrests, let alone in all

the arrests of the class members, and any application to all arrests requires an impermissible inference to be made against the non-movant.

34.     According to the CPDs GOs, "charging" is defined as "the formal recording on an arrest report . . .of the citation of offenses alleged in signed complaint." Exh. 16, GO 92-05, §II.F; Exh. 17, GO 02-03, §III.F.

**Response:**     Misleading and unsupported.  Plaintiffs' Ex. 17, G.O. 02-03, § III.F does not define "charging."  Plaintiffs inaccurately quote Pls. Ex. 16, G.O. 92-05, § II.F, which actually defines "charging" as "the formal recording on an Arrest Report (CPD-11.420) of the legal citation of offenses alleged in signed complaints." Pls. Ex. 16, G.O. 92-05, § II.F.  Otherwise not controverted to the extent it accurately quotes the general orders, but unsupported and misleading because nothing in the cited evidence indicates when "charging" occurs with respect to other processing steps in all arrests, let alone in all the arrests of the class members, and any application to all arrests requires an impermissible inference to be made against the non-movant.

35.     According to GO 02-03, §IV.C.11, the desk sergeant is also responsible for ensur[ing] that "criminal complaints are prepared when charges are upgraded." However, municipal ordinance violations are not subject to upgrading.  Exh. L, Sodini dep. II, at 30:6-11; 69:17-70:11; Exh. D, Kehoe dep., at 130:19-131:8; Exh. S, McMahon dep. II, at 103:10-21. Therefore, the only circumstance that would necessitate an upgrade or change in the charge(s) would be if a name check reveals an outstanding warrant for another crime.  Exh. A, Sodini dep. III, at 126:13-127:14; Exh. C, Richmond dep., at 70:5-24; Exh. J, Cobb dep., 81:24-82:3.

**Response:**     Controverted, misleading, unsupported and objectionable.  Multiple CPD officers have testified that new charges can be brought against fine-only ordinance violators after their initial arrests for a variety of reasons.  Def. Ex. 12, Cobb Dep. at 111:15-112:11; Def. Ex. 13, Coleman Dep. at 106:3-9, 120:1-10; Def. Ex. 3, Sodini 8/22/05 Dep. at 126:13-127:14; Def. Ex. 6, Sodini 10/29/03 Dep. at 143:10-144:9; Def. Ex. 19, Wedster 9/20/05 Dep. at 131:11-132:5. States a legal conclusion as to whether municipal ordinance violations are subject to upgrading and not a statement of fact.  Paragraph 35 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph.  The deposition testimony cited was taken subject

to objection and lacks proper foundation. The cited testimony in Pls. Ex. L only refers to charges "upgradeable to felonies," and thus does not support the proposition that municipal ordinance violations are not subject to upgrading. Pls. Ex. L p. 30:10-11. The cited testimony in Pls. Ex. D does not mention the word "upgradeable," let alone define the term's application to this case, and thus does not support the proposition that municipal ordinance violations are not subject to upgrading. The citation to Pls. Ex. S is incomplete in violation of Fed. R. Evid. 106 in that the answer to plaintiffs' counsel's question "so nothing could change in the charge of that individual" is not submitted to Court, Pls. Ex. S p. 103:24. Unsupported in that the exhibits cited do not support the statement regarding "the only circumstance that would necessitate an upgrade or change in the charge(s)." Plaintiffs' statement is also disputed by the law itself, which provides that false statements made on an I-Bond application, if discovered prior to issuing the I-bond, could constitute a felony. *See* 720 ILCS § 540 (making false statement constitutes perjury or subornation of perjury); 720 ILCS § 5/32-2 (perjury a class 3 felony); and 720 ILCS § 5/32-3 (subornation of perjury a class 4 felony).

36. The name check for each named plaintiff did not reveal any warrants. Docket no. 44, defendants' answer and affirmative defenses to second amended complaint, at 15, ¶46; 12, ¶36, 8,¶25.

**Response:** Unsupported and misleading. The cited material only shows that it was determined "prior to [each named plaintiff's] release" that he was "not wanted for any outstanding warrants." (Dkt. Nos. 44 at 15, ¶ 46; *id.* at 12, ¶ 36, *id.* at 8,¶ 25). The cited material does not demonstrate that only one name check was performed during the processing of each named plaintiff, nor does it demonstrate that warrants were not initially revealed during the named plaintiffs' processing, and any request for such a finding requires an impermissible inference to be made against the non-movant.

37. After the desk sergeant has confirmed that the arrest report and the complaint have been completely filled out, the desk sergeant or any sergeant deputized as a clerk of the

Circuit Court of Cook County witnesses the arresting officer sign the affirmation statement on the complaint and signs the arrest report in the box captioned "deputy clerk's signature." This process is known as "clerking" the arrest report and the complaint.  Exh. 16, GO 92-05, §IV.B; Exh. 17, GO 02-03, §IV.C; Exh. B, Sodini dep., at 58:19-59:13; Exhs. 1, 5, 8, and 15, arrest reports and complaint.

**Response:**      Objectionable, unsupported and misleading.  None of these citations offers

adequate authentication of Pls. Ex. 15, and it also contains inadmissible hearsay.  None of the

deposition testimony contains the word "clerking."  Otherwise not controverted to the extent it

accurately quotes the general orders, but unsupported and misleading because nothing in the

citations to the record indicates that these procedures occur in the order described in all arrests,

let alone in all the arrests of the class members, and any application of this testimony to establish

"clerking" or what occurred during all arrests requires an impermissible inference to be made

against the non-movant.

38.      The arresting officer then takes the arrest report and the complaint to the watch commander.  Exh. B, Sodini dep., at 59:14-16; 102:19-103:4; Exh. G, Obuchowski dep., at 17:9-12, 19:2-8.

**Response:**      Unsupported and misleading.  The deposition testimony cited at p. 102:19-103:4

of Pls. Ex. B was taken subject to objection, and lacks proper foundation.  Unsupported and

misleading in that nothing in the citations to the record indicates that these procedures occur in

the order described in all arrests, let alone in the arrests of the class members, and thus any

application of this testimony as to what occurred during all arrests, let alone the class members'

arrests, requires an impermissible inference to be made against the non-movant.

39.      The watch commander is responsible for confirming that the arrestee has been adequately identified and that there are no outstanding warrants.  Exh. B, Sodini dep., at 146:3-5; Exh. H, Malinowski dep., at 24:22-25; Exh. K, McMahon dep., at 46:18-47:6.

**Response:**      Unsupported and misleading.  The deposition testimony cited at Pls. Ex. B at

146:3-5 refers to determining whether or not to fingerprint an individual, and indicates that the

watch commander could make that determination to fingerprint, before, at, or after the time the

watch commander reviews the arrest report for probable cause. The deposition testimony cited at Pls. Ex. K, at 46:18-47:6 actually provides that the watch commander has the responsibility to review the arrest report "to make sure everything was correctly prepared by the arresting officer," and that, among those tasks is for the watch commander to ensure, "to the best of his ability," that the arrestee has been properly identified, and thus to establish the statement would require impermissible inferences be made against the non-movant. Otherwise uncontroverted to the extent it is consistent with the language of the general orders.

40.     Prior to September 3, 2004, the policy of the CPD was that "fingerprints need not be taken of persons arrested for violations of city ordinances punishable by fine only." Exh. 16, GO 92-05, §VII.A.2.a; Exh. 17, GO 02-03-07, §II.A; Exh. L, Sodini dep. II, at 27; Exh. A, Sodini dep. III, at 31:9-32:22. All other adult arrestees (other than those who will not be charged and certain traffic offenders under Chapter 625 ILCS) are fingerprinted. Exh. A, Sodini dep. III, at 33:23-35:21; Exh. 17, GO 02-03-07, §II.B.

**Response:**     Controverted in that it is objectionable, misleading and unsupported. Paragraph 40 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph. Unsupported because the deposition testimony relied upon was taken subject to objection, lacks proper foundation, and the citations are misleading in that the deponent first answered he "wasn't sure," Pls. Ex. A p. 34:6, and answered questions explicitly without the above clarifications as to who was or was not fingerprinted. *Id.* at 35:1-7. Misleading and incomplete in violation of Fed. R. Evid. 106, as Pls. Exs. 16 and 17 further provide that "an arresting officer may request that the watch commander in charge of the detention facility authorize fingerprinting of an arrestee by articulating sufficient cause to justify the request." Pls. Ex. 16 G.O. 92-05, §VII.A.2.a; Pls. Ex. 17, G.O. 02-03-07; *see also* Def. Ex. 20, Garrity 7/29/05 Dep. at 13:17-14:5 (noting that this language must be read in conjunction with the other language). Unsupported in that the citations to the record do not demonstrate that "all other adult arrestees" (other than the exceptions identified by plaintiffs) were actually fingerprinted prior to September 3, 2004, and thus to establish the statement would require an impermissible inference be made against the non-

movant. The first sentence of ¶ 40 is otherwise uncontroverted to the extent it is consistent with the language of the general orders.

41. Since September 3, 2004, all persons arrested for city ordinance violations are fingerprinted. Exh. 17, GO 02-03-07.C.

**Response:** Immaterial and unsupported. Immaterial because the class period ends prior to September 3, 2004. *See* Dkt. No. 380. Unsupported because the exhibit cited does not demonstrate that all persons arrested for city ordinance violations since September 3, 2004 were actually fingerprinted, and thus to establish the statement would require an impermissible inference be made against the non-movant.

42. Prior to September 3, 2004, if the watch commander was not satisfied that the persons arrested for fine-only ordinance violations were sufficiently identified, he could order that the arrestee be fingerprinted. Exh. B, Sodini dep., at 145-46; Exh. L, Sodini dep. II, at 29-30, 48-49; Exh. S, McMahon dep. II, at 69:2-6; Exh. 16, GO 92-05, §VII.A.2; Exh. 17, GO 02-03-07, §II. Most fine-only ordinance violators were not fingerprinted. Exh. 21, DiPrete expert report, at Appendix B.

**Response:** Objectionable, misleading and unsupported. Paragraph 42 violates Local Rule 56.1 by including multiple statements of fact within the same paragraph. The first sentence of ¶ 42 is not controverted to the extent it is consistent with the language of the general orders. The second sentence is objectionable, misleading and unsupported. Plaintiffs' Ex. 21 is the unsworn expert report of Dr. Thomas DiPrete, which is not admissible evidence and should not be considered.[10] All of the deposition testimony cited was taken subject to objection, lacks proper foundation, and thus cannot not adequately support the plaintiffs' statement. Unsupported in that Pls. Ex. 21 does not define "most" in the context of this statement, and thus any inference as to what constitutes "most" that could be made against the non-movant would be impermissible.

---

[10] Unsworn expert reports are not admissible in support of summary judgment motions under Fed. R. Civ. P. 56(e). *See Loeffel Steel Products Inc. v. Delta Brands Inc.*, 379 F.Supp.2d 968, 984 (N.D.Ill. 2005) citing *Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir, 1996). Consequently, each time that the City points out that one of plaintiffs' facts is based on an unsworn expert report, the City respectfully requests that this Court either strike or disregard that fact in ruling on plaintiffs' summary judgment motion.

Misleading in that Pls. Ex. 21 also fails take into account those fine-only ordinance violators who were fingerprinted, and, based on those fingerprint results, were found to have an outstanding warrant.

43.    The watch commander's decision to fingerprint an individual arrested for a nonjailable ordinance offense was based on whether the watch commander was satisfied that the arrestee was identified, and this determination was based on the information contained in the arrest report and any information provided from the arresting officer, including whether the arrestee possessed identification and/or had identification confirmed through computer checks and verifications.  Exh. L, Sodini dep. II, at 40, 49.

**Response:**    Controverted, objectionable, misleading and unsupported.  CPD watch commanders have testified that a watch commander's decision to fingerprint an individual arrested for an ordinance violation also rested on whether the arrestee had been deceptive in his statements, or whether there was an unusual circumstance regarding the arrest, such that the arrestee tried to flee, conceal themselves, or destroy evidence.  Def. Ex. 18, Bay Dep. at 52:9-22. The deposition testimony relied upon in Pls. Ex. L lacks proper foundation and is outside the scope of the deponent's knowledge.  The citation to Pls. Ex. L is incomplete in violation of Fed. R. Evid. 106 in that it does not provide the deponent's entire answer, where he repeatedly indicates that the factors impacting the decision to fingerprint changed on a "case by case basis." Unsupported and misleading in that nothing in the citations to the record indicates that a watch commander's decision to fingerprint was based on these facts in all cases where fingerprints were ordered, and any application to all such occasions requires an impermissible inference to be made against the non-movant.

44.    None of the named plaintiffs and none of the class members were fingerprinted. Order, docket no. 380; docket no. 378-1, at 4; Exh. M, Mitchell dep., at 65:4-5; Exh. N, Bay dep., at 54:23-55:8; Exh. I, Miceli dep., at 34:2-4.

**Response:**    Objectionable and misleading.  It is uncontroverted that the class definition excludes individuals who were fingerprinted.  This paragraph, however, is unsupported as Dkt. No. 378-1 is nothing more than the plaintiffs' pleading, which does not constitute evidence and

Dkt. No. 380 does not make reference to this issue at all. The deposition testimony relied upon was taken subject to objection, lacks proper foundation, and in each circumstance the deponent stated the question was outside the scope of their personal knowledge. Plaintiffs' Ex. I at 34:2-4 does not even address the issue of fingerprinting, but rather the location of 18th District.

45. The watch commander can also order that the arrestee be fingerprinted, but "waive the results of the fingerprint check" (i.e., the arrestee is not to be detained until the results are returned) and the arrestee is considered "charged" when the decision to waive is made. Exh. 17, GO 02-03, at 6.

**Response:** Controverted in part as objectionable and misleading and immaterial. Incomplete in violation of Fed. R. Evid. 106 because it fails to note that Pls. Ex. 17 at 02-03, addendum 03, provides the grounds necessary for a watch commander to waive the results of the fingerprint check. Pls. Ex. 17, G.O. 02-03-03 at 1-2 (indicating that arrestee must: (1) not have been arrested for an offense that is, or can be upgraded, to a felony, or voluntarily surrendered on a misdemeanor warrant; (2) be ready to post bond; (3) possess sufficient personal identification; and (4) not be wanted on another offense or investigative alert). Otherwise uncontroverted to the extent it is consistent with the language of the general orders.

46. In addition to assuring the adequacy of the identification, the watch commander also confirms that the name check revealed no warrants for the arrestee, and that there is probable cause in that the charges are appropriate based on the narrative on the arrest report. Exh. B, Sodini dep., at 112:14-19; Exh. L, Sodini dep. II, at 59:14-60:5; Exh. D, Kehoe dep., at 63-64; Exh. 17, GO 02-03, at §IV.B.3.

**Response:** Controverted, unsupported, objectionable, and misleading. Multiple officers have testified that at the time the watch commander confirms that probable cause exists, the name check has not necessarily confirmed the absence of any warrants for the arrestee. Def. Ex. 3, Sodini 8/22/05 Dep. at 103:13-16; Def. Ex. 6, Sodini 10/29/03 Dep. at 67:8-16; Def. Ex. 19, Wedster 9/20/05 Dep. at 129:20-130:6; Def. Ex. 10, Caver-Elder Dep. at 65:7-14. Further, watch commanders have testified that the watch commander confirms that there is probable cause based not only on the narrative in the arrest report, but on additional pieces of information

in the report, and possibly information from other documents. Def. Ex. 18, Bay Dep. at 42:17-43:1, 47:3-4. Unsupported in that the portion of the transcript cited in Pls. Ex. B is nothing more than an objection made by the City. The deposition testimony cited in Pls. Exs. L and D was taken subject to objection, lacks proper foundation, is outside the scope of the deponents' personal knowledge, or does not directly support the plaintiffs' statement. Unsupported and misleading in that nothing in the citations to the record indicates that these procedures always occur in the order described with respect to the all arrests, and any application of the cited evidence to establish the statement requires impermissible inferences to be made against the non-movant.

47.     The watch commander then signs the box number 47 on the arrest report, entitled "initial approval of probable cause." Exh. 16, GO 92-05, §VII.C.1; Exh. 17, GO 02-03, §§IV.B.1-3 and IV.A.3; Exh. B, Sodini dep., at 146 ; Exh. O, Garrity dep., at 57; Exh. K, McMahon dep., at 46-47, 65-66; Exh. H, Malinowski dep., at 25; Exh. D, Kehoe dep., at 63:20-64:2.

**Response:**     Controverted, unsupported, objectionable, and misleading. Multiple officers have testified that it is not necessary that the watch commander has confirmed that the name check revealed no warrants for the arrestee prior to approving probable cause. Def. Ex. 3, Sodini 8/22/05 Dep. at 103:13-16; Def. Ex. 6, Sodini 10/29/03 Dep. at 67:8-16; Def. Ex. 19, Wedster 9/20/05 Dep. at 129:20-130:6; Def. Ex. 10, Caver-Elder Dep. at 65:7-14. The deposition testimony cited in Pls. Ex. B is incomplete in violation of Fed. R. Evid. 106 in that it does not provide the previous testimony, which states the watch commander could sign the box "at that time, it could be after that time, it could be before that time." Pls. Ex. B at 146:2-4. Further, the deposition testimony in Pls. Ex. B and was taken subject to objection and lacks proper foundation. The deposition testimony in Pls. Ex. O lacks proper foundation and does not support the plaintiffs' statement. The deposition testimony in Pls. Ex. K lacks proper foundation, was taken subject to objection, and makes no mention of signing any box on the arrest report. The

deposition testimony in Pls. Ex. H lacks proper foundation, was taken subject to objection, and makes no mention of signing any box on the arrest report. The deposition testimony cited in Pls. Ex. D lacks proper foundation, was taken subject to objection as to establishing a particular time frame, and makes no mention of signing any box on the arrest report. Unsupported and misleading in that nothing in the citations to the record indicates that these procedures always occur in the order described with respect to all arrests, and any application to all arrests requires an impermissible inference to be made against the non-movant.

48.     At the initial determination of probable cause, the arrestee has been charged. Exh. D, Kehoe dep., at 175; see ¶¶30, 33-37; Exh. Q, Griffin dep., at 79:15-17.

**Response:**     Unsupported, objectionable and misleading. States a legal conclusion as to when an arrestee is deemed charged. The deposition testimony cited in Pls. Ex. D lacks proper foundation, was taken subject to objection as to what the deponent actually testified to, and does not support the statement because the deponent testified only as to what the term "charged" meant as the term was used in G.O. 02-03. *See* Pls. Ex. D at 175:5-6. The deposition testimony cited in Pls. Ex. Q lacks proper foundation and does not support the statement because the deponent testified only as to what happened at the "old 18th District" and so any inferences as to what happened in other instances that would be made against the non-movant would be impermissible. Nothing in the citations to the record indicates that these procedures always occur in the order described with respect to all arrests, and any application to all arrests requires an impermissible inference to be made against the non-movant.

49.     The watch commander then returns all copies of the arrest report and the complaint to the arresting officer (Exh. B, Sodini dep., at 59:14-60:5) and the officer takes the arrestee (and the arrest reports) to lockup to be booked, and returns to the street. Exh. B, Sodini dep., at 105; Exh. X, Obuchowski dep. II, at 52:6-55:20; Exh. Y, Hughes dep., at 30:7-14.

**Response:**     Unsupported, objectionable and misleading. Unsupported and misleading in that nothing in the citations to the record indicates that these procedures always occur in the order

described with respect to all arrests, let alone the class members' arrests, and any application to

all arrests requires an impermissible inference to be made against the non-movant.  The

deposition testimony cited in Pls. Ex. B lacks proper foundation, is outside the scope of the

deponent's knowledge at to what actually happened with respect to the plaintiffs' actual arrests,

and was taken subject to objection as to what the deponent actually testified to (Pls. Ex. B at

57:19-21, 105:22-24).  The deposition testimony cited in Pls. Ex. X does not contain pages 52

through 55 and therefore any reliance on it for any fact is improper.  The deposition testimony

cited in Pls. Ex. Y lacks proper foundation and is explicitly limited to his personal knowledge,

and thus to establish this statement would require impermissible inferences be made against the

non-movant.

50.     The watch commander could authorize the arresting officer to issue a ticket for
class members at the time the probable cause determination is made, and release them.  Exh. S,
McMahon dep. II, at 83; Exh. D, Kehoe dep., at 70-71.

**<u>Response:</u>**     Controverted, unsupported, objectionable, misleading, and argumentative.  This

statement blatantly mischaracterizes the deponents' testimony and is incomplete in violation of

Fed. R. Evid. 106 in that the deposition testimony cited in Pls. Exs. D and S actually shows that

the deponents testified that they had "never heard" of the circumstances described in this

statement ever happening.  Pls. Ex. S at 83:17-18; Pls. Ex. D at 70:11-12.  Multiple officers

(including Deputy Chief Kehoe, whose testimony plaintiffs cite in Pls. Ex. D) testified that the

watch commander has no authority to order the issuance of a ticket once a custodial arrest has

been made.  Def. Ex. 19, Wedster 9/20/05 Dep. at 101:15-22; Def. Ex. 16, Kehoe Dep. at 77:22-

78:10, 168:3-169:1; Def. Ex. 20, Garrity 7/29/05 Dep. at 63:22-64:22.  According to one CPD

watch commander, in order for a watch commander to authorize the arresting officer to issue a

ticket for class members at the time the probable cause determination is made, the watch

commander would have to re-investigate what the arresting officer did in order to determine that

the arrestee did not meet the criteria under General Order 03-12-01 to receive a ticket in the first place, which is neither provided for by the general orders, nor is practical for a watch commander to perform given the scope of his duties.  Def. Ex. 18, Bay Dep. at 173:20-175:3; Def. Ex. 1, D.S.O. 03-12-01.  Further disputed in that there is no provision within the general orders for processing persons under departmental control which would warrant issuing a ticket to an individual already arrested and taken into custody.  *See generally* Pls. Exs. 16 and 17.  The deposition testimony cited both Pls. Exs. S and D was taken subject to objection and lacks foundation.  Unsupported and misleading in that nothing in the citations to the record indicates that these procedures could or did occur during any of the class members' particular detentions.

51.    Even though the watch commander has approved the adequacy of the identification, confirmed the absence of warrants, and confirmed that the narrative supports the charges, s/he does not initial the "final approval of charges" box on the arrest report or authorize the I-bond at that time.  Exh. A, Sodini dep. III, at 110:10-114:13; Exh. D, Kehoe dep., at 73:23-74:13; Exh. W, Wedster dep., at 40:16-19, 42:2-45:13; 100:21-103:11.

**<u>Response:</u>**    Controverted, unsupported, objectionable, and misleading.  Multiple deponents testified that at the time the watch commander confirms that probable cause exists, the name check has not necessarily confirmed the absence of any warrants for the arrestee.  Def. Ex. 3, Sodini 8/22/05 Dep. at 103:13-16; Def. Ex. 6, Sodini 10/29/03 Dep. at 67:8-16; Def. Ex. 19, Wedster 9/20/05 Dep. at 129:20-130:6; Def. Ex. 10, Caver-Elder Dep. at 65:7-14; Def. Ex. 14, Greene 9/26/06 Dep. at 167:11-15.  Multiple witnesses also testified that there are additional steps (such as completion of case reports, inventorying of evidence, and completion of the bonding documents) which must take place between the initial approval of probable cause and the final approval of charges that prevent the watch commander from making those determinations at the same time.  Def. Ex. 3, Sodini 8/22/05 Dep. at 113:11-114:23; Def. Ex. 19, Wedster 9/20/05 Dep. at 84:6-14.  Under the CPD General Orders, an arrestee cannot be made eligible for bond until he is both booked and charged, neither of which has occurred under the

scenario detailed in ¶ 51.  Def. Ex. 6, Sodini 10/29/03 Dep. at 69:11-70:1; Def. Ex. 16, Kehoe

Dep. at 74:6-13 (at the time of the initial approval of probable cause an arrestee is "not eligible

for bond at that point"); Pls. Ex. 17, G.O. 02-03 at 2 ("arrested persons will be booked, charged

and made eligible for bond in that order").  The deposition testimony cited to in Ex. A was taken

subject to numerous objections, is speculative, lacks proper foundation, does not directly support

the statement, and is incomplete in violation of Fed. R. Evid. 106 because plaintiffs' counsel asks

"for a few clarifications" without providing what those clarifications ended up clarifying. *See*

Pls. Ex. A at 114:14-24.  The deposition testimony in Pls. Ex. D was likewise taken subject to

numerous objections, is speculative, lacks proper foundation, and does not directly support the

statement.  The deposition testimony cited in Pls. Ex. W was taken subject to objection, lacks

proper foundation, and violates Fed. R. Evid. 106 in that the deponent testified that she "did not

understand" the question, Pls. Ex. W at 40:22-23, and because Pls. Ex. W does not contain pages

43-45 or 100.  Unsupported and misleading in that nothing in the cited material indicates that

these procedures always occur in the order described with respect to all arrests, let alone the class

members' arrests, and any application to all arrests requires an impermissible inference to be

made against the non-movant.

     52.     Rather, almost all arrestees, even those who will not be fingerprinted, must be
taken to lockup, issued a CB number, and placed into a jail cell.  Exh. A, Sodini dep. III, at 60:2-
61:14; Exh. D, Kehoe dep., at 76:8-14; Exh. W, Wedster dep., at 41-46, 101-03.

**Response:**     Controverted, unsupported, and objectionable.  While the City does not dispute

that the general orders provide that these procedures take place for adult arrestees, multiple

officers have testified that the sequence of these events varies from arrest to arrest.  Def. Ex. 2,

Skahill Dep. at 84:9-84:20 (issuance of a CB number can occur when an arrestee is in a cell or

before the arrestee is placed in a cell); Def. Ex. 3, Sodini 8/22/05 Dep. at 60:16-21, 61:9-14

(same); Def. Ex. 21, Sodini 4/21/05 Dep. at 58:1-7, 63:9-64:8 (decision to fingerprint an arrestee

could be made after that arrestee is placed in a jail cell); Def. Ex. 16, Kehoe Dep. at 65:11-18 (same); Def. Ex. 22, Bradshaw Dep. at 45:1-17 (identification of arrestees who are not being fingerprinted has not necessarily been established at the time they are taken to lockup); Def. Ex. 23, Garrity 10/23/02 Dep. at 73:15-74:12 (same). The deposition testimony cited in Pls. Exs. A, D, and W was taken subject to objection, lacks proper foundation, and is outside the scope of the deponents' personal knowledge as to what happens to "almost all arrestees." The deposition testimony cited in Pls. Ex. W does not contain pages 41 or 43-45.

53. One exception is for women arrestees held in a police district that lacks a female lockup. Exh. 16, GO 92-05, §V.B; Exh. 17, GO 02-03-01, §IV. For these arrestees, the CPD obtains a CB number generated by a computer and furnishes the I-bond without placing the arrestees into lockup. Exh. 16, GO 92-05, §V.B.a.1; Exh. 17, GO 02-03. See also Exh. 17, GO 02-03-03, §III.B.I.

**Response:**     Controverted, unsupported, objectionable, and misleading. Incomplete in violation of Fed. R. Evid. 106 because Pls. Ex. 16, G.O. 92-05, §V.B and Pls. Ex. 17, G.O. 02-03-01, §IV actually provide that if "after a reasonable amount of time, the [female] arrestee cannot be let to bail or the number of arrestees being detained in the desk area presents an imminent danger or is disruptive to the police personnel assigned to desk duties, the watch commander will arrange for a transfer to the designated female detention facility." Pls. Ex. 16, G.O. 92-05, §V.B.2; Pls. Ex. 17, G.O. 02-03-01, §IV.A.2. Multiple officers testified that women arrested in police districts lacking a female lockup are generally transported to districts with female lockups for normal processing, as opposed to the procedures plaintiffs suggest. Def. Ex. 12, Cobb Dep. at 69:15-23; Def. Ex. 24, McMahon 8/2/05 Dep. at 29:3-30:4; Def. Ex. 20, Garrity 7/29/05 Dep. at 55:6-11. CPD officers have also testified that for those women who are held in a police district that lacks a female lockup and not transported to a district with a female lockup, those females are still detained in a secure area, such as a holding cell, located in the desk area. Def. Ex. 3, Sodini 8/22/05 Dep. at 51:22-52:4. Paragraph 53 also violates Local Rule

56.1 by including multiple statements of fact within the same paragraph. Unsupported and misleading because there is no cited material that provides what happens or happened with respect to how the CPD obtains or obtained a CB number or an I-bond when dealing with "these arrestees," and thus it would require an impermissible inference be made against the non-movant.

54.     Women class members who were brought to police districts without a lockup facility for women were released 1.5 hours more quickly than women class members brought to police districts that had female lockup facilities.

**Response:**     Controverted in that it is unsupported, objectionable, and misleading. Paragraph 54 is not supported by *any* citation to the record, let alone evidence that could (and would) be disputed.

55.     A second exception is individuals arrested for certain moving violations for traffic offenses under Chapter 625 ILCS who, pursuant to the city's GOs, are generally not to be placed in lockup prior to issuance of their bonds. Group Exh. 8 (GO 99-12-05, §§III.B and C; DSO 04-17-05, §§III.B and C); Exh. X, Obuchowski dep. II, at 155:8-156:16.

**Response:**     Unsupported, misleading, objectionable and immaterial. Unsupported in that Pls. Ex. 8 contains none of the sections indicated by the statement. The deposition testimony cited in Pls. Ex. X lacks proper foundation, is outside the scope of the deponent's knowledge as to what happens or happened to "individuals arrested for certain moving violations" and as to what happens "generally" with respect to the procedures of their arrests. *See* Pls. Ex. X at 156:13-16. Thus to establish the statement requires an impermissible inference be made against the non-movant. Immaterial in that none of the individuals arrested for traffic offenses under Chapter 625 ILCS are members of the class.

56.     After being placed into lockup, most arrestees, particularly those arrested before June 7, 2002, underwent one or more additional name checks.

**Response:**     Unsupported in that paragraph 56 is not supported by *any* citation to evidence in the record.

57.     Those who will be fingerprinted are checked against a national database called AFIS.  Exh. F, Perfetti dep., at 10:5-10.  The AFIS system uses a unique identification number for each person in the fingerprint database.  At the time of the check, the AFIS system takes a digital scan of the arrestee's fingerprints.  The AFIS system reports if the person's fingerprints are contained in the AFIS database and, if so, whether there are any outstanding warrants associated with the person.

**Response:**     Unsupported, objectionable and immaterial.  Immaterial because it is

uncontroverted that the class definition excludes individuals who were fingerprinted.  *See* Dkt.

No. 380.  The deposition testimony cited in support of the first sentence was taken subject to

objection, lacks proper foundation, and is outside the scope of the deponent's personal

knowledge as to who the question refers to as "those who will be fingerprinted."  The remaining

portion of this statement is not supported by any record citation, let alone evidence that could

(and would) be disputed.

58.     For persons who will be fingerprinted, a white copy of the arrest report was sent to the identification section of the permanent records division.  Exh. 16, GO 92-05, §VII.B.2. The identification section is responsible for all fingerprinting.  Exh. F, Perfetti dep., at 9:12-19.

**Response:**     Controverted, unsupported, objectionable, misleading and immaterial.  CPD

personnel testified that lockup personnel in the stationhouse, rather than officers in the

identification section, are responsible for fingerprinting arrestees.  Def. Ex. 18, Bay Dep. 70:21-

22; Def. Ex. 20, Garrity 7/29/05 Dep. at 28:3-8.  Immaterial because it is uncontroverted that the

class definition excludes individuals who were fingerprinted.  *See* Dkt. No. 380.  The deposition

testimony cited in Pls. Ex. F lacks proper foundation, does not directly support the statement, and

therefore requires an impermissible inference be made against the non-movant.

59.     Prior to June 7, 2002, for ordinance arrestees who were not to be fingerprinted (i.e., the members of our class), the only required name check that was performed while they are being detained in lockup after a CB number has been issued was a second name check against the hot desk, performed at the field inquiry section of the permanent records division.  Exh. 16, GO 92-05, §VII.B.2.

**Response:**     Controverted, unsupported and misleading.  CPD officers have testified that name

checks are required to be conducted until the point where either:  (1) the arrestee's identity had

been sufficiently established or (2) the watch commander ordered that the arrestee be fingerprinted. Def. Ex. 7, Miceli Dep. at 87:19-24; Def. Ex. 3, Sodini 8/22/05 Dep. at 137:17-22 ("the policy is to ensure [the arrestee's identity] and the practice is to do that by taking all reasonable measures, all substantial - all significant steps we can. Constantly doing [name] checks as repeatedly and as often as possible in that process to accomplish that goal."). Unsupported because ¶ 59 does not define "hot desk" or cite to evidence to establish what such a term means in the context of this statement. The material cited does not directly support the assertion that the second name check described was "the only required name check that was performed while [the arrestees] are being detained in lockup," and therefore requires an impermissible inference be made against the non-movant.

60. To perform this second name check on class members, the biographical information from the arrest report (i.e., the same document created by the arresting officer who obtained the first hot desk name check) was transmitted to the field inquiry section after the arrestee was placed in lockup. Exh. 16, GO 92-05, §VII.B.2; Exh. B, Sodini dep., at 79.

**Response:**    Unsupported and misleading. Unsupported because ¶ 60 does not define "hot desk" nor cite to evidence to establish what such a term means in the context of this statement. Unsupported and misleading in that nothing in the cited material indicates that these procedures occurred in the order described with respect to the all arrests, let alone the class members' arrests, and any application to all arrests requires an impermissible inference to be made against the non-movant.

61. The field inquiry section then ran this information through the same hot desk system used by the arresting officer when s/he performed the name check. Exh. F, Perfetti dep., at 24:9-17. Accordingly, if the inquiry section personnel enter the same identifying information from the arrest report that was entered in the first hot desk name check, they will receive the exact same information back from the system. Exh. F, Perfetti dep., at 24:18-22; Exh. E, Maris dep., at 142:10-143:1. The only information that the inquiry section had was the white copy of the arrest report. Exh. F, Perfetti dep., at 24:23-25:8.

**Response:**    Controverted, unsupported, objectionable, and misleading. Multiple witnesses testified that name checks performed by the identification section may be based on new or

different information than the initial name checks.  Def. Ex. 2, Skahill Dep. at 142:1-8; Def. Ex. 14, Greene 9/26/06 Dep. at 75:7-12 ("John Jones comes in and identified himself as John Jones and there are 50 John Joneses that come up on the screen and maybe its Ray Jones.  So there may be multiple checks through the same system as one begins to challenge the offered identity of the person who comes in."); Def. Ex. 25, Greene 10/24/06 Dep. at 68:5-11 ("[s]omebody gives you a name, you run the name, they spell the name differently, your boss looks at it and says 'no you typed it wrong, I want you to type it again.'  There are reasons why people may go back to the same database is what I am suggesting.").  Unsupported and misleading in that nothing in the cited material indicates that these procedures occurred in the order described with respect to the all arrests, let alone the class members' arrests, and any application to all arrests requires an impermissible inference to be made against the non-movant.  Unsupported because ¶ 61 does not define "hot desk" system as such term is used in this statement nor does it indicate what system or method was used "by the arresting officer" with respect to a particular plaintiff.  The deposition testimony cited in Pls. Ex. F lacks proper foundation, does not directly support the statement, and is outside the scope of the deponent's personal knowledge regarding what constituted the "only information" the inquiry section possessed with respect to the arrests in question.  The deposition testimony cited in Pls. Ex. E was taken subject to objection, lacks proper foundation, and is outside the scope of the deponent's personal knowledge.

62.    The records division contacted the police station with the name check results only if the results are positive, i.e., a warrant is found.  If the results of that name check were negative, that fact was not communicated back to the station, no matter how quickly it was learned. Exh. F, Perfetti dep., at 25:9-19.

**<u>Response:</u>**    Unsupported, objectionable and misleading.  Unsupported and misleading in that nothing in the cited evidence indicates that these procedures occurred in the order described with respect to all arrests, let alone the class members' arrests, and any application to all arrests requires an impermissible inference to be made against the non-movant.  The deposition

testimony cited in Pls. Ex. F lacks proper foundation, does not directly support the statement, and is outside the scope of the deponent's personal knowledge with respect to what happened with respect to the arrests in question.

63.     Accordingly, the police station waited for 45 minutes after the white copy of the arrest report was sent to the field inquiry section and, if nothing was sent back in that time, it was presumed that the check was negative. See Exh. 16, GO 92-05, §VII.B.3.

**Response:**     Controverted, unsupported and misleading.  According to the testimony of 12th District Commander, in certain situations, the district station may wait beyond the 45 minutes after the faxing of the arrest report to the field inquiry section prior to presuming that the warrant check was negative.  Def. Ex. 6, Sodini 10/29/03 Dep. at 85:24-87:2.  Unsupported and misleading in that nothing in the cited material indicates that these procedures always occur in the order described with respect to all arrests, let alone the class members' arrests, and any application to all arrests requires an impermissible inference to be made against the non-movant. The statement is misleading in that it does not indicate the method of contacting, who at the police station was or would have been contacted, or which "station" the statement refers to.

64.     The 45-minute waiting period could be waived. Exh. 16, GO 92-05, at §VII.B.3.

**Response:**     Incomplete in violation of Fed. R. Evid. 106 because Pls. Ex. 16, G.O. 92-05 §VII.B.3 actually provides that the waiting period may only be waived "if the name check has been completed on the district land-based computer terminal and he returns clear of any warrants, stops, etc."  *See* Pls. Ex. 16, G.O. 92-05 §VII.B.3.

65.     For class members (i.e., persons arrested for fine-only ordinance violations who are not fingerprinted), any name/warrant checks performed after the class member had been placed in lockup were based on the information contained on the arrest report that was used for the initial name check, were performed on a computer terminal that accessed the same hot desk system, and would produce the same output as the name/warrant check conducted by the arresting officer. Exh. E, Maris dep., at 51:1-19, 142:10-143:1; Exh. F, Perfetti dep., at 24:18-22.

**Response:**     Controverted, unsupported, objectionable and misleading.  Multiple witnesses testified that name checks performed after an arrestee is placed in lockup may be based on new

or different information than the initial name checks.  Def. Ex. 2, Skahill Dep. at 142:1-8; Def.

Ex. 14, Greene 9/26/06 Dep. at 75:7-12 ("John Jones comes in and identified himself as John

Jones and there are 50 John Joneses that come up on the screen and maybe its Ray Jones.  So

there may be multiple checks through the same system as one begins to challenge the offered

identity of the person who comes in."); Def. Ex. 25, Greene 10/24/06 Dep. at 68:5-11

("[s]omebody gives you a name, you run the name, they spell the name differently, your boss

looks at it and says 'no you typed it wrong, I want you to type it again.'  There are reasons why

people may go back to the same database is what I am suggesting.").  Multiple witnesses also

testified of instances where a second name check provided a different output than the initial

name/warrant check, either in the form of additional information or the presence of a warrant that

was not revealed by the first name check.  Def. Ex. 10, Caver-Elder Dep. at 103:4-13; Def. Ex.

13, Coleman Dep. at 120:1-10; Def. Ex. 19, Wedster 9/20/05 Dep. at 131:11-132:5, 133:5-14;

Def. Ex. 25, Greene Dep. 10/24/06 at 90:2-91:22, 94:24-96:8; Def. Ex. 26, Greene Report at 7.

Unsupported and misleading in that nothing in cited material demonstrates that all name and

warrant checks of class members that took place after those class members placement in lockup

were based on the same information contained in the initial name check and would produce the

same output, and any application to all arrests requires an impermissible inference to be made

against the non-movant.  The deposition testimony cited in Pls. Ex. E was taken subject to

objection, lacks proper foundation, is outside the scope of the deponent's personal knowledge as

to what happened with "any name/warrant checks."  The deposition testimony cited in Pls. Ex. F

lacks proper foundation, does not directly support the statement, is outside the scope of the

deponent's personal knowledge with respect to what happened with "any name/warrant checks."

      66.    Chicago police officers are trained in the use of the CPD hot desk system for
making name and warrant checks (Exh. A, Sodini dep. III, at 83:14-22; Exh. N, Bay dep., at
13:21-14:4), and there is no evidence that the name check performed by the arresting officer are

unreliable, or any studies that show that subsequent name checks of class members produce new information about the arrestee. Exh. A, Sodini dep. III, at 83:14-22.

**Response:** Move to strike this paragraph as argumentative in violation of LR 56.1.

Controverted, unsupported, objectionable, and misleading. The statement that there is "no

evidence" or "studies that show" that a subsequent name check produces any "new information"

is argumentative and a legal conclusion as to what constitutes "evidence" and has no place in a

Local Rule 56.1 statement, and should therefore be stricken. Multiple witnesses testified of

instances where a second name check provided additional information or indicated the presence

of a warrant that was not revealed by the first name check. Def. Ex. 10, Caver-Elder Dep. at

103:4-13; Def. Ex. 13, Coleman Dep. at 120:1-10; Def. Ex. 19, Wedster 9/20/05 Dep. at 131:11-

132:5, 133:5-14; Def. Ex. 25, Greene 10/24/06 Dep. at 90:2-91:22; 94:24-96:8; Def. Ex. 26,

Greene Report at 7. The deposition testimony cited in Pls. Exs. A and N was taken subject to

objection, lacks proper foundation, is beyond the scope of the deponents' personal knowledge as

to what all the police officers are trained in, whether there is evidence of the unreliability of the

name checks, or the existence of any studies of subsequent name checks.

67. For class members (i.e., persons arrested for fine-only ordinance violations who are not fingerprinted), there is no documentary evidence of charges being changed or upgraded based on the second name check. Exh. L, Sodini dep. II, at 69-70; see ¶35, supra.

**Response:** Move to strike this paragraph as argumentative in violation of LR 56.1.

Controverted, unsupported, objectionable, immaterial, and misleading. The statement that there

is "no documentary evidence of charges being changed or upgraded based on a second name

check" is argumentative and a legal conclusion as to what constitutes "documentary evidence"

and has no place in a Local Rule 56.1 statement, and should therefore be stricken. Multiple

witnesses testified of instances where a second name check provided additional information or

indicated the presence of a warrant that was not revealed by the first name check. Def. Ex. 10,

Caver-Elder Dep. at 103:4-13; Def. Ex. 13, Coleman Dep. at 120:1-10; Def. Ex. 19, Wedster

9/20/05 Dep. at 131:11-132:5, 133:5-14; Def. Ex. 25, Greene 10/24/06 Dep. at 90:2-91:22; 94:24-96:8; De.f Ex. 26, Greene Report at 7. The deposition testimony cited in Pls. Ex. L was taken subject to objection, is beyond the scope of the deponent's personal knowledge as to the existence of documents, and does not directly support the statement. It is immaterial given that an individual arrested for violation of a municipal ordinance violation punishable by fine only whose charges were upgraded would, by virtue of that upgrade, fail to meet the class definition, and thus it is hardly surprising that there is no documentary evidence of class members' charges being upgraded. Objectionable in referencing other paragraphs in a Rule 56.1 statement as evidence in the record that supports this statement is as misleading as it is improper (*see* N.D. Ill. L.R. 56.1; *see also* the improper nature of ¶ 35, *supra*).

68. Defendant City of Chicago has failed to make a showing that a second name check for class members is ever necessary. See ¶¶65-67.

**Response:** Move to strike this paragraph as argumentative in violation of LR 56.1. Controverted, unsupported, objectionable, and misleading. Numerous witnesses have explained the necessity of a second name check for arrestees who will not be fingerprinted and why it is a good practice. Def. Ex. 3, Sodini 8/22/05 Dep. at 134:9-135:3, 136:14-25, 137:3-22; Def. Ex. 7, Miceli Dep. at 87:19-24; Def. Ex. 19, Wedster 9/20/05 Dep. at 131:11-132:5, 133:5-14; Def. Ex. 20, Garrity 7/29/05 Dep. at 97:3-99:8; Def. Ex. 25, Greene 10/24/06 Dep. at 67:22-68:11, 90:2-91:22; 94:24-96:8; Def. Ex. 26, Greene Report at 7. The statement that the City has "failed to make a showing that a second name check for class members is ever necessary" is argumentative and a legal conclusion as to what constitutes "a showing" that has no place in a Local Rule 56.1 statement, and should therefore be stricken. Unsupported in that it fails to cite *any* section of the record concerning what is "ever necessary" in processing of class members. Objectionable in referencing other paragraphs in a Rule 56.1 statement as "evidence" to support this statement is

as misleading as it is improper (*see* N.D. Ill. L.R. 56.1; *see also* the improper nature of ¶¶ 65-67, *supra*).

69.     Effective June 7, 2002, the CPD GOs no longer required, and CPD personnel rarely performed, a second name check at the field inquiry section of the permanent records division for arrestees who were not to be fingerprinted and, if performed, it was done after the arrestee was released. Exh. F, Perfetti dep., at 40:6-9, 40:21-41:1, 43:24-44:15, 45:19-24. Nevertheless, defendants continued to place arrestees in lockup.

**Response:**     Controverted, unsupported, objectionable, and misleading.  The deposition testimony cited in Pls. Ex. F does not directly support the statement, the testimony was given subject to objection, lacks proper foundation, is beyond the scope of the deponent's knowledge of what happened with respect to the arrests at issue, and provides no evidence of if, when, where, or why the "defendants continued to place arrestees in lockup."  Misleading to the extent that plaintiffs imply that the only valid reason to place arrestees in lockup was to perform a second name check at the field inquiry section, given that multiple witnesses have testified that there are multiple other reasons why arrestees are placed in lockup.  Def. Ex. 24, McMahon 8/2/05 Dep. at 31:23-32:10, 89:2-5 ("booking process," one part of which is where a CB number is assigned, takes place in the lockup area, and therefore entry into lockup is a necessary aspect of obtaining a CB number for arrestees who are charged); Def. Ex. 3, Sodini 8/22/05 Dep. at 113:11-114:1 (explaining reasons behind placing arrestees in lockup).

70.     All arrestees must receive a CB number. Exh. 16, GO 92-05, §IV.C.1; Exh. 17, GO 02-03, §IV.D.1. The CB number allows the records division to track all the documents associated with the arrest (e.g., the arrest report). Exh. I, Miceli dep., at 57:12-58:4.

**Response:**     Not controverted, but unsupported and objectionable.  The deposition testimony cited to in Pls. Ex. I was taken subject to objection, lacks foundation, and does not directly support the statement.

71.     For most arrestees, the CB number is assigned while they are in the lockup area prior to being placed in a cell. Exh. 16, GO 92-05, §IV.C.1; Exh. 17, GO 02-03, §IV.D.1. However, that is not a necessary aspect of receiving a CB number. Exh. A, Sodini dep. III, at 43:21-45:01, 46:4-13; Exh. S, McMahon dep. II, at 89; Exh. C, Richmond dep., at 93; Exh. 17,

GO 02-03-03, at §III.B.1. For example, women who are arrested in districts that do not have a separate lockup facility for women and who do not require fingerprinting do not go to lockup. Exh. 16, GO 92-05, §V.B.a; Exh. 17, GO 02-03-01, at §IV.A. Instead, a CB number is obtained and the booking process is completed without placing them into lockup. Exh. 16, GO 92-05, §V.B; Exh. 17, GO 02-03-01, §IV.1; Exh. A, Sodini dep. III, at 46:4-17. In addition, it is the responsibility of the watch commander to ensure that all arrestees receive a CB number, including persons arrested, not charged, and released before they were placed in lockup. Exh. 17, GO 02-03-03, §III.B.1. When an arrestee is taken to a hospital, or when lockup is very busy, CB numbers are assigned before the arrestee is received into lockup (Exh. B, Sodini dep., at 44:16-18) and CB numbers can even be obtained via a telephone call (Exh. A, Sodini dep. III, at 62:8-9; Exh. P, Serpe dep., at 61:12-22).

**Response:**      Move to strike as narrative argument in violation of Local Rule 56.1 by including

six different statements of "fact" within the same paragraph.  Controverted, unsupported,

objectionable, and misleading.  CPD watch commanders testified that the "booking process,"

which is the part of the process where a CB number is assigned, takes place in the lockup area,

and therefore entry into lockup is a necessary aspect of obtaining a CB number for arrestees who

are charged.  Def. Ex. 24, McMahon 8/2/05 Dep. at 31:23-32:10, 89:2-5.  Multiple CPD officers

testified that women arrested in police districts lacking a female lockup are generally transported

to districts with female lockups for processing.  Def. Ex. 12, Cobb Dep. at 69:15-23; Def. Ex. 24,

McMahon 8/2/05 Dep. at 29:3-30:4; Def. Ex. 20, Garrity 7/29/05 Dep. at 55:6-11.  CPD officers

have also testified that for those women who are held in a police district that lacks a female

lockup and not transported to a district with a female lockup, those females are still detained in a

secure area, such as a holding cell, located in the desk area.  Def. Ex. 3, Sodini 8/22/05 Dep. at

51:22-52:4.  Misleading and incomplete in violation of Fed. R. Evid. 106 in that, for detention

facilities without a female lockup, Pls. Ex. 16, G.O. 92-05, §V.B and Pls. Ex. 17, G.O. 02-03-01,

§IV actually provide that if "after a reasonable amount of time, the [female] arrestee cannot be

let to bail or the number of arrestees being detained in the desk area presents an imminent danger

or is disruptive to the police personnel assigned to desk duties, the watch commander will

arrange for a transfer to the designated female detention facility."  Pls. Ex. 16 at G.O. 92-05,

§V.B.2; Pls. Ex. 17 at G.O. 02-03-01, §IV.A.2. Unsupported as nothing in the cited material indicates that these procedures occur or occurred in the order described with respect to "most arrestees" and any application to all arrests requires an impermissible inference to be made against the non-movant. Unsupported as nothing in the cited testimony directly supports the "example" given with respect to "women who are arrested in districts that do not have a separate lockup facility for women." The deposition testimony cited in support of these compound statements was taken subject to objection and lacks proper foundation.

72. The CB number is issued by a "booking computer." Exh. B, Sodini dep., at 129. The booking computer is a terminal linked to the CHRIS system and programmed to issue CB numbers. Exh. E, Maris dep., at 153:15-154:2. A CB number is obtained by entering into the booking computer the arrestee's name, identifying information, and the charges as delineated in the arrest report. Exh. 17, GO 02-03-04, §III.I; Exh. P, Serpe dep., at 53; Exh. I, Miceli dep., at 69; Exh. 17, GO 02-03, §IV.D.4. The time the CB number issues is recorded automatically in the CPD's CHRIS system.

**Response:** Controverted, unsupported, objectionable, and misleading. CPD lockup keepers have testified that for individuals whose identities have not yet been established, a CB number is obtained by entering information as a "John Doe." Def. Ex. 22, Bradshaw Dep. at 46:5-15. Unsupported because the deposition testimony cited in Pls. Ex. B does not directly address the statement that the CB number is issued by a booking computer. The deposition testimony cited in Pls. Ex. E was taken subject to objection, lacks proper foundation, and is outside the scope of the deponent's personal knowledge. The deposition testimony cited in Pls. Ex. P does not directly address this statement of how a CB number is obtained. The deposition testimony cited in Pls. Ex. I was taken subject to objection, lacks foundation, and does not directly support the statement of how a CB number is obtained. The last sentence of ¶ 72 is totally unsupported by any citation to the record. Further unsupported in that plaintiffs fail to cite evidence as to what constitutes the "booking computer," the CHRIS system, and how the CB is treated by either and so the statement requires impermissible inferences to be made.

73.     After all class members (except women identified supra, at ¶53) were issued CB numbers, it was the policy of the CPD to place them in a cell even though they will not be fingerprinted. Exh. A, Sodini dep. III, at 60:2-61:14; Exh. W, Wedster dep., at 41-46, 101-03.

**Response:**     Controverted, unsupported, objectionable, and misleading.  Plaintiffs' Ex. 16, G.O. 92-05, §V.B and Pls. Ex. 17, G.O. 02-03-01, §IV provides that if "after a reasonable amount of time, the [female] arrestee cannot be let to bail or the number of arrestees being detained in the desk area presents an imminent danger or is disruptive to the police personnel assigned to desk duties, the watch commander will arrange for a transfer to the designated female detention facility."  Pls. Ex. 16 at G.O. 92-05, §V.B.2; Pls. Ex. 17 at G.O. 02-03-01, §IV.A.2. Multiple officers have testified that women arrested in police districts lacking a female lockup (as identified in  ¶ 53) are generally transported to districts with female lockups for processing. Def. Ex. 12, Cobb Dep. at 69:15-23; Def. Ex. 24, McMahon 8/2/05 Dep. at 29:3-30:4.  CPD officers have also testified that for those women who are held in a police district that lacks a female lockup and not transported to a district with a female lockup, those females are still detained in a secure area, such as a holding cell, located in the desk area.  Def. Ex. 3, Sodini 8/22/05 Dep. at 51:22-52:4.  Multiple officers have testified that the decision to fingerprint an arrestee could be made after that arrestee has been placed in a jail cell.  Def. Ex. 21, Sodini 4/21/05 Dep. at 58:1-7, 63:9-64:8; Def. Ex. 16, Kehoe Dep. at 65:11-18 (same).  Unsupported and misleading in that nothing in the cited material supports a showing as to what happened with respect to "all class members," or women, nor does it indicate that the procedures occurred in the order described with respect to "all class members."  The cited deposition testimony in Pls. Ex. A was taken subject to objection, lacks foundation, is outside the scope of the personal knowledge of the deponent as to what happened during the detention of "all class members," and directly contradicts the statement in that the deponent explicitly stated the events described in the statement may not have occurred in that order, Pls. Ex. A at 61:6-24.  The deposition testimony

cited in Pls. Ex. W does not contain pages 41 or 43-45, and therefore any reliance on it for any

fact, let alone one the non-movant controverts is improper.  Further, the testimony from the

pages of Pls. Ex. W that actually were included was taken subject to objection, lacks proper

foundation, and does not directly support the statement thus requiring an impermissible inference

be made.

74.     The lockup keeper confirms that all paperwork is complete and accepts custody of
the arrestee. Exh. M, Mitchell dep., at 31:9-23. Prior to placing an arrestee into a lockup cell,
there are a number of measures which the lockup personnel must take. Exh. 16, GO 92-05,
§IV.C; Exh. 17, GO 02-03, §IV.D.

**Response:**     Controverted that the paperwork is "complete" in every instance that the lockup

keeper accepts custody of an arrestee, as all information might not be available at that time for a

number of reasons.  CPD watch commanders have testified to this fact.  Def. Ex. 18, Bay Dep. at

57:24-58:8.  Under the CPD general orders, the tasks performed by lockup personnel must be

performed for all arrestees taken into custody, regardless of whether or not the arrestee will be

placed in a jail cell.  Def. Ex. 24, McMahon 8/2/05 Dep. at 37:1-38:8; Def. Ex. 27, G.O. 02-03-

05.  Objectionable, and misleading in that the deposition testimony cited in Pls. Ex. M was taken

subject to objection, lacks proper foundation, and is outside the scope of the deponent's personal

knowledge as to who the lockup keeper was, what they did or did not confirm, and whether they

did or did not accept custody of a particular plaintiff or class member in this case.

75.     First, the lockup personnel subject the arrestee to a custodial search (similar to the
search performed at the time of arrest and earlier at the police station) to check for weapons and
contraband. Exh. P, Serpe dep., at 91; arrest report box no. 50.

**Response:**     Controverted in part, unsupported, objectionable, and misleading.  CPD lockup

keepers have testified that the order of procedures occurring in lockup can vary.  Def. Ex. 12,

Cobb Dep. at 74:14-18.  Multiple CPD officers testified that the search performed by lockup

personnel is far more detailed and thorough than the searches performed at arrest and earlier at

the police station.  Def. Ex. 22, Bradshaw Dep. at 39:18-40:17; Def. Ex. 12, Cobb Dep. at 46:7-

24; Def. Ex. 13, Coleman Dep. at 83:21-84:8; Def. Ex. 20, Garrity 7/29/05 Dep. at 85:16-86:4. The arrest report on which this statement relies is unauthenticated and inadmissible hearsay. Unsupported and misleading in that nothing in the cited material indicates that these procedures always occur in the order described for all arrests, let alone the class members' arrests, and require the drawing of impermissible inferences. The deposition testimony cited in Pls. Ex. P was taken subject to objection, lacks foundation, and is outside the scope of the deponent's personal knowledge as to who the lockup personnel was, what type of search was conducted, and whether that search was similar to earlier searches.

76. Second, the arrestee's personal property must be seized and inventoried and a record of the property created. Exh. M, Mitchell dep., at 34, 44; Exh. A, Sodini dep. III, at 54:12-57:5. This includes safety measures such as taking shoelaces and belts from the arrestee. Exh. M, Mitchell dep., at 45:1-8. The property must also be returned before the arrestee can be released. Exh. D, Kehoe dep., at 127:17-128:11.

**Response:**     Uncontroverted that these steps are performed, but unsupported and misleading that they are performed "second" or in any particular order for each arrest. CPD lockup keepers have testified that the order of procedures occurring in lockup can vary. Def. Ex. 12, Cobb Dep. at 74:14-18. The record cited does not indicate that these procedures always occur in the order described for all arrests, let alone the class members' arrests, and to find so would require impermissible inferences. The deposition testimony cited in Pls. Ex. M was taken subject to objection, lacks foundation, and is outside the scope of the deponent's personal knowledge as to what happened or did not happen with respect to a particular plaintiff. Plaintiffs' Ex. D does not contain pages 127-28.

77. Third, the lockup personnel must ensure that the arrestee is in good physical condition and not in need of medical care and complete a health questionnaire regarding the arrestee. Exh. Q, Griffin dep., at 55:2-11. The lockup keeper's observations and interview include:

      (a)     obvious pain or injury;
      (b)     obvious signs of infection;

    (c)      appears under the influence of alcohol or drugs;

    (d)      visible signs of alcohol/drug withdrawal;

    (e)      appears to be despondent;

    (f)      appears to be irrational;

    (g)      carrying medication;

    (h)      presently taking medication;

    (i)      (if female) pregnant;

    (j)      first time arrested;

    (k)      ever tried to kill or do harm to self;

    (l)      any serious medical/mental problems; and

    (m)     currently receiving any treatment.

Exh. 14, arrest report. The lockup personnel then complete the portion of the arrest report on page two captioned "receiving screening record for arrestee to be held in lockup." Exh. A, Sodini dep. III, at 54:12-56:2.

**Response:**      Uncontroverted that these steps are performed, but unsupported and misleading that they are performed "third" or in any particular order for each arrest. CPD lockup keepers have testified that the order of procedures in lockup can vary. Def. Ex. 12, Cobb Dep. at 74:14-18. The record cited does not indicate that these procedures always occur in the order described for all arrests, let alone the class members' arrests, and to find so would require impermissible inferences. None of these citations offers adequate authentication of Pls. Ex. 14, and it also contains inadmissible hearsay. The deposition testimony cited in Pls. Ex. Q lacks proper foundation, is outside the scope of the deponent's knowledge with respect to what happened during each arrestees' detention, and does not directly address the statement. The deposition testimony cited in Pls. Ex. A was taken subject to objection, is out of the deponent's personal knowledge with respect to what happened during each plaintiff's detention, lacks foundation, and does not directly address the statement.

    78.    Fourth, the lockup personnel must permit the arrestee to make a telephone call. Exh. M, Mitchell dep., at 43.

**Response:**      Uncontroverted that these steps are performed, but unsupported and misleading that they are performed "fourth" or in any particular order for each arrest. CPD lockup keepers have testified that the order of procedures in lockup can vary. Def. Ex. 12, Cobb Dep. at 74:14-

18. The deposition testimony cited in Pls. Ex. M does not directly address the statement, lacks proper foundation, and is outside the scope of the deponent with respect to what happens or happened during the plaintiffs' detentions.

79.     Fifth, the lockup personnel must assign the arrestee to a cell and record his or her name on the "roster of persons in custody" form. Exh. P, Serpe dep., at 68; Exh. 16, GO 92-05, §§IV.D.1-8; Exh. 17, GO 02-03, §IV.6.

**Response:**     Uncontroverted that these steps are performed, but unsupported and misleading that they are performed "fifth" or in any particular order for each arrest. CPD lockup keepers have testified that the order of procedures in lockup can vary. Def. Ex. 12, Cobb Dep. at 74:14-18. The deposition testimony cited in Pls. Ex. P makes no reference whatsoever to whether lockup personnel must assign an arrestee to a cell or whether an arrestee's name would have to be placed on a "roster."

80.     After the lockup keeper has completed his tasks (i.e., searched the arrestee and inventoried any property; booked the arrestee; entered the CB number on the arrest report; and completed the interview/observation portion of page two of the arrest report), the arrestee is placed in a jail cell and the lockup keeper takes the arrest report to the front desk. Exh. B, Sodini dep., at 136; Exh. R, Caver-Elder dep., at 43; Exh. T, Johnson dep., at 37.

**Response:**     Controverted in part, unsupported, misleading and objectionable. Uncontroverted that these steps are performed, but unsupported and misleading that they are performed in any particular order for each arrest. According to 12th District Commander Ronald Sodini, the completion of the listed tasks does not necessarily indicate that the "lockup keeper has completed his tasks." Def. Ex. 6, Sodini 10/29/03 Dep. at 141:18-24. CPD lockup keepers have testified that the order of procedures in lockup can vary. Def. Ex. 12, Cobb Dep. at 74:14-18. The deposition testimony cited in Pls. Ex. B and T was taken subject to objection, lacks proper foundation, and is outside the scope of the deponent's knowledge with respect to what happens or happened during the plaintiffs' detentions. The deposition testimony cited in Pls. Ex. R lacks

proper foundation and is outside the scope of the deponent's personal knowledge with respect to what happens or happened during the plaintiffs' detentions.

81.     After the arrest report is returned to the front desk by the lockup keeper, the desk sergeant's duties include making sure that (a) the arrest report is presented to the watch commander for "final approval" of charges and approval of bond; and (b) the bond is prepared. Exh. B, Sodini dep., at 167; Exh. I, Miceli dep., at 85; Exh. T, Johnson dep., at 38.

**Response:**     Controverted in part, unsupported, objectionable, and misleading.

Uncontroverted that these are some of the duties of a desk sergeant, but unsupported and

misleading that they are performed in any particular order for each arrest, or specifically for

these plaintiffs or all class members.  According to CPD officers, after the arrest report is

returned to the front desk, the desk officers typically conduct another name check via the

computer, and, if anything appeared to have been missed in the previous check or checks, would

re-contact the arresting officers.  Def. Ex. 12, Cobb Dep. at 81:1-10.  Paragraph 81 violates Local

Rule 56.1 by including multiple statements of fact within the same paragraph.  The deposition

testimony cited in Pls. Exs. B, I, and T lacks proper foundation and does not address this

statement.

82.     For fine-only ordinance violators who are not fingerprinted, the charges approved by the watch commander at the initial approval of probable cause, prior to placing the arrestee into lockup, will be the same as the charges presented for "final" approval. Exh. C, Richmond dep., at 70-71. They will be based on the same arrest report with the same narrative. Ordinance violations are not potentially upgradeable to felonies (Exh. L, Sodini dep. II, at 30:6-11, 69:17-70:5; Exh. S, McMahon dep. II, at 103), and there will be no new charges. Exh. C, Richmond dep., at 70. See also Exh. S, McMahon dep. II, at 103:6-104:18 ("no law enforcement reason" for not initialing "final charge box" when initial probable-cause determination is made).

**Response:**     Controverted, unsupported, objectionable, and misleading.  Paragraph 82 violates

Local Rule 56.1 by including multiple statements of fact within the same paragraph, and should

be stricken.  Multiple CPD officers testified that new charges or an upgrade in charges can be

brought against fine-only ordinance violators after the initial approval of charges, but prior to the

final approval.  Def. Ex. 12, Cobb Dep. 111:15-112:11; Def. Ex. 13, Coleman Dep. at 106:3-9,

120:1-10; Def. Ex. 3, Sodini 8/22/05 Dep. at 126:13-127:14; Def. Ex. 6, Sodini 10/29/03 Dep. at

143:10-144:9; Def. Ex. 19, Wedster 9/20/05 Dep. at 131:11-132:5. Multiple deponents testified

that at the time the watch commander confirms that probable cause exists, the name check has

not necessarily confirmed the absence of any warrants for the arrestee. Def. Ex. 3, Sodini

8/22/05 Dep. at 103:13-16; Def. Ex. 6, Sodini 10/29/03 Dep. at 67:8-16; Def. Ex. 19, Wedster

9/20/05 Dep. at 129:20-130:6; Def. Ex. 10, Caver-Elder Dep. at 65:7-14; Def. Ex. 14, Greene

9/26/06 Dep. at 167:11-15. Multiple witnesses also testified that there are additional steps (such

as completion of case reports, inventorying of evidence, and completion of the bonding

documents) which must take place between the initial approval of probable cause and the final

approval of charges that prevent the watch commander from making those determinations at the

same time. Def. Ex. 3, Sodini 8/22/05 Dep. at 113:11-114:23; Def. Ex. 19, Wedster 9/20/05

Dep. at 84:6-14. Unsupported and misleading in suggesting that the approvals are the same,

when the initial review by the watch commander is for approval of probable cause for arrest,

while the latter is for final approval of charges. Pls. Ex. 17, G.O. 02-03 at 2-3 (defining

"approval of charges" and "initial approval of probable cause"). The deposition testimony cited

in Pls. Ex. C was taken subject to objection, lacks foundation, is outside the scope of the

deponent's personal knowledge with respect to all "fine-only ordinance violators who are not

fingerprinted," and does not support the statement that the charges approved at the initial

approval of probable cause will be the same as those approved at the final approval of charges.

The deposition testimony cited in Pls. Ex. L does not support the statement in that there is no

mention of what constitutes an "upgradeable" offense. The deposition testimony cited in Pls. Ex.

S does not contain the quote "no law enforcement reason" for not initialing "final charge box"

when initial probable-cause determination is made and thus the citation is incorrect and

misleading. The deposition testimony cited in Pls. Ex. C was taken subject to objection, lacks

proper foundation, and does not directly address the statement.

83. While discovery of a warrant following the initial approval may result in additional charges, the second hot desk name check is run against the same databases as the name check that was conducted before the watch commander initially approved the charges. See ¶61. Chicago has not produced a study, analysis, or report that shows a second hot desk name check produces a warrant that was not discovered by the hot desk name check conducted before the watch commander first approved charges.

**Response:**      Move to strike this paragraph as improper argument and containing multiple

arguments in one paragraph, both in violation of LR 56.1. Controverted, unsupported,

objectionable, immaterial and irrelevant. The statements in this paragraph are unsupported with

proper record citation. Numerous witnesses have explained why a second name check for

arrestees who will not be fingerprinted is a good practice and may be necessary. Def. Ex. 3,

Sodini 8/22/05 Dep. at 134:9-135:3, 136:14-25, 137:3-22; Def. Ex. 6, Miceli Dep. at 87:19-24;

Def. Ex. 19, Wedster 9/20/05 Dep. at 131:11-132:5, 133:5-14; Def. Ex. 20, Garrity 7/29/05 Dep.

at 97:3-99:8; Def. Ex. 25, Greene 10/24/06 Dep. at 67:22-68:11, 89:21-91:22, 94:24-96:8.

Immaterial and irrelevant because the Seventh Circuit has recently held that double checking

names of arrestees during processing is a valid, constitutional step (*see Hernandez v. Sheahan*,

455 F.3d 772, 775 (7th Cir. 2006) (noting with approval that "the City requires . . . double

checking" of arrestee identity to make sure the right person is charged), and plaintiffs' own

database shows that for the 36,000 fine-only offenders, one in 20 arrests disclosed the presence

of a warrant. Pls. Statement of Undisputed Facts Pursuant to Local Rule 56 at ¶ 95; Def. Ex. 28,

LaLonde Report at 17; Def. Ex. 26, Greene Report at 2. When that occurs in the process is

irrelevant, because once the warrant is revealed, the arrestee is not eligible for release on an I-

Bond in any event. This argument also fails to account for the importance of proper

identification alone, particularly given the prevalence of identity theft. Def. Ex. 3, Sodini

8/22/05 Dep. at 136:14-24, 137:3-22.

84.     Approval of an I-bond for class members is a non-discretionary determination. Exh. S, McMahon dep. II, at 116-17; see ¶19.

**Response:**     Controverted, unsupported, objectionable, and misleading.  The deposition testimony cited in Pls. Ex. S does not directly address this statement, was taken subject to objection, calls for speculation, lacks proper foundation, and is not within the deponent's personal knowledge.  Objectionable as argumentative and in referencing other paragraphs in a Rule 56.1 statement as evidence to support the statement in this paragraph (*see* N.D. Ill. L.R. 56.1; *see also* the improper nature of ¶ 19, supra).  Further, the statement is disputed to the extent it implies, incorrectly, that the granting of an I-Bond does not involve critical analysis, investigation, review of probable cause for arrest, proper identification of the arrestee, analysis of the outcome of a warrant search, and analysis of final approval of charges, all of which must occur before the watch commander will make the decision to release on an I-Bond.  Def. Ex. 18, Bay Dep. at 79:14-18; Def. Ex. 23, Garrity 10/23/02 Dep. at 85:23-86:9; Def. Ex. 20, Garrity 7/29/05 Dep. at 59:19-60:1.  Thus, to state "approval of an I-Bond" is non-discretionary makes no real sense.

85.     Any desk officer can write an I-bond. Exh. R, Caver-Elder dep., at 20. There is no difference in the processing of arrestees who are released on cash bonds and those released on I-bonds. Exh. P, Serpe dep., at 101; Exh. B, Sodini dep., at 180. The procedures for releasing an arrestee on an I-bond are the same as the procedures for releasing an arrestee on a cash bond. Exh. R, Caver-Elder dep., at 106; Exh. M, Mitchell dep., at 70. There should be no difference in the time it takes for releasing an arrestee on a cash bond than the time it takes for releasing an arrestee on an I-bond. Exh. R, Caver-Elder dep., at 106.

**Response:**     Move to strike this paragraph as improper argument and containing multiple arguments in one paragraph, both in violation of LR 56.1.  Controverted, unsupported, objectionable, and misleading.  The statement that "there should be no difference in the time it takes for releasing an arrestee on a cash bond than the time it takes for releasing an arrestee on an I-Bond" is argumentative and has no place in a Local Rule 56.1 statement, and should be stricken.  Multiple CPD officers testified that it is the watch commander who makes the decision

to release on an I-Bond, and it is the desk sergeant who normally prepares or is responsible for preparing the I-bond. Def. Ex. 29, Griffin Dep. at 101:19-23; Def. Ex. 18, Bay Dep. at 34:9-18. Unsupported in that none of the citations directly addresses the statement. The deposition testimony cited to in Pls. Ex. R does not contain a page 20 and therefore any reliance on it for any fact, let alone one the non-movant controverts is improper. Further, the testimony cited from Ex. R that was included was taken subject to objection, lacks proper foundation, and is outside the scope of the deponent's knowledge with respect to what happened not "on [his] watch." Pls. Ex. R p. 106:14. The deposition testimony cited to in Pls. Exs. P and B was taken subject to objection, lacks proper foundation, and is outside the scope of the deponent's personal knowledge. The deposition testimony cited in Pls. Ex. M lacks foundation and is as misleading as it is false because the deponent repeatedly informed the plaintiffs' attorney that he "didn't know" the answer to the questions posed to him. Pls. Ex. M at 70:14-23.

86.     The I-bond (attached as Exh. 9) is a one-page document that takes a few minutes to complete. Exh. R, Caver-Elder dep., at 55:7-17.

**Response:**     Controverted, objectionable and misleading and immaterial. Other CPD officers have testified that tasks associated with completing the I-Bond take more than "a few minutes." Def. Ex. 18, Bay Dep. at 146:18-149:8; Def. Ex. 20, Garrity 7/29/05 Dep. at 66:19:67:5. Moreover, the deposition testimony cited in Pls. Ex. R lacks proper foundation, does not directly address the statement, and is outside the scope of the deponent's personal knowledge with respect to how long it takes other officers to complete an I-Bond. Further, the statement is misleading and immaterial because the length of time it takes "to complete" an I-Bond ignores all of the investigation and work on the arrest and processing that occurs before the I-Bond can even be issued, as well as the condition of the arrestee, including his cooperation with the process, and the tasks and duties that station personnel are undertaking at the time of any given arrest and concomitant processing.

87.     An I-bond can be approved and issued without bringing an arrestee to lockup. Group Exh. 28 (GO 99-12-05, at §§III.B and III.C; DSO 04-17-05, at §§III.B and III.C).

**Response:**     Controverted, unsupported and misleading.  Unsupported because there is no Pls.

Group Ex. 28.  Further unsupported and misleading in that Pls. Ex. 27 (which appears to be what

was meant) only concerns individuals arrested on certain traffic offenses in violation of state law,

and does not support the statement that an I-bond could have been approved and issued to the

class members without bringing them to lockup.  Under the CPD general orders, the tasks

performed in lockup must be performed for all arrestees taken into custody, regardless of

whether or not the arrestee will be placed in a jail cell.  Def. Ex. 24, McMahon 8/2/05 Dep. at

37:1-38:8, Def. Ex. 27, G.O. 02-03-05.

88.     Class members who were able to post a cash bond were released 1.2 hours faster than were class members who were released on an I-bond. Exh. 21, DiPrete expert report, p. 8, at 40.

**Response:**     Controverted as it relies on objectionable material; misleading, unsupported and

immaterial.  Plaintiffs' Ex. 21 is the unsworn expert report of plaintiffs' expert, Dr. DiPrete,

which is not admissible evidence and should not be considered.  Incomplete in violation of Fed.

R. Evid. 106 because the expert report actually reads "Arrestees who were released on a cash

bond were detained for an average of approximately 1.2 hours less than those who were released

on an I-bond.  This effect was statistically significant at the 0.01 level or better in the presence of

the full set of controls (see Table 1)."  Pls. Ex. 21 at 8.  Immaterial because it purportedly

includes class members who are making the same claims as those released on I-Bonds.

89.     During discovery in this case, plaintiffs propounded interrogatories on defendants asking if they would offer any classwide explanation for why the class members were detained more than two hours following their arrests. See Exh. 22, pls.' fifth set of interrogatories, interrogatory no. 6. Plaintiffs also asked the same question with regard to detentions of more than four hours. *Id.*, interrogatory no. 5. The same interrogatories required defendants to list all documents and witnesses supporting their answer. *Id.*

**Response:**     Move to strike the this paragraph as argumentative in violation of LR 56.1.

Objectionable and immaterial.  Paragraph 89 is not a statement of material fact that has any place

in a Local Rule 56.1 statement, but rather is argument containing immaterial allegations and

assertions regarding the discovery practice between the parties in this lawsuit, and should be

stricken.  Defendants have, since the beginning of discovery on this class action, objected to the

certification of the class because it was impossible for defendants to present the individualized

facts and circumstances surrounding more than 18,000 "class member" arrests that would be

necessary in an individualized showing for each arrestee.  This made the management of the case

as a class action impracticable.  Although defendants sought to depose additional class members,

(*see* Dkt. No. 178), that effort was denied by the Magistrate Judge.  Plaintiffs failed to provide a

single response to interrogatories directed to the class members, other than plaintiffs, and

provided no documents to support their claims at all.  As all of the Fourth Amendment case law

precedent establishes that the reasonableness of any individual arrest like those at issue here is to

be decided on the facts and circumstances of its own case, plaintiffs have failed in their burden of

proof for each individual class member.  Defendants, thus, took the position that since plaintiffs

were not going to prove that each class member's arrest was unreasonable on its own facts and

circumstances, defendants did the next best thing:  they garnered proof of the myriad facts and

circumstances that can and do occur at the stations while people are being processed, located an

expert to give his opinion (based on his 25 years of experience in evaluating police departments)

on whether the CPD comported with national standards, and offered evidence to debunk

plaintiffs' classwide argument on which their whole case is based, namely, that there exists a

two-hour time limit from when the arrestee received a CB number to when he is released.  *See*

*generally,* Defendants' Additional Material Facts and support for same, *infra*.

        90.     After defendants initially served ill-founded objections and improper responses,
Judge Nolan entered an order on January 11, 2005, stating:

> Regarding interrogatories 5 and 6 from plaintiffs' fifth set of
> interrogatories, defendants must supplement their answers by
> Friday, 1/4/05; specifically, if the defendants intend to offer a
> classwide explanation for the length of the class members'
> detentions, they must disclose that explanation.

Exh. 23, 01/11/05 minute order. Plaintiffs again sought the Court's assistance for a more definite answer, and the Court cautioned the city that "in the event defendants intend to offer an analysis, report, or study in support of their classwide explanation, defendants must disclose any such analysis, report or study in time for plaintiffs to take necessary discovery." Docket no. 235, at 12 (citing Fed. R. Civ. P. 26(e)(2) (requiring supplemental disclosures to interrogatories when warranted); Fed. R. Civ. P. 37(c)(1) (barring parties from using evidence at trial that is responsive to discovery requests but has not been disclosed, unless the failure to disclose is harmless)).

**<u>Response:</u>**     Move to strike the this paragraph as argumentative in violation of LR 56.1.

Objectionable, unsupported, and immaterial.  The City repeats and incorporates by reference its

response to paragraph 89 as though fully set forth here.  Uncontroverted that Magistrate Judge

Nolan entered an order on January 11, 2005 that included the quoted material.  Nevertheless,

paragraph 90 is not a statement of material fact that has any place in a Local Rule 56.1 statement,

but is rather an argument containing a series of unsupported and immaterial allegations and

assertions regarding the discovery practice between the parties in this lawsuit, and should be

stricken.  Paragraph 90 also violates Local Rule 56.1 by including multiple statements within the

same paragraph.

     91.     Defendants' explanation and identification of evidence, in its entirety, is attached as Exh. 24. A slew of objections aside, defendants answered as follows:

> (1)     There is no unlawful municipal policy, custom or practice as
> alleged in the complaint regarding such detentions, or to detain
> persons in excess of four hours, and the evidence establishes that
> the lengths of the class member representatives' detentions were
> not the result of any official municipal policy or custom on the part
> of the city. Therefore, under *Monell v. Department of Social
> Services*, 436 U.S. 658 (1978), there can be no liability against the
> city.
>
> (2)     The evidence shows that the length of the detentions was
> reasonable under the Fourth Amendment. There is a natural and
> widespread backlog within the Chicago Police District stations that

existed during the class period, and that exists where there is a ratio of arrestees to total police force of approximately 20:1, let alone a ratio of arrestees to the personnel working intake, processing and release at the district stations, which far outstrips 20:1. Similarly, unavoidable delays can be caused by there being a large number of arrestees on a given night in a given district, there being are arrested [sic] in large groups, transporting arrested persons from one facility to another, personnel shortages, personnel deployment, unusual circumstances in a district, and myriad other practical realities. The unavoidable delays that occur, combined with the total lack of any evidence of improper purpose creating such delay, establishes that the length of detentions was reasonable.

(3)    As shown even in connection with just the class plaintiff representatives, the individualized nature of the reasons behind each detention belies the existence of any municipal policy or custom. Defendants have already set out various facts concerning the named class members' detentions, and why they were entirely reasonable, in other filings. See, e.g., memorandum in support of defendants' motion to decertify the Rule 23(b)(3) class at 9-10; defendants' reply brief in support of their motion to decertify the Rule 23(b)(3) class at 7-8; defendants' memorandum in opposition to class certification at 3.

(4)    Defendants note that in their reply in support of their motion to compel, plaintiffs claim that various "facts," including various statistics that plaintiffs repeatedly cite, "show a persistent citywide practice of unreasonable detentions that demand a classwide explanation. "Plaintiffs, however, have failed to produce the documents reflecting such statistics, and refuse to share with defendants any methodology or criteria used to determine the "facts" they rely on to justify such a demand. Until such information is disclosed, defendants are precluded from responding more particularly.

(5)    Plaintiffs have provided no information or proof that any of the individual defendants even knew of any of the plaintiff representatives, or any other class member, or that there was any improper purpose on the part of any, identified member of the Chicago Police Department regarding any individual's detention.

b.    The witnesses include all members of the class certified by Judge Gettleman on March 5, 2003, and members of the Chicago Police Department who were involved in the arrests and detentions and who might appear on the arrest records produced to plaintiffs, including arresting officers, watch commanders, desk sergeants, and lockup personnel, many of whom have already been deposed in this action,

including but not limited to all witnesses produced for deposition pursuant to Rule 30(b)(6) notice.

c.    The documents that relate directly or indirectly include: i) the arrest reports of the members of the class certified by Judge Gettleman on March 5, 2003; ii) watch commander logs, rosters of persons in custody, and detention reports for the dates of the arrests of the members of the class certified by Judge Gettleman on March 5, 2003; iii) the general orders previously produced in this case; iv) any statistical analysis of any of the above; and v) annual reports of the Chicago Police Department.

Exh. 24, defendants' court-ordered supplemental answers and objections to interrogatories 5 and 6 of plaintiffs' fifth set of interrogatories, 01/14/05, at 5-7.

**Response:**    Move to strike the this paragraph as argumentative in violation of LR 56.1. Incomplete, unsupported, objectionable, immaterial. Uncontroverted that pages 5-7 of defendants' court-ordered supplemental answers and objections to interrogatories 5 and 6 of plaintiffs' fifth set of interrogatories included the above quoted language. Incomplete in that the paragraph improperly omits the well-founded objections to the discovery. *See* Pls. Ex. 24. However, ¶ 91 is not a statement of material fact that has any place in a Local Rule 56.1 statement, but is rather a legal argument containing immaterial allegations and assertions regarding the discovery practice between the parties in this lawsuit, and should be stricken. Paragraph 91 also violates Local Rule 56.1 by including multiple statements within the same paragraph. Further, the responses cited were provided before the end of discovery and before experts were named. Subsequently, defendants provided their expert report to plaintiffs which refuted plaintiffs' statistical theory of the case, and their expert for two sessions of deposition, which also refuted plaintiffs' expert's work. Def. Ex. 28, LaLonde Report.

92.    Defendants produced a reduced list of witnesses, but did not otherwise supplement the foregoing response during discovery with any analysis or report or other documentary evidence in support of any statement in ¶91(2) and to demonstrate, on a classwide basis, that any of those events occurred and explained the lengthy detention of class members. Group Exh. 19, court orders and defendants' responses to plaintiffs' discovery regarding classwide defenses.

**Response:**      Move to strike the this paragraph as argumentative in violation of LR 56.1.

Controverted, objectionable, unsupported, misleading and immaterial.  Paragraph 92 is not a

statement of material fact in violation of Local Rule 56.1 statement, but is rather an argument

containing immaterial allegations and assertions regarding the discovery practice between the

parties in this lawsuit, and should be stricken.  Paragraph 92 also violates Local Rule 56.1 by

including multiple statements within the same paragraph.  Plaintiffs' misleading allegations fail

to note that defendants produced more than 30 witnesses in the case that provided ample

evidence of the facts in support of their written discovery responses.  Subsequently, defendants

provided their expert report to plaintiffs which refuted plaintiffs' statistical theory of the case,

and their expert for two sessions of deposition, which also refuted plaintiffs' expert's work.  Def.

Ex. 28, LaLonde Report.

93.      Plaintiffs retained Dr. Thomas A. DiPrete, Professor and Chair, Department of
Sociology, Columbia University, to (a) identify the class; (b) calculate their length of detention
from time of arrest and from time CB number was issued, to the time of release; and (c) analyze
the evidence defendants relied upon to support their purported classwide explanation of the
delays, and he has determined that it cannot explain the delays. Exh. 21, DiPrete expert report.
Dr. DiPrete prepared a database that includes (*id.*, at 30-32):

   (a)      the CPD CHRIS system data (in computer-readable form) for all fine-only
            ordinance violations from 05/02/00 through 5/31/04. The data included the
            ordinance violated, the "booking posted date" (date of CB number), CPD
            district, demographic characteristics of the arrestee, and whether the
            arrestee was fingerprinted;

   (b)      additional data keypunched from the hard-copy arrest reports, including
            date and time of arrest and release, type of bond, whether there was an
            outstanding warrant, and 13 items listed by the lockup keeper. This
            information was entered by paralegals, and then it was reentered by a
            private firm and verified ("form of double entry, where the keypuncher
            enters the data and then enters it again and the computer verifies that it is
            the same"), and the differences in the two entries were reconciled (Exh. U,
            DiPrete dep., at 44-47; Appendix B; data dictionary that accompanied
            database);

   (c)      data from a computer-readable database produced by the Clerk of the
            Circuit Court of Cook County for all arrests on CPD database (including

statute violated, type of bond, and the most recent disposition of the case) (Exh. U, DiPrete dep., at 48);

(d)    data from lockup population reports (men and women locked up on each watch, at each district, on each day) was keypunched and then were algorithmically compared with other computerized lockup population report data (Exh. U, DiPrete dep., at 70-71);

(e)    data from a sample of watch commander logs by district and month was keypunched (the logs recorded whether or not 26 types of events occurred during the watch, e.g., unusual events in lockup, computer systems down, unusual events occurred in the district) (Exh. U, DiPrete dep., at 51-52); and

(f)    data from the CPD annual reports for the years 2000-2004 (including demographic and index crime data by CPD district).

**Response:**    Move to strike the this paragraph as argumentative in violation of LR 56.1. Controverted, objectionable, unsupported, and immaterial. Plaintiffs' Ex. 21 is the unsworn expert report of plaintiffs' expert, Dr. DiPrete, which is not admissible evidence and should not be considered. Paragraph 93 violates Local Rule 56.1 by including multiple statements within the same paragraph, and by containing argument. The deposition testimony cited in Pls. Ex. U was taken subject to objection, and violates Fed. R. Evid. 106 as it does not include relevant testimony of the deponent with respect to the expert report identified above, and thus to rely on this testimony requires impermissible inferences be made against the non-movant. Furthermore, the defendants' statistical expert, Dr. Robert LaLonde, Professor of Public Policy at the Irving Harris Graduate School of Public Policy Studies at the University of Chicago, refuted the claims made in DiPrete's report and testimony, which was based on assumptions provided solely by plaintiffs' counsel and relied on material cherry-picked for him by plaintiffs' counsel. Def. Ex. 30, DiPrete 6/7/06 Dep. at 64:12-19, 74:19-21. The deficiencies in DiPrete's work are fully revealed in the report of Dr. LaLonde. Def. Ex. 28, LaLonde Report.

94.    Defendants were invited to work with plaintiffs to develop a joint database but declined to do so (docket no. 115, at p. 2) and while they began the process of creating their own database (Exh. 25), they refused to produce it and claimed that the project was not completed.

Furthermore, defendants performed no tests or analysis of plaintiffs' database that permit them to question the accuracy or reliability of the data. Exh. V, LaLonde dep., at 17:12-18:2.

**Response:**     Move to strike the this paragraph as argumentative in violation of LR 56.1.

Controverted, objectionable, unsupported, and immaterial.  Paragraph 94 is not a statement of

material fact that has any place in a Local Rule 56.1 statement, but is rather a legal argument

containing immaterial allegations and assertions, purportedly supported by plaintiffs' counsel's

earlier arguments only, in connection with the discovery practice between the parties in this

lawsuit, and should be stricken.  Plaintiffs' Ex. 25 is an unauthenticated (and inadvertently

produced) e-mail that depends entirely on hearsay in violation of Fed. R. Evid. 802, and does not

support the statement in any way.  Plaintiffs' counsel believed, wrongly, that the Defendants had

created a sort of dueling database to rival theirs.  This is simply wrong, and it is therefore hardly

surprising that there is no support for it.  Defendants in fact *provided* to plaintiffs the entire

database of the CPD for those arrested on municipal ordinance violations alleged in the

complaint.  Moreover, there is no requirement that the parties agree on a database that the

plaintiffs manipulated and added to on their own, and concerning which they concealed the true

cost of production of such database.  Further, the deposition testimony cited in Pls. Ex. V does

not support the assertions in paragraph 94.  *See* Pls. Ex. V at 17:12-23 (defendants' expert

testifies that his assistant performed diagnostic checks on plaintiffs' database, which revealed

"that there were errors, particularly in things like whether a person had an ID or not when they

were arrested.").  Defendants' expert found otherwise:  "we know holding times are measured

with some error.  Moreover, random spot-checking also indicates the potential for error in other

variables." Def. Ex. 28, LaLonde Report at 2, 13-14.

    95.     Based on the data set forth in ¶93, Dr. DiPrete found that:

        (a)     in 18,031 arrests (the "analysis population") in which the arrestee was not fingerprinted, there was no evidence of a warrant, and there was sufficient information to compute the detention time;

(b)     80% of the arrests of the analysis population resulted in a detention of two hours or more from the time that a CB number was assigned; approximately 95% were detained for one hour or more; 10% are held for longer than eight hours the mean detention time (from the time the CB number was assigned) was 4.42 hours and the median detention time was 3.75 hours;

(c)     75% of the arrests of the analysis population resulted in the arrestee being held for four hours or more from the time of arrest to the time of release; and the mean time from arrest to release on bond was 6.27 hours;

(d)     the final disposition for 85% of the arrestees in the analysis population was a "non-suit" according to the computerized data from the Clerk of the Circuit Court of Cook County;

(e)     the probability of being detained for two or more hours in the analysis population varied by district, but was always over 53%; and in 24 of the 25 districts it was over 60%, in 20 of the 25 districts it was over 70%, and in three districts the probability of being detained for two or more hours was over 90%;

(f)     arrestees in the analysis population who posted cash bonds were released approximately 1.2 hours faster than were arrestees who were released on personal recognizance bonds;

(g)     the mean and median detention times for women were more than one half-hour shorter than for men in the analysis population. Women in the analysis population who were arrested and brought to a district without a lockup facility for women were released 1.5 hours more quickly than women arrested who were arrested in and brought to a district with a lockup facility;

(h)     the probability of being detained for two or more hours in the analysis population varied by the ordinance violated. For the 20 ordinances that were most commonly violated, the probability of being detained for two hours or more was always greater than 50% and for park district offenses, peddling in a prohibited district, and disorderly conduct -- panhandling -- it was over 90%;

(i)     mean and median detention times for African-Americans were longer than for whites;

(j)     detention times in the analysis population were only slightly affected by the conditions of the arrestee as recorded in the lockup keeper's visual check and questionnaire;

(k)     detention times in the analysis population were not obviously related to the level of activity in the district as represented by the number of people in lockup during the watch or by the occurrence of unexpected events

during the watch. Net of controls, the more same-sex individuals in lockup, the shorter the time to release; and

(l)     the length of the detention for members of the analysis population varied by the arresting police officer.

Def. Ex. 21, DiPrete expert report, at 2, 3.

**Response:**     Controverted, objectionable, unsupported, and misleading.  Plaintiffs' Ex. 21 is the unsworn expert report of plaintiffs' expert, Dr. DiPrete, which is not admissible evidence and should not be considered.  The assertions in this paragraph are merely a recitation of Dr. DiPrete's conclusions; to the extent plaintiffs are actually asserting the truth of those conclusions as well, the assertions require an impermissible weighing of the credibility of the expert.  *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 665 (7th Cir. 2006) (making credibility determinations at summary judgment stage improper); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (movant may not ask the Court to "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). Paragraph 95 violates Local Rule 56.1 by including multiple statements within the same paragraph.  Unsupported and misleading in that the cited material does not support the statements made in subsections (a), (c), (f) and (g).  Furthermore, DiPrete's report suffers from numerous methodological and logical deficiencies as set forth in the report of Dr. Robert LaLonde.  Def. Ex. 28, Lalonde Report.

96.     The lockup keeper records various characteristics concerning the current conditions of the arrestees (see ¶77, supra), but these factors are relatively rare. Only 1% or less are recorded as being in obvious pain or injury; having obvious signs of infection; showing visible signs of alcohol or drug withdrawal; appearing to be despondent, irrational, or carrying medication; being a pregnant female; or being someone who has tried to kill oneself.  Two percent or fewer are recorded as having serious medical problems or are receiving treatment. Five percent are recorded as currently taking medication, while 10% appear to be under the influence of alcohol or drugs. Taken together, these factors are much too rare to account for the fact that 80% of arrestees are detained for two hours or more following issuance of their CB number. Exh. 21, DiPrete expert report, at 8.

**Response:**     Move to strike the this paragraph as argumentative in violation of LR 56.1.

Controverted, objectionable, unsupported, misleading, and immaterial.  The first sentence of this

paragraph is completely unsupported by any record citation.  The allegations are also

argumentative, and state a legal conclusion as to the ultimate issue of whether these factors

"account for" the length of detentions, and they have no place in a Local Rule 56.1 statement.

To the extent that plaintiffs are asserting that "these factors are relatively rare" based solely on

the cases documented of such conditions, the allegations fail to take into account the numerous

conditions of the arrestee that are not contained on a form, and thus such assertions are

misleading and controverted.  Def. Ex. 18, Bay Dep. at 105:12-106:5 (drunkenness); Def. Ex. 18,

Bay Dep. at 112:12-17, 113:17-24, 144:13-23 (prisoner being taken to the hospital); Def. Ex. 12,

Cobb Dep. at 110:19-111:5 (uncooperative arrestees); Def. Ex. 13, Coleman Dep. at 138:12-23

(ambulance coming to take sick detainees); Def. Ex. 7, Miceli Dep. at 103:17-18 (arrestee

sleeping in lockup); Def. Ex. 2, Skahill Dep. at 101:11-14 ("again, the documentation would not

be the whole story because there could have been events that occurred that also impacted that

were not documented"); Def. Ex. 25, Greene 10/24/06 Dep. at 28:4-21 (police logs do not

capture all activity).  Plaintiffs' Ex. 21 is the unsworn expert report of plaintiffs' expert, Dr.

DiPrete, which is not admissible evidence and should not be considered.  The assertions in this

paragraph are merely a recitation of Dr. DiPrete's conclusions; to the extent plaintiffs are

actually asserting the truth of those conclusions, it requires an impermissible weighing of the

credibility of the expert.  Paragraph 96 violates Local Rule 56.1 by including multiple statements

within the same paragraph.  Objectionable in referencing other paragraphs in a Rule 56.1

statement as evidence in the record to support this statement is misleading and improper (*see*

N.D. Ill. L.R. 56.1; *see also* the improper nature of ¶ 19, supra).  Unsupported and misleading in

that nothing in the cited material indicates that these procedures always occur in the order

described with respect to all arrests, let alone the class members' arrests, and to establish the statement based on the evidence cited requires impermissible inferences be made against the non-movant.

97.     The watch commander maintains a log for each watch and is to record significant events that occurred during the watch. Exh. 26, watch commander log. There are 26 types of occurrences, including, e.g., (a) unusual occurrences -- lockup; (b) major incidents within the district that might require the attention of the watch commander or desk sergeant (police officer injured or killed; major potential media incidents; battery/resisting arrest incidents; shots fired at or by a police officer; demonstrations/strikes; incidents involving prominent citizens; CAPS meetings); and (c) occurrences that indicate the malfunctioning of computer equipment. Dr. DiPrete examined whether there was a statistical relationship between the occurrence of unexpected or unusual events that may occur during lockup and the length of detention time. 3,038 watch commander logs were selected by district and month to get a representative sample of districts and times of year, given the restrictions imposed by the availability of the hard-copy watch commander logs, which varied by district. *Id.*, at 9.

**Response:**     Move to strike the this paragraph because it violates LR 56.1.  Controverted, objectionable, unsupported, and misleading.  Paragraph 97 violates Local Rule 56.1 by including multiple statements within the same paragraph.  Paragraph 97 is unsupported in that it purports to argue that there are only a discrete number of events or happenings that can occur in a station house or in connection with an arrestee.  This has been refuted by numerous witnesses.  Def. Ex. 2, Skahill Dep. at 76:1-18 (describing "an infinite amount" of possibilities); Def. Ex. 29, Griffin Dep. at 139:7-15 ("there are so many different variables.  We just scratched the surface"); *see also* Defendants' Additional Material Facts at ¶¶ 28-30 and citations therein.  Moreover, there is nothing cited to prove that these logs capture all of the events that did in fact occur, that may have affected the length of arrestees' detentions, as may such events are simply not always documented.  Def. Ex. 23, Garrity 10/23/02 Dep. at 29:15-20 (computer system failures); Def. Ex. 19, Wedster 9/20/05 Dep. at 89:5-13 (large numbers of prisoners awaiting entrance into the lockup); Def. Ex. 18, Bay Dep. at 105:12-106:5 (drunkenness); Def. Ex. 18, Bay Dep. at 112:12-17, 113:17-24, 144:13-23 (prisoner being taken to the hospital); Def. Ex. 12, Cobb Dep. at 110:19-111:5 (uncooperative arrestees); Def. Ex. 13, Coleman Dep. at 138:12-23 (ambulance

coming to take sick detainees); Def. Ex. 7, Miceli Dep. at 103:17-18 (arrestee sleeping in

lockup); Def. Ex. 2, Skahill Dep. at 101:11-14 ("again, the documentation would not be the

whole story because there could have been events that occurred that also impacted that were not

documented"); Def. Ex. 25, Greene 10/24/06 Dep. at 28:4-21 (police logs do not capture all

activity).  Further, the citations given do not directly support the statements with respect to the

types of "occurrences" listed on Pls. Ex. 26.  The second two sentences are equally unsupported

insofar as plaintiffs contend that DiPrete examined all "unexpected or unusual events that may

occur during lockup."  Plaintiffs themselves provided Dr. DiPrete only a small sampling of

watch commander logs, ignoring some districts altogether (Def. Ex. 30, DiPrete 6/7/06 Dep. at

53:21-54:10), and there is no evidence that the events logged on such forms were the only events

that occurred with respect to all the arrestees in question or to any other group.

98.     Dr. DiPrete first looked at the frequency with which events occurred to see if it
was plausible that such events occurred frequently enough to account for delays in release. He
paid particular attention to the events that were most likely to explain lengthy detention because
they occupied the time and attention either of lockup personnel or watch commanders and desk
sergeants and thereby might delay the completion of processing of members of the analysis
population ("unexpected events"). The sample of watch commander logs shows that the events in
question are relatively rare. Unusual occurrences in lockup (item F in the watch commander log)
only occurred on 1% of the watches in the sample, or only about once a month. Events that might
occupy watch commanders or desk sergeants are also rare relative to the frequency of long
detentions. Major or potential media events (item B) occurred in 18% of the watches. Police
officer injuries (item A) occurred in 5% of the watches. Battery or resisting arrest incidents (item
C) occurred in 6% of the watches. Demonstrations or strikes (item G) occurred in 3% of the
watches. There were no incidents involving prominent persons (item J) in the watch commander
log sample. Taken together, one or another of these unexpected events occurred in only 28.5% of
the watches in the watch commander sample. In contrast, Dr. DiPrete's analysis of the analysis
population shows that detentions for periods greater than two hours are much more common than
this. In district 1, for example, detentions of arrestees for two hours or longer occurred on 90% or
more of the watches during which people were brought to the station for fine-only ordinance
violations. But in only a third of the time or less (depending on the watch) did unexpected events
during the watch occur. A similar discrepancy existed in districts 2, 6, 12, 15 (in watches 2 and
3), 18 (in watches 2 and 3), 19, 23, and 25 (these constitute all the districts that were in the watch
commander log sample). In other words, as a rule it was much more common for arrestees to be
detained for two hours or longer in a watch than it was for unexpected events to occur. *Id.*, at 9,
10.

**Response:**     Move to strike the this paragraph as argumentative and in clear violation of Local

Rule 56.1.  Controverted, objectionable, unsupported, misleading, and immaterial.  Plaintiffs'

statement that "as a rule it was much more common for arrestees to be detained for two hours or

longer in a watch than it was for unexpected events to occur" is argumentative and conclusory,

has no place in a Local Rule 56.1 statement, and should therefore be stricken.  Plaintiffs rely on

the unsworn expert report of plaintiffs' expert, Dr. DiPrete, which is not admissible evidence and

should not be considered.  The assertions in this paragraph are merely a recitation of Dr.

DiPrete's conclusions; to the extent plaintiffs are actually asserting the truth of those conclusions

as well, the assertion requires an impermissible weighing of the credibility of the expert.

Paragraph 98 violates Local Rule 56.1 by including multiple statements within the same

paragraph.  Unsupported insofar as plaintiffs contend that "unexpected events" were not very

common based solely on the "unexpected events" listed on the watch commander logs, given

that many of the events which may affect the length of arrestees' detentions are not always

documented.  Def. Ex. 23, Garrity 10/23/02 Dep. at 29:15-20 (computer system failures); Def.

Ex. 19, Wedster 9/20/05 Dep. at 89:5-13 (large numbers of prisoners awaiting entrance into the

lockup); Def. Ex. 2, Skahill Dep. at 101:11-14 ("again, the documentation would not be the

whole story because there could have been events that occurred that also impacted that were not

documented"); Def. Ex. 25, Greene 10/24/06 Dep. at 28:4-21 (police logs do not capture all

activity).  The second sentence is further disputed in that the report recites only that Dr. DiPrete

looked at what he "was told were potentially most likely to explain lengthy detention," and it

was plaintiffs' counsel who told him what to look at.  Def. Ex. 30, DiPrete 6/7/06 Dep. at 129:3-

7, 194:8-13 ("Q. All you are trying to do is analyze a set of factors posited by Mr. Miner on this

population of people? . . . A. That's right."); Def. Ex. 31, DiPrete 11/17/06 Dep. at 112:11-113:9,

118:7-9 ("As of this moment, the information that I have comes from Mr. Miner and I have no

reason to believe that it is inaccurate"), 118:15-22 ("Q. And you hadn't seen documents, court

pleadings in this case in advance of completing your report? A. That's correct. Q. So, at that

point you really are limited as to what Mr. Miner has told you is true? A. At that point"); 119:3-

11 ("Q. Did you ask before you turned in your report to see any of those things, court pleadings

or depositions or any of those things? A. I asked for [Mr. Miner's] understanding of the process.

Q. So, you didn't ask for court pleadings or depositions on their own, you asked for Mr. Miner's

take on them? A. Yes, I asked for his understanding.").

99. Next, Dr. DiPrete examined whether occurrences of events during lockup had a statistical relationship to the booking-to-bond times of arrestees. To do this, he estimated the probability of a detention of two hours or more for the 516 arrests in the analysis population that occurred at a district, day, and watch that overlapped with the computerized watch commander logs. First, Dr. DiPrete looked at whether the unexpected events explained the duration of these detentions (see Table 4). He found no statistically-significant effect of the occurrence of these events on the duration of the detention. After controlling for age, sex, race, the day of the week, the time of the day, the year and quarter of the arrest, the bond type, the presence of female lockup facilities, the description of the arrestee from the lockup keeper report, and the statute corresponding to the fine-only ordinance violation, there was only a statistically-significant effect of demonstrations and strikes, and in this case the effect was negative; the presence of demonstrations and strikes was associated with a reduction of the detention time of 1.5 hours. Next, he looked at all of the events on the watch commander log (see Table 5). With all the watch commander items included in the analysis, there was a statistically-significant positive effect of only the discharge of an aerosol and of a non-functional LAN on the detention time. Shots fired at or by police was associated with a significantly shorter detention time. The presence of high-risk missing persons was also associated with a significantly shorter detention time. *Id.*, at 11.

**Response:**    Move to strike the fourth sentence of this paragraph as argumentative in clear

violation of Local Rule 56.1. Controverted, objectionable, unsupported, misleading, and

immaterial. Plaintiffs' allegations regarding what Dr. DiPrete may have "found" are

argumentative and conclusory and have no place in a Local Rule 56.1 statement, and should

therefore be stricken. Plaintiffs rely on the unsworn expert report of Dr. DiPrete, which is not

admissible evidence and should not be considered. The assertions in this paragraph are merely a

recitation of Dr. DiPrete's opinions, which are not fact, and to the extent plaintiffs are actually

asserting the truth of his opinions, they require impermissible inferences and an impermissible

weighing of the credibility of the expert. Paragraph 99 violates Local Rule 56.1 by including multiple statements within the same paragraph. Unsupported insofar as plaintiffs contend that "unexpected events" were not very common based solely on the "unexpected events" listed on the watch commander logs, given that many of the events which may affect the length of arrestees' detentions are not documented. Def. Ex. 23, Garrity 10/23/02 Dep. at 29:15-20; Def. Ex. 19, Wedster 9/20/05 Dep. at 89:5-13 (large numbers of prisoners awaiting entrance into the lockup); Def. Ex. 2, Skahill Dep. at 101:11-14 ("again, the documentation would not be the whole story because there could have been events that occurred that also impacted that were not documented"); Def. Ex. 25, Greene 10/24/06 Dep. at 28:4-21 (police logs do not capture all activity). Further disputed to the extent that plaintiffs contend that controlling for other factors should emphasize the impact of watch commander log events; indeed, it is expected that, to the extent those factors are correlated with watch commander log events, such controlling will actually decrease the explanatory power of the watch commander log events. Def. Ex. 32, LaLonde Dep. at 262:15 – 266:16. Further disputed to the extent that, by using the word "effect," plaintiffs are attempting to imply a causal relationship between an event and the length of detentions; both Dr. DiPrete and Dr. LaLonde testified that Dr. DiPrete's work does not show causation. Def. Ex. 32, LaLonde Dep. at 286:20 – 287:1 ("Q. So as a social scientist, it's your opinion of Dr. DiPrete's work that we cannot say that any of the factors he analyzed is causally related to hold times? He has not established that in his work? A. Correct."); Def. Ex. 31, DiPrete 11/17/06 Dep. at 70:6-13.

100.    As a further check, Dr. DiPrete then used the full watch commander log sample to estimate the probability that an unexpected event occurred as a function of district and watch. He estimated a logistic regression to establish whether there was any relationship between the probability of such events occurring and the detention time (see Table 6). He found that there was no statistically-significant effect of this probability on the probability that the detention time would be greater than two hours. *Id.*, at 10.

**Response:**       Move to strike the last sentence of this paragraph as argumentative in violation of LR 56.1.  Controverted, objectionable, unsupported, and misleading.  Paragraph 100 violates Local Rule 56.1 by including multiple statements within the same paragraph.  Plaintiffs' allegations regarding what Dr. DiPrete "found" based on a minute sample of logs is argumentative and conclusory and has no place in a Local Rule 56.1 statement, and should therefore be stricken.  The assertions in this paragraph are merely a recitation of Dr. DiPrete's opinions, which are not fact, and to the extent plaintiffs are actually asserting the truth of those opinions, they require an impermissible weighing of the credibility of the expert.  Further, the unsworn expert report of Dr. DiPrete is not admissible evidence and should not be considered. Also disputed is plaintiffs' contention that controlling for other factors should emphasize the impact of watch commander log events; indeed, it is expected that, to the extent those factors are correlated with watch commander log events, such controlling will actually decrease the explanatory power of the watch commander log events.  Def. Ex. 32, LaLonde Dep. at 262:15 – 266:16.  Further disputed to the extent that, by using the words "function" and "effect," plaintiffs are attempting to imply a causal relationship between an event and the length of detentions; both Dr. DiPrete and Dr. LaLonde testified that Dr. DiPrete's work does not show causation.  Def. Ex. 32, LaLonde Dep. 286:20 – 287:1 ("Q. So as a social scientist, it's your opinion of Dr. DiPrete's work that we cannot say that any of the factors he analyzed is causally related to hold times?  He has not established that in his work? A. Correct."); Def. Ex. 31, DiPrete 11/17/06 Dep. at 70:6-13.

101.    Next, Dr. DiPrete examined whether the number of individuals in lockup has an effect on the length of detention. Both the proportion of arrestees who are detained for two hours or longer and the mean detention time rises with the number of same-sex individuals in detention in the same watch that the arrestee is brought into the station. However, this positive relationship is fully explained by the controls. Net of the full set of controls, arrestees actually had a predicted 0.17 hour shorter detention when the jail had more than 15 same-sex inhabitants than when it had five or fewer arrestees in detention (see Table 1). Net of controls, Dr. DiPrete found that the

more arrestees in lockup, the shorter the detention time from issuance of a CB number to release. *Id.*, at 11.

**Response:**     Move to strike the this paragraph as argumentative in violation of LR 56.1.

Paragraph 101 violates Local Rule 56.1 by including multiple statements within the same

paragraph.  Controverted, objectionable, unsupported, misleading, and immaterial.  Plaintiffs'

allegations concerning what Dr. DiPrete "found" are argumentative and conclusory and have no

place in a Local Rule 56.1 statement, and should therefore be stricken.  Plaintiffs rely on the

unsworn expert report of Dr. DiPrete, which is not admissible evidence and should not be

considered.  The assertions in this paragraph are merely a recitation of Dr. DiPrete's opinions,

not fact, and to the extent plaintiffs are actually asserting the truth of his opinions, they require

an impermissible weighing of the credibility of the expert.  Further disputed, by the City's

expert, in that in "trying to take into account the number of other people in the lockup," Dr.

DiPrete merely took "into account the total number of people that were in the lockup over the

period, but [did not] take into account" variance "with time over the watch."  Def. Ex. 32,

LaLonde Dep. at 113:18 – 114:3, 116:6-11 ("That would be one factor that would be time

varying, and you wouldn't want to model it simply as a single constant which would be modeled

by, say, the total number of people that came in over an eight-hour period."); Def. Ex. 28,

LaLonde Report at 10 (noting that DiPrete took into account "the number of persons in lockup as

recorded in the lockup population reports," but that "measure might not do a good job capturing

the timing of activity in the district . . . .  A key point to recognize is that the holding times for

one arrestee should be related to the timing of bookings for all arrestees – not just municipal

ordinance violators – who were brought into the district," and that "measure of the timing of

activity at the district can not be constructed using plaintiffs' data base.").  In addition, Dr.

DiPrete did not account for activity going on the area "outside the lockup," which "would be an

example of a variable you'd want to take into account."  Def. Ex. 32, LaLonde Dep. at 115:11-23

("How long someone is being held in lockup would depend on what's going on just outside the lockup …"). Further disputed to the extent it implies that Dr. DiPrete controlled for all potentially relevant factors. *See* Def. Ex. 28, LaLonde Report at 8 ("I do not expect the level of activity [in a police district] to be captured very well in the statistical analysis by controlling for the district, booking hour, watch, day of the week and violation. The reason is that these variable control for average differences in holding times across these variables over the entire sample period.").

102.     Finally, Dr. DiPrete examined whether the number of index crimes per year in the district has an effect on the length of detention. The number of index crimes per year in the district (based on the CPD annual report) has no statistically-significant relationship to the length of detention across districts after controlling for other factors (see Table 7). Group Exh. 3, General Orders ("GO") 99-02, 10-07, 03-12; Exh. 18, DiPrete expert report, at 11.

**Response:**     Move to strike the last sentence of this paragraph as argumentative in violation of LR 56.1. Paragraph 102 violates Local Rule 56.1 by including multiple statements within the same paragraph. Controverted, objectionable, unsupported, misleading, and immaterial. Plaintiffs' allegations concerning what Dr. DiPrete "found" are argumentative and conclusory and have no place in a Local Rule 56.1 statement, and should therefore be stricken. Plaintiffs rely on the unsworn expert report of Dr. DiPrete, which is not admissible evidence and should not be considered. The assertions in this paragraph are merely a recitation of Dr. DiPrete's opinions, not fact, and to the extent plaintiffs are actually asserting the truth of those opinions as well, they require an impermissible weighing of the credibility of the expert. Disputed because Pls. Ex. 3 does not support any of the statement. To the extent it implies that Dr. DiPrete controlled for all potentially relevant factors, that implication is refuted by the evidence. *See* Def. Ex. 28, LaLonde Report at 8 ("I do not expect the level of activity [in a police district] to be captured very well in the statistical analysis by controlling for the district, booking hour, watch, day of the week and violation. The reason is that these variable control for average differences

in holding times across these variables over the entire sample period.").  Further disputed to the

extent it indicates index crimes are a relevant measure of police activity, especially in connection

with the fine-only ordinance violations at issue here:  Plaintiffs' own expert testified he did not

know if that was true, and further testified that the fine-only ordinances at issue here are not

index crimes.  Def. Ex. 30, DiPrete 6/7/06 Dep. at 208:5-7 ("Q. Do you know if index crime is a

good predictor of level of police activity in a district?  A. No."), 207:2-4 ("Q. Are non-jailable

municipal ordinances index crimes? A. I don't believe so.").

103.    Defendants have adopted no directives or orders or implemented any procedure to
ensure that ordinance violators are not detained for four hours or more or that explanations for
longer delays be recorded. Exh. A, Sodini Dep. III, at 143:11-145:6; Exh. N, Bay dep., 102:2-16;
see Exh. 16, GO 92-05; Exh. 17, GO 02-03; cf., Exh. 17, GO 02-03, at §IV.R.C ("no arrestee is
held longer than 48 hours after the time of his or her arrest without approval of charges or a
finding of probable cause by an appropriate court authorizing continued detention).

**Response:**    Controverted, argumentative, objectionable, misleading, irrelevant and

immaterial.  Disputed in that the policy of the CPD, which plaintiffs concede they are not

challenging, is that the processing of arrestees will be performed without unreasonable delay.

Pls. Ex. 16, G.O. 92-05 at 4; Pls. Ex 17, G.O. 02-03 at 1.  It is plaintiffs' burden under the law to

show that such a detention was unreasonable based on the facts and circumstances in each case.

*See Gerstein v. Pugh*, 420 U.S. 103 (1975); *County of Riverside v. McLaughlin*, 500 U.S. 44

(1991).  Disputed, misleading, immaterial and irrelevant to the extent the allegations purport to

suggest there was an affirmative duty under federal law for the CPD to record reasons why

violators are detained for four or more hours, when no such law exists, and plaintiffs have

provided no proof of such duty.  Lacking any direct evidence that such detentions were

unreasonable, the allegations in this paragraph require impermissible inferences to be drawn

against the non-movant; and disputed that, without any proof of the facts and circumstances for

each arrest, an inference of unreasonableness can be made in any event.  Further, in connection

with the named plaintiffs, the City has provided fulsome explanations based on the facts and

circumstances surrounding their arrests, detention and release for the length of their detentions. *See* Defs. Additional Material Facts and citations therein at ¶¶ 33, 35, 37. Objectionable in that the paragraph contains pure argument, and calls for speculation without citation to evidence to support what the defendants have or have not adopted. The deposition testimony cited in Pls. Ex. A and N was taken subject to objection, lacks proper foundation, calls for a legal conclusion, and is outside the scope of the deponent's personal knowledge with respect to whether any directives, orders, or procedures exist or existed.

## DEFENDANTS' ADDITIONAL MATERIAL FACTS

1.      In 2004, the Chicago Police Department ("CPD") made 244,193 arrests. Def. Ex. 33, 2004 Chicago Police Department Annual Report at 26.

2.      In 2003, the CPD made 238,961 arrests. Def. Ex. 34, 2003 Chicago Police Department Annual Report at 26.

3.      In 2002 CPD made 237,706 arrests. Def. Ex. 34, 2003 Chicago Police Department Annual Report at 26.

4.      In 2001, CPD made 233,455 arrests. Def. Ex. 35, 2001 Chicago Police Department Annual Report at 26.

5.      In 2000, CPD made 275,745 arrests. Def. Ex. 35, 2001 Chicago Police Department Annual Report at 26.

6.      In 2004, the CPD received a total of 5,271,469 emergency calls for service to 911, along with an additional 308,598 non-emergency 311 calls for service, 325,319 administrative calls for service and 100,749 automatic calls for service from triggered burglar alarms. Def. Ex. 33, 2004 Chicago Police Department Annual Report at 40.

7.      In 2003, the CPD received a total of 5,054,817 emergency calls for service to 911, along with an additional 332,609 non-emergency 311 calls for service, 340,779 administrative

calls for service and 106,514 automatic calls for service from triggered burglar alarms.  Def. Ex. 34, 2003 Chicago Police Department Annual Report at 40.

8.      In 2002, the CPD received a total of 4,937,360 emergency calls for service to 911, along with an additional 345,130 non-emergency 311 calls for service, 339,612 administrative calls for service and 109,942 automatic calls for service from triggered burglar alarms.  Def. Ex. 34, 2003 Chicago Police Department Annual Report at 40.

9.      In 2001, the CPD received a total of 5,144,617 emergency calls for service to 911, along with an additional 479,440 non-emergency 311 calls for service, 242,848 administrative calls for service and 197,949 automatic calls for service from triggered burglar alarms.  Def. Ex. 35, 2001 Chicago Police Department Annual Report at 38.

10.     In 2000, the CPD received a total of 4,396,615 emergency calls for service to 911, along with an additional 620,307 non-emergency 311 calls for service, 188,254 administrative calls for service and 246,056 automatic calls for service from triggered burglar alarms.  Def. Ex. 35, 2001 Chicago Police Department Annual Report at 38.

11.     According to their own database, the arrestees that plaintiffs claim make up the certified class constitute less than 2% of total arrests that took place in the City of Chicago during the class period.  Pls. Statement of Undisputed Facts Pursuant to Local Rule 56 at ¶95; Def. Ex. 28, LaLonde Report at 18.

12.     In 2004, there were 13,423 sworn officers in the Chicago Police Department and 1186 additional civilian members.  Def. Ex. 33, 2004 Chicago Police Department Annual Report at 39.

13.     Not all of these officers serve in the field or are involved in the arrest process. Def. Ex. 36, Johnston Dep. at 172:22-173:22.

14.     During the class period, CPD General Orders 92-05 and 02-03, and their addendums, provided the CPD's procedures for processing persons under departmental control. Pls. Ex. 16, G.O. 92-05; Pls. Ex. 17, G.O. 02-03.

15.     These CPD's General Orders for processing persons under departmental control provide a standardized framework for the processing of all adult arrestees, regardless of what offenses committed.  Pls. Ex. 16, G.O. 92-05; Pls. Ex. 17, G.O. 02-03; Def. Ex. 3, Sodini 8/22/05 Dep. at 29:23-30:13.

16.     Like the CPD's general orders, the national standards governing police practices calls for a standardized framework for the processing of all adult arrestees in the same manner, without any special processing procedures for individuals arrested for fine-only offenses.  Def. Ex. 37, Klotz Dep. at 111:7-16 (discussing national standards promulgated by National Advisory Commission on Criminal Justice Standards and Goals ("NACCJSG")); Def. Ex. 25, Greene Dep. 10/24/06 at 81:6-22 (same), 78:9-17, 81:23-82:6 (discussing national standards promulgated by Commission on Accreditation of Law Enforcement Agencies (CALEA)).

17.     Similarly, there is no national standard indicating how many hours an individual arrested for a municipal ordinance violation punishable by fine only may be detained prior to release before the length of that detention becomes unreasonable.  Def. Ex. 37, Klotz Dep. at 111:7-112:5, 140; Def. Ex. 26, Greene Report at 4-5; Def. Ex. 25, Greene 10/24/06 Dep. at 39:19-40:22; Def. Ex. 38, Standards of National Advisory Commission on Criminal Justice Standards and Goals at 313; Def. Ex. 39, Standards for Law Enforcement Agencies published by the Commission on Accreditation of Law Enforcement Agencies at Chapter 72.

18.     In Chicago, the amount of time it takes, from arrest to release, to process individuals arrested for violation of fine-only municipal ordinance violations varies among districts.  Def. Ex. 31, DiPrete 11/17/06 Dep. at 143:17-23, 145:11-12 ("the pattern across the

City varies"). Plaintiffs' expert, Thomas DiPrete, could not explain this variance. *Id.* at 143:24-144:2.

19.     The General Orders prescribe the procedures for processing adult arrestees under departmental control. According to these procedures, the arrestee:

- Is arrested and undergoes a search;

- Is transported to a police station;

- Is placed in a holding room until the arresting officer(s) arrive;

- Has an arrest report completed for him;

- Has a quasi-criminal complaint filled out for him;

- Has his personal property and/or evidence inventoried;

- Has his paperwork (including his arrest report, quasi-criminal complaint, and any other reports) reviewed by a desk sergeant;

- Has his paperwork reviewed by a watch commander;

- Is taken to lockup, where the lockup keeper reviews his paperwork, and inspects and accepts the arrestee;

- Is searched again to ensure that he does not possess anything that could be used to hurt himself, others, or police department property, and even may be (though not usually) strip searched;

- Has a medical screening form filled out for him;

- Is permitted to make phone calls;

- May be fingerprinted or photographed;

- Is placed in a cell;

- Has paperwork completed by the lockup keeper;

- Has information from his arrest report entered into a computer system to obtain a central booking number, and has a clearance completed for him -- which includes a check for outstanding warrants and positive identification;

- Has his arrest report reviewed by a watch commander for final approval of charging;

- Has a desk officer prepare an I-Bond slip prepared for him and presented to the lockup;

- Is given his I-Bond slip to sign; and,

- Has his belongings returned to him and is released.

Def. Ex. 6, Sodini 10/29/03 Dep. at 56:7-67:17; Def. Ex. 7, Miceli Dep. at 108:21-23; Pls. Ex. 16, G.O. 92-05; Pls. Ex. 17, G.O. 02-03.

20.    The sequence that these steps are completed may vary from arrestee to arrestee. Def. Ex. 3, Sodini 8/22/05 Dep. at 61:6-14.

21.    By placing arrestees in lockup, the arresting officer is free to get back on the street. Def. Ex. 18, Bay Dep. at 77:13-78:12 ("we would have individual arresting officers baby sitting prisoners instead of the lockup personnel that is the reason, one of the reasons, for having a lockup"); Def. Ex. 9, Smith Dep. at 29:13-17 (once lockup accepts the arrestee, arresting officer free to return to the streets).

22.    One of the most important steps CPD must take is identifying arrestees, and one method used to identify arrestees under departmental control is performing a name check. Def. Ex. 3, Sodini 8/22/05 Dep. at 136:14-24.

23.    Multiple name checks of the same arrestee are often performed at various points during the arrestee's detention to ensure that the arrestee has been properly identified. Def. Ex. 3, Sodini 8/22/05 Dep. at 80:16-81:6.

24.    Multiple name checks of individuals arrested for fine-only ordinance violations serve two purposes: (1) ensuring that an arrestee whose initial name check reveals the existence of a warrant is in fact the individual identified by that warrant; and (2) ensuring that an arrestee whose initial name check reveals the lack of any warrants is indeed not wanted on any warrants, thus providing a sufficient basis to let the arrestee to bond. Def. Ex. 3, Sodini 8/22/05 Dep. at 134:9-135:3; Def. Ex. 26 Greene Report at 7.

25.     Among the issues police officers are attempting to resolve through the use of these additional name checks are:  (1) to check a different spelling of the individual's name; (2) to check additional information about the arrestee's name, such as a middle name or initial; (3) to help ensure positive identification of individuals with more common names that may appear multiple times within a database; (4) to check possible aliases of an arrestee that are discovered; and (5) as a double-check ordered by more senior officers to ensure that the individual has been properly identified.  Def. Ex. 2, Skahill Dep. at 142:1-8; Def. Ex. 14 Greene 9/26/06 Dep. at 75:7-12 ("John Jones comes in and identified himself as John Jones and there are 50 John Joneses that come up on the screen and maybe its Ray Jones.  So there may be multiple checks through the same system as one begins to challenge the offered identity of the person who comes in."); Def. Ex. 25, Greene 10/24/06 Dep. at 68:5-11 ("somebody gives you a name, you run the name, they spell the name differently, your boss looks at it and says 'no you typed it wrong, I want you to type it again.'  There are reasons why people may go back to the same database is what I am suggesting.").

26.     Of the approximately 36,000 people in plaintiffs' database arrested for fine-only ordinance violations, there was an outstanding warrant on a more serious offense for about 5% (1 in 20 arrestees) of the cases – or about 500 persons per each year of the class period.  Def. Ex. 28, LaLonde Report at 18; Def. Ex. 25 Greene 10/24/06 Dep. at 67:13-19.

27.     Events, both unusual and routine, occur in the lockup area that require the attention of the officers in lockup, and lengthen the time it takes to complete the processing and ultimate release of individuals arrested and detained for violation of fine-only offenses.  Def. Ex. 29, Griffin Dep. at 48:15-49:14, 55:17-56:24, 60:10-14, 60:20-61:7, 66:2-67:24, 72:2-13, 76:5-77:4, 83:10-84:4, 86:17-88:20 (collecting examples); Def. Ex. 26, Greene Report at 8 ("[W]hile the Chicago Police Department is committed to the release of . . . offenders in a 'reasonable'

time frame, reasonable is a time dimension, which is often conditioned by interruption; an hour or two of processing time, may be expanded by several interruptions, which collectively add time to any individual's processing.  And, while these tasks take time, the police, including the Chicago Police, are mindful to process arrestees of all sorts as expeditiously as possible").

28.     These scenarios include:

- Cases where a detainee in the lockup becomes sick or injured.  Def. Ex. 29, Griffin Dep. at 48:15-49:14;

- Cases where a detainee in the lockup has in his possession or is need of receiving medicine.  Def. Ex. 29, Griffin Dep. at  55:17-56:24;

- Cases where a detainee in the lockup threatens suicide.  Def. Ex. 29, Griffin Dep. at 60:10-14;

- Requests from the detective division for detainees who can take part in a lineup.  Def. Ex. 29, Griffin Dep. at 60:20-61:7;

- Shift changes.  Def. Ex. 29, Griffin Dep. at 66:2-66:5;

- Arrival of the bus to criminal courts, requiring that the lockup keepers turn their attention to getting those prisoners onto the bus.  Def. Ex. 29, Griffin Dep. at 66:8-67:24;

- Rush transport of prisoners from lockup to the criminal courts at separate times other than the morning bus run.  Def. Ex. 29, Griffin Dep. at 72:2-13;

- Cases where a detainee in the lockup has been arrested for either resisting arrest or battering a police officer, requiring the watch commander to interview that individual in the lockup area.  Def. Ex. 29, Griffin Dep. at 76:5-77:4; 83:10-84:4; and

- Cases where multiple arrestees are brought into the lockup at the same time.  Def. Ex. 29, Griffin Dep. at 86:17-88:20.

29.     Events, both unusual and routine, also occur at the desk area that require the attention of officers working the desk area and may affect the time it takes to complete the processing and ultimate release of individuals arrested and detained for violation of fine-only offenses.  Def. Ex. 29, Griffin Dep. at 107:24-116:3 (collecting events); Def. Ex. 26, Greene Report at 8.

30.     Finally, events, both unusual and routine, also occur that require the attention of the watch commander and may affect the time it takes to complete the processing and ultimate release of individuals arrested for violation of fine-only offenses.  Def. Ex. 29, Griffin Dep. at 127:4-131:20 (collecting events); Def. Ex. 26, Greene Report at 8.

31.     Many of the events listed above are not always documented on forms.  Def. Ex. 19, Wedster 9/20/05 Dep. at 89:5-13 (large numbers of prisoners awaiting entrance into the lockup); Def. Ex. 18, Bay Dep. at 105:12-106:5 (drunkenness); Def. Ex. 18, Bay Dep. at 112:12-17, 113:17-24, 144:13-23 (prisoner being taken to the hospital); Def. Ex. 12, Cobb Dep. at 110:19-111:5 (uncooperative arrestees); Def. Ex. 13, Coleman Dep. at 138:12-23 (ambulance coming to take sick detainees); Def. Ex. 23, Garrity 10/23/02 Dep. at 29:15-20 (computer system failure); Def. Ex. 7, Miceli Dep. at 103:17-18 (arrestee sleeping in lockup); Def. Ex. 19, Wedster 9/20/05 Dep. at 89:5-13 (large numbers of prisoners awaiting entrance into the lockup); Def. Ex. 2, Skahill Dep. at 101:11-14 ("again, the documentation would not be the whole story because there could have been events that occurred that also impacted that were not documented"); Def. Ex. 25, Greene 10/24/06 Dep. at 28:4-21 (police logs do not capture all activity).

32.     According to his arrest report, named plaintiff Emmett Lynch was arrested at 5:59 p.m. on May 6, 2002 and released on an I-bond at 2:00 a.m. on May 7, 2002.  Pls. Ex. 5, Arrest Report of Emmett Lynch.

33.     The length of Mr. Lynch's detention resulted from any one or more of the following events:  (a) backlog within the 19th District resulting from arrests and patrols in and around Wrigley Field before, during, and after the Chicago Cubs game on the evening of May 6, 2002; (b) backlog within the 19th District resulting from the influx of prisoners during the 2nd watch on May 6, 2002 from the neighboring 23rd District Station, where an individual was shot and killed inside that district station on May 6, 2002, causing the 23rd District to transfer all of its

prisoners to the 19th District and causing the 19th District to process all those arrested within the 23rd District during that time period; (c) backlog in the 19th district caused by the processing of six other arrestees who were transported into the 19th district station with Mr. Lynch on May 6, 2002; (d) backlog in the 19th District caused by the processing of at least 15 individuals arrested and brought into the 19th District within two hours of Mr. Lynch's arrival in the 19th District station; (e) backlog in the 19th District as a result of the presence of no fewer than 30 individuals in custody within the district during the 1st Watch (from 10:00 May 6, 2002 until 6:00 a.m. May 7, 2002); (f) the time it took to complete all of the administrative steps incident to Mr. Lynch's arrest. Def. Ex. 8, Defendants' Answers and Objections to Plaintiffs' Third Supplemental Interrogatories at 4.

34.     According to his arrest report, named plaintiff Ronald Portis was arrested at 8:40 p.m. on August 20, 2001, and released on an I-bond at 7:15 a.m. on August 21, 2001. Pls. Ex. 1, Arrest Report of Ronald Portis.

35.     The length of Mr. Portis's detention resulted from any one or more of the following events: (a) Mr. Portis's deposition testimony that he was asleep during a portion of his detention, and testimony of numerous officers, including Sgt. Mary Miceli and Sgt. Eugene Richmond, that detainees are often permitted to sleep in their cells in the late night and early morning prior to release, particularly if they will not or refuse to wake up; (b) the fact that Mr. Portis was without any state identification; (c) ordinary backlog on the 1st watch resulting from preparing detainees for morning court appearances; (d) Sgt. Miceli's deposition testimony that there was extraordinary backlog within the 18th District on August 20-21, 2001, (e) the time it took to complete all of the administrative steps incident to Mr. Portis's arrest. Def. Ex. 8,

Defendants' Answers and Objections to Plaintiffs' Third Supplemental Interrogatories at 4-5;[11] *see also* Def. Ex. 7, Miceli Dep. at 115:20-117:12.

36.     According to the arrest report, named plaintiff Madric Lance was arrested at 1:00 p.m. on February 27, 2002, and released on an I-bond at 5:15 a.m. on February 28, 2002.  Pls. Ex. 7, Arrest Report of Madric Lance.

37.     The length of Mr. Lance's detention resulted from any one or more of the following events:  (a) an erroneous entry of a "time fingerprinted" on the arrest report, indicating that the CPD was mistakenly awaiting fingerprint results for Mr. Lance, which never came through because as it turned out he had not been fingerprinted; (b) Mr. Lance's deposition testimony that he was brought into lockup behind "two or three" other detainees who would have required processing concomitantly to Mr. Lance; (c) the arrest and processing of four juveniles shortly after Mr. Lance's entry into the 6th District lockup, which according to the deposition testimony of Officer Marlon Mitchell, took precedence over any further processing of adult arrestees; (d) the fact that 6th District Watch Commander Robert Johnson's was away from the 6th District station during the early morning hours on February 28, 2002; (e) Mr. Lance's deposition testimony that he was asleep during  at least a portion of his detention, and testimony of numerous officers, including Sgt. Mary Miceli and Sgt. Eugene Richmond, that detainees are often permitted to sleep in their cells prior to release in the late night and early morning, particularly if they will not or refuse to wake up; (f) ordinary backlog on the 1st watch resulting from preparing detainees for morning court appearances; (g) the time it took to complete all of the administrative steps incident to Mr. Lance's arrest.  Def. Ex. 8, Defendants' Answers and

---

[11] Defendants subsequently informed plaintiffs that they had determined after further investigation that the shooting death of on-duty Chicago Police officer Eric Lee, originally identified as one of the possible reasons for the length of Mr. Portis detention in subpart (c) of its Answers and Objections to Plaintiffs Third Supplemental Interrogatories, did not in fact contribute to the length of his detention.

Objections to Plaintiffs' Third Supplemental Interrogatories at 5-6[12]; *see also* Def. Ex. 10, Caver-Elder Dep. at 113:2-22 (explaining that it appeared that officers were mistakenly awaiting fingerprint results from Mr. Lance, despite the fact that he was not fingerprinted); Def. Ex. 9, R. Johnson Dep. at 54:6-22 (explaining that one cause for the length of Mr. Lance's detention may have been that he was fingerprinted).

Dated: February 9, 2007                            Respectfully submitted,

                                                   s/ June K. Ghezzi
                                                   June K. Ghezzi, Bar No. 6185506
                                                     jkghezzi@jonesday.com
                                                   Brian J. Murray, Bar No. 6272767
                                                     bjmurray@jonesday.com
                                                   Morgan R. Hirst, Bar No. 6275128
                                                     mhirst@jonesday.com
                                                   JONES DAY
                                                   77 West Wacker Drive
                                                   Chicago, Illinois 60601-1692
                                                   (312) 782-3939

                                                   Attorneys for Defendants

---

[12] Defendants subsequently informed plaintiffs that they had determined after further investigation that the bomb threat, identified as one of the possible reasons for the length of Mr. Lance's detention in subpart (c) of its Answers and Objections to Plaintiffs' Third Supplemental Interrogatories, did not in fact contribute to the length of his detention.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 9, 2007, I electronically filed the foregoing

**DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF UNDISPUTED**

**FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS** with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the following at

their e-mail address on file with the Court:

Thomas G. Morrissey
10249 S. Western Avenue
Chicago, Illinois 60643
(773) 239-0387

Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-4878

Robert H. Farley, Jr.
1155 S. Washington Street
Naperville, Illinois 60540
(630) 369-0195

Judson H. Miner
Miner, Barnhill & Galland
14 West Erie Street
Chicago, IL 60610
(312) 751-0438

Michael Kanovitz
Loevy & Loevy
312 N. May St.
Suite 100
Chicago, IL 60607
(312) 243-5902

s/ Brian J. Murray _____