IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD PORTIS, MADRIC LANCE, and )
EMMETT LYNCH, individually and on behalf )
of a class, )
)
Plaintiffs, )
) No.  02 C 3139
v. )
) Judge Robert W. Gettleman
CITY OF CHICAGO, a municipal corporation; )
and TERRY G. HILLARD, Superintendent of the )
Chicago Police Department, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Ronald Portis, Madric Lance and Emmett Lynch brought a second amended

class action complaint against defendant City of Chicago[1] alleging that the City has a practice of

unconstitutionally delaying release of persons arrested for non-jailable ordinance violations that

are punishable by fine only.  The court certified a class defined as:

> All persons who, from May 1, 2000, through September 3, 2004, were arrested on
> ordinance violations which carry no jail time in the City of Chicago and who were
> detained for more than two hours after all administrative steps incident to the
> arrest, except non-discretionary ministerial acts, were completed.  The class is
> further limited to those persons who (1) were not fingerprinted by defendants
> after being brought into custody; and (2) were eligible for release on personal
> recognizance bond pursuant to Rule 553(d) of the Illinois Supreme Court.

Plaintiffs previously moved for summary judgment of liability against the City.  In Portis

v. City of Chicago, 510 F.Supp.2d 461 (N.D.Ill. 2007) ("Portis I"), the court denied plaintiffs'

motion, but later granted plaintiffs leave to renew it to clarify whether certain material facts were

_____

[1]Defendant Hillard and all other originally named individual defendants were previously
dismissed by plaintiffs pursuant to Fed. R. Civ. P. 41.

genuinely in dispute. Because, as discussed below, the court is now satisfied that no genuine issues of material fact remain for trial, and that plaintiffs are entitled to judgment as a matter of law, plaintiffs' renewed motion for summary judgment of liability is granted.

## BACKGROUND

Plaintiffs are a class of individuals who were arrested and detained for non-jailable ordinance violations under the City of Chicago's Municipal Code. That is, the violations with which the class members were charged are punishable by fine only, not by detention or incarceration. Although plaintiffs could simply have been issued a ticket for the offenses, they do not dispute the propriety of their arrests. Defendant, for its part, does not dispute that once the necessary administrative steps incident to the class members' arrests were completed, the arrestees were eligible to be released on an individual recognizance bond ("I-bond") pursuant to Ill. Supp. Ct. Rule 553(d).

Just as plaintiffs do not challenge the legality of their arrests, they do not complain about the length of time they were detained while the City established that they were eligible for release on an I-bond. The gravamen of plaintiffs' complaint is that the City violated their Fourth Amendment rights when it continued to detain them for more than two hours (and in some cases for as long as 16 hours or more) _after_ it completed _all_ of the administrative steps necessary to determine that they were eligible for release. In their first motion for summary judgment, plaintiffs argued that once the class members' eligibility for release had been established, any remaining administrative steps were non-discretionary, ministerial, and often redundant, and could not justify continuing to detain the class members any longer than the few minutes those steps reasonably required.

2

Although the court agreed with plaintiffs in theory, it appeared from the record that the order in which certain administrative steps were taken was disputed.  Because the court could not resolve the legal issues presented by plaintiffs' claims until it had a firm grasp on when, in the sequence of administrative steps, plaintiffs' eligibility for release had been conclusively established, it denied summary judgment.   Plaintiffs have now renewed their efforts to show that the administrative steps the City took in processing the class members' arrests are indeed undisputed, and that the class members had been determined eligible for release, at the latest, by the time they were issued a Central Booking ("CB") number, as discussed below.  Plaintiffs again urge the court to find that their continued detention in excess of two hours after receiving a CB number violates the Fourth Amendment as a matter of law.

## **LEGAL STANDARDS**

The standard for summary judgment remains unchanged since the court decided Portis I. As before, summary judgment is proper when the moving papers and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party has established undisputed facts entitling that party to judgment, the non-moving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990).  The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing summary judgment.  Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [the non-moving party]." Anderson, 477 U.S. at 252.

To assist courts in sorting out which facts, if any, are genuinely in dispute, the Northern District of Illinois adopted Local Rule ("L.R.") 56.1. Having discussed the requirements of L.R. 56.1 in detail in Portis I, the court need not revisit them here. It bears repeating, however, that the court is entitled to demand strict adherence to L.R. 56.1 and may refuse to consider facts presented in a manner that does not comport with the rule. Ciomber v. Cooperative Plus, Inc., 527 F.3d 635, 643 (7th Cir. 2008). In Portis I, the court admonished both parties for failing to observe the requirements of L.R. 56.1, deploring in particular defendant's consistently improper, obfuscatory, and argumentative statements. Portis I, at 464. Nevertheless, the court tried to piece together the material facts as best it could without the aid of a proper L.R. 56.1 "roadmap," and concluded that the order in which certain administrative steps were taken appeared to be in dispute. As a result, the court denied summary judgment "despite the strong possibility that had [the] motion been prosecuted properly plaintiffs would have been able to demonstrate that defendant has violated the constitutional rights of the plaintiff class." Portis I, at 465.

If plaintiffs succeed in their renewed attempt to show that no material facts are in dispute, they must then convince the court that class members' detention in excess of two hours after they

were determined to be eligible for release is unreasonably lengthy under Fourth Amendment

standards.  Chortek v. City of Milwaukee, 356 F.3d 740, at 747 (citing Gerstein v. Pugh, 420

U.S. 103 (1975)).  If plaintiffs are successful on that front as well, their final burden is to

demonstrate that the City is liable under Monell v. Dep't of Soc. Serv. Of City of New York, 436

U.S. 658, 694 (1978), for the Fourth Amendment violations.   Under Monell, plaintiffs must

show that the violations were caused by a policy or custom carried out by the City's lawmakers

"or by those whose edicts or acts may fairly be said to represent an official policy."  Portis I, at

469 (citing Chortek, at 748).

## DISCUSSION

The City's Arrest Procedures

In Portis I, the court summarized its understanding of the City's basic arrest processing

procedure.  The first steps, which are not materially disputed, are that an individual suspected of

an ordinance violation is arrested, searched, transported to a police station, and placed in a

holding area.[2]   At the station, the arresting officer enters the individual's available identifying

information into the "hot desk" system, which has access to multiple law enforcement databases,

to determine whether the individual is wanted on any outstanding warrants.  Either before, after,

or while completing this name/warrant check, the arresting officer also fills out an arrest report

and a quasi-criminal complaint.

The arresting officer takes the paperwork generated by these steps, along with any other

reports, to the desk sergeant, who reviews it and charges the arrestee.  The paperwork then goes

---

[2]Defendant's claim that in some instances, class members bypassed the holding area and
were taken directly to a cell is not supported by the record, as discussed below, and does not give
rise to a material dispute.

to the watch commander, who reviews the paperwork and the charge, determines whether the individual has been satisfactorily identified, and makes an initial determination of probable cause. At that point the arrestee is taken from the holding area to the lockup.

The lockup keeper reviews the paperwork and generates a CB number using information from the arrest report. Meanwhile, arrestees are prepared for custody: they are again searched, their belongings are inventoried, they fill out a medical screening form, and they are allowed to use the telephone. During this time, arrestees whose identity and/or warrant status was deemed inconclusive by the watch commander are fingerprinted, and additional name/warrant checks are run.[3] At the end of these additional steps, the watch commander again reviews the paperwork and signs off on the final charges. A desk officer then prepares an I-bond for the arrestee's signature. Once the individual has signed the I-bond, his or her belongings are returned, and the individual is released.

According to plaintiffs, class members became eligible for release, at the latest, by the time they received the CB number. Defendant contends, however, that a CB number could issue before (1) an arrested individual's identity was established and (2) it was determined whether that individual was the subject of any outstanding warrants. In such cases, defendant argues, one or more subsequent steps could be required to determine whether that individual was eligible for release. Because the court could not, based on the parties' previous L.R. 56.1 submissions, conclude that class members had systematically been determined eligible for release before

---

[3]Until June 7, 2002, a subsequent name/warrant check was performed on all arrestees by faxing a copy of the Arrest Report to the Field Inquiry Section. This step was apparently determined to be redundant, since it was based on the same information and accessed the same databases as the "hot desk," and was therefore discontinued.

receiving a CB number, it was left with no identifiable starting point for measuring the allegedly unconstitutional detention.

Mercifully, plaintiffs' renewed L.R. 56.1 statement heeds the court's previous directives, and more importantly, it resolves the apparent dispute identified in Portis I. Defendant, meanwhile, persists in muddling the record with argumentative and misleading responses. Wading through the morass of defendant's improper submissions, the court was tempted more than once to throw up its hands and deem the entirety of plaintiffs' L.R. 56.1 statement undisputed.[4] Reluctant to punish the City for the failings of its counsel, however, and in an effort to bring this drawn-out litigation to a meaningful close, the court persevered. Yet the substantive result is the same, because a considered analysis of defendant's responses reveals little more than smoke and mirrors.

Though the standard processing procedure summarized above reflects the general sequence of the various steps,[5] it is helpful to set forth relevant portions in a numbered list, highlighting in bold the crux of the apparent dispute that defeated summary judgment in Portis I:

1.  The class member is arrested, searched, and transported to a police station;

2.  The class member is placed in a holding area;

3.  The arresting officer completes an arrest report;

---

[4]This is essentially the relief requested in plaintiffs' pending motion to strike defendant's L.R. 56.1 responses. The court considered the parties' respective arguments relating to that motion jointly with their summary judgment arguments and denies the motion to strike (Docket No. 505) as moot in light of the present ruling.

[5]Although the court, like the parties, often uses the present tense to refer to the City's practice, it is mindful that the City's policies and/or practices have changed in material respects since the end of the defined class period.

4.      A quasi-criminal complaint is completed;

5.      **An initial name/warrant check is performed and the results are obtained**
        [*this step may take place at different points after arrival at the police station in step 1, but in any event prior to the next step*]

6.      A desk sergeant reviews the arrest report, quasi-criminal complaint, and any other reports (i.e., the "paperwork") and charges the class member;

7.      The arresting officer takes the class member's paperwork to the **watch commander**, **who ensures that the person has been identified correctly and makes the preliminary probable cause determination (i.e., determines that the charges are appropriate);**

8.      The class member is taken to lockup, where the lockup keeper reviews his or her paperwork and accepts the class member, and where the class member is again searched, permitted to make phone calls, and receives a computer-generated CB number.

By and large, the above sequence is consistent with the City's own account of its procedures.[6]  It is also consistent with the Chicago Police Department General Orders ("GOs"), which require the initial name/warrant check to be completed <u>before</u> the desk sergeant's review of the paperwork (step 6), and which the parties agree occurs before the watch commander's review (step 7).  Nevertheless, defendant maintains that, "in practice the charging paperwork (arrest report and complaint) were brought to the watch commander for initial review [step 7] *prior to completion of the initial name/warrant check* [step 5]."  <u>Portis I</u>, at 469.  (Emphasis added.)

The court is now convinced, however, that that is not what the evidence establishes. Instead, the undisputed evidence shows that according to the City's general practice, an <u>initial</u> name/warrant check was consistently performed, and completed (to the best of the arresting

---

[6]In ¶ 21 of its L.R. 56.1 statement of additional material facts, the City sets forth its procedures in bullet-point format.

officer's ability using the information and resources available), prior to the watch commander's review.  If the results of that check were unsatisfactory or inconclusive, the watch commander would require <u>subsequent</u> checks based on information obtained from fingerprinting.  In such cases, the arrestee could, indeed, be taken to the lockup before an arrestee's name/warrant status was ascertained.   But as plaintiffs correctly note, because the class is limited, by definition, to those cases in which fingerprinting was not ordered, the identity and warrant status of <u>class</u> <u>members</u> was, in each case, satisfactorily determined based on the information resulting from the initial name/warrant check.

The court also agrees with plaintiffs that defendant's L.R. 56.1 responses conflate the evidence relating to initial name/warrant checks with evidence relating to subsequent checks. The result is misleading because it purports to show a genuine factual dispute, when in fact there is none.  An example of this pervasive problem follows:

### <u>STATEMENT 10</u>

10.     Typically, the Arresting Officer does not present the Class Members' paperwork to the Desk Sergeant until he/she has completed the name check and determined to the best of his/her ability the Class Members' identity and warrant status.  Exh. 3, Cobb dep. At 25:17-26:5; Exh. 13, Richmond dep. At 49:24-50:15.

This statement makes a concise, intelligible assertion about the City's typical practice and properly lends itself to a response of "admit" or "deny."  It is also supported by the record evidence.  Indeed, the statement incorporates the very terms used by Officer Cobb, who testified:

Q      And are all of the steps we just discussed completed before you go to the desk sergeant, the filling out of the complaint and the completing of the name and warrant check and any other computer checks that you think are appropriate?

[ ]<sup>7</sup>

A    When an arresting officer is – to the best of their ability is satisfied that
     they know who they have in custody and what the correct charges would
     be, the desk sergeant does have to approve everything that the arresting
     officer just completed.

Q    So when the arresting officer is satisfied to the best of his ability that he
     knows the identity of the person in custody and there are no warrants, and
     he's finished the paperwork, he then presents it to the desk sergeant?

A    Yes, sir.

Defendant responds to this statement as follows:

RESPONSE:    Controverted and unsupported.  Controverted because multiple
officers have testified that the arrestee's identity or the absence of any warrants has not
necessarily been verified at the time the arrest report is brought to the Desk Sergeant.  Def. Exh.
8, Sodini 8/22/05 Dep. at 103:13-16; Def. Ex. 1, Sodini 10/29/03 Dep. at 67:8-16; Def. Ex. 10,
Wedster 9/20/05 Dep. at 129:20-130:6; Def. Ex. 11, Caver-Elder Dep. at 65:7-14.  Multiple
officers have also testified that many of these tasks performed by the Arresting Officer may not
be completed until after he has handed control of the arrestee over to lockup personnel, which
may or may not have occurred before presentment of the paperwork to the Desk Sergeant.  Def.
Ex. 15, Bay Dep. at 57:24-58:8 (completion of criminal complaints and "plethora of additional
documents" may be taken care of after arrestee is placed in lockup); Def. Ex. 8, Sodini 8/22/05
Dep. at 71:19-23 (criminal complaint form may be completed after the issuance of a CB
number); Def. Ex. 9, Smith Dep. at 24:8-12 (in effort to "expedite," name check may be
performed after the desk officer has clerked the arrest report).  Unsupported because Plaintiffs do
not indicate what hypothetical "Class Member," "Arresting Officer," or "Desk Sergeant" they
are referring to and nothing in the cited evidence indicates that these procedures occur in the
order described with respect to all arrests, let alone the Class Members' arrests, and any
application of the cited evidence to establish the statement requires impermissible inferences be
made against the non-movant.

        Defendant's response is disingenuous from the outset.  Whether or not an arrestee's

identity has been "verified" is not the point.  Plaintiffs do not assert (in this statement or any

other) that the name/warrant check conducted by the arresting officer is sufficient to "verify" an

---

<sup>7</sup>Defendant's counsel objected on the ground that the question was hypothetical.  The
court does not find the question improper and sees no basis for excluding the testimony elicited.

arrestee's name/warrant status. The facts for which plaintiffs do seek admission, and which the evidence taken as a whole supports, is that typically, prior to bringing an arrestee's paperwork to the desk sergeant, an arresting officer uses his or her best efforts, based on the resources available at the time, to identify the name and warrant status of the arrested individual. The first part of defendant's response (including the citations to the record) does not controvert or even respond to plaintiffs' statement.

Defendant's second assertion is confusing (the demonstrative phrase "these tasks" lacking any antecedent referent) and largely non-responsive. As noted, plaintiffs' statement makes a straightforward assertion, supported by the record, about the arresting officer's responsibility for ascertaining the identity and warrant status of an arrested individual. Even assuming that "these tasks" refers to some tasks beyond the initial name/warrant check that may, in some cases, be required to "verify" an arrestee's identity, such tasks are irrelevant because they were not necessary to identify the name/warrant status of any class member. Moreover, two of the three record citations defendant offers that evoke additional tasks cite the completion of criminal complaints. That an arresting officer also must complete a complaint form has nothing to do with whether the officer uses his or her best efforts to identify an individual prior to bringing the paperwork to the desk sergeant. Defendant's invocation of that task is entirely non-responsive. Moreover, testimony about criminal complaints is irrelevant in any event, since *quasi*-criminal (as opposed to criminal) complaints are used for non-jailable ordinance violations. The only portion of defendant's statement that even remotely responds to plaintiffs' statement is the testimony by Officer Smith that when a computer is not immediately available for an arresting officer to run a name/warrant check, the officer may take the

paperwork to a desk sergeant before completing the check. Even assuming that Officer Smith's

testimony accurately reflects the way arresting officers sometimes "expedite" the paperwork,

however, that testimony, standing alone, is insufficient to controvert plaintiffs' statement about

the City's general practice, which is consistent with the evidentiary record as a whole.

Finally, defendant's third assertion about the "hypothetical" nature of plaintiffs'

statement (which is repeated throughout its responses) consists of improper argument, does not

point to any facts that controvert plaintiffs' general assertion, and merits no serious

consideration.[8]

Sadly, most of defendant's responses are similarly unhelpful. The following is another

example that goes to the heart of the potential dispute identified in Portis I:

### STATEMENT 30

30.     The initial name/warrant check has been completed before the
Watch Commander makes the initial determination of probable cause. Exh. 8,
Malinowski dep. at 24:22-25:5; Exh. 25, Schmit dep. at 58:23-59:11; Exh. 10,
Smith dep. at 24:16-21.

Each of plaintiffs' citations to the record supports this straightforward assertion.

Defendant responds as follows:

RESPONSE:          Controverted and unsupported. Controverted because multiple
officers have testified that it is not necessary that the Watch Commander has confirmed that the
name check revealed no warrants for the arrestee prior to approving probable cause. Def. Exh. 8,
Sodini 8/22/05 Dep. at 103:13-16; Def. Ex. 1, Sodini 10/29/03 Dep. at 67:8-16; Def. Ex. 10,

---

[8]In this response, as in many others, defendant complains that plaintiffs' statement is
"hypothetical" because it does not refer to specific individuals. This objection is nonsense. To
the extent fact witnesses are able, based on their personal knowledge or experience, to make
observations about general practices, the court finds nothing improper in allowing them to testify
about these observations. Defendant is free to argue that such evidence should be accorded little
probative value; but defendant's brief, not its L.R. 56.1 response, is the proper venue for such
argument.

Wedster 9/20/05 Dep. at 129:20-130:6; Def. Ex. 11, Caver-Elder Dep. at 65:7-14. Unsupported because Plaintiffs do not indicate what hypothetical "Watch Commander" they are referring to and nothing in the cited evidence indicates that these procedures occur in all arrests, let alone the arrests of the Class Members, and any application to all arrests requires an impermissible inference be made against the non-movant.

This response mirrors the response to Statement 10 but is cast in slightly different terms. Defendant this time responds to a statement about an initial name/warrant check with an assertion disputing what the watch commander has "confirmed." Notably, defendant cites the very same evidence it pointed to earlier, when it asserted that an arrestee's name and warrant status had not yet been "verified" upon completion of the initial name/warrant check. The remainder of defendant's response is the same improper argument as above, and again fails to set forth any facts to controvert plaintiffs' statement.

The preceding submissions are characteristic of the parties' respective L.R. 56.1 statements and responses, and it is unnecessary to discuss each of the factual assertions establishing the nature and order of the City's processing procedures in detail.[9] Plaintiffs' account of the procedures is supported by the record, and defendant's responses are inadequate to controvert that account in any material way. Nevertheless, one further ostensible dispute bears comment. Defendant gives substantial air time, in an effort to controvert a number of plaintiffs' assertions about steps that occur between the time class members arrived at the police station and the time they were placed in lockup, to the "fact" that named plaintiff Ronald Portis testified he was taken to lockup immediately upon arrival at the police station. Indeed, references to Portis's testimony are at the front and center of defendant's attack on plaintiffs'

---

[9]Defendant's motion to strike plaintiffs' reply in support of their L.R. 56.1 statements (Docket No. 503) is denied. In light of the nature of defendant's responses, plaintiffs were justified in filing a reply.

factual assertions–a number of which are directly supported by the testimony of Ronald Sodini, the City's 30(b)(6) witness designated as knowledgeable about the Chicago Police Department's procedures and practices--regarding the steps that occur before an arrestee is placed in lockup. And for good reason: would not plaintiffs have a problem if the testimony of their named representative controverted one of the critical factual underpinnings of their case? The court thought so, and took the time to review the Portis testimony carefully.

In his deposition, in response to the City's request that Portis "walk [him] through what happened at the station when [Portis] arrived," Portis testified:

> I don't know what they do as they put you in the lockup, they search you, put you in the cell, and they call you out, and fingerprint you and take your picture. I don't think they did that, though. I don't remember. That's the usual procedure.

On its face, Portis' testimony is muddled and equivocating. Indeed, the first three words of his response are "I don't know." He then lists several procedures that do not apply to individuals arrested for non-jailable ordinance violations (fingerprinting and photographing), and no sooner has he recited those procedures than he retracts some or perhaps all of his narrative, saying that he doesn't remember what happened. Furthermore, it is not at all clear that Portis was focusing on the temporal aspect of the question, as defendant now wishes to do; indeed, Portis' testimony reads more like a scrambled account of various procedures he had been through at one time or another than his actual recollection of an exact sequence of events, beginning with his arrival at the police station on the day in question.[10]

_____

[10]Indeed, Portis's testimony immediately preceding the City's "walk me through the steps" question reflects that he was arrested on more than one occasion, and that he was confused about what happened on which occasion.

While it is not the court's function at summary judgment to "weigh the evidence and decide on the merits," Anderson, at 249, neither must the court allow a case proceed to trial based on merely a "metaphysical doubt as to the material facts." Matsushita, at 586. "It is well accepted that the purpose of summary judgment is to prevent an unnecessary trial where, on the basis of the pleadings and supporting documents, there remains no material issue of fact to be tried." Moore v. Marketplace Restaurant, Inc., 754 F.2d 1336, 1339 (citing Kirk v. Home Indemnity Co., 431 F.2d 554, 559 (7th Cir.1970)). Here, the evidence taken as a whole firmly supports plaintiffs' characterization of the steps occurring before an arrestee is taken to lockup, and no measure of artful advocacy by defendant can transform Portis's faltering testimony into a triable dispute.

In sum, plaintiffs have successfully demonstrated that no triable issues remain regarding the nature and order of the steps taken in processing class members. The court is now satisfied that the evidence shows that class members had been determined to be eligible for release on an I-bond no later than by the time they received a CB number.

Statistical Evidence of the City's Procedures

The court is equally convinced that undisputed facts prove that the prolonged detention of class members after the issuance of CB numbers was a city-wide phenomenon. Plaintiffs rely on the analysis of their expert, Thomas DiPrete, to establish the statistical basis for their claim that these detentions were systematic. Defendant argues that DiPrete's expert report is "unauthenticated, unsubstantiated, hearsay" and should not be considered. But Mr. DiPrete's report was accompanied by his sworn affidavit attesting to the report's authenticity and to its factual foundation. Moreover, the affidavit stated that Mr. DiPrete could testify competently to

the contents of the report, if called upon to do so. Defendant's objection is thus unfounded. See Winskunas v. Birnbaum, 23 F.3d 1264, 1267-68 (evidence submitted at summary judgment must be admissible in content, but not in form).

Defendant also complains that Mr. DiPrete's methodology was flawed because the data he used did not reflect certain information, such as the time each class member entered the lockup, the order in which the processing steps were completed, or factors that may have accounted for processing delays. But defendant fails to explain how that information would have any bearing on the principal issue on which Mr. DiPrete opines: the statistical prevalence, throughout the City's districts, of prolonged detention of class members after they have been determined eligible for release.[11] Moreover, other than the general assertion that defendant's own expert, Robert LaLonde, "refutes the claims made in DiPrete's report and testimony," defendant does not identify a shred of evidence to controvert any of the statistics plaintiffs assert, including: that of 18,031 arrests, 80% resulted in a detention of two hours or more from the time that a CB number was issued to the time of release; that approximately 95% of the class members were detained for one hour or more; and that the mean detention time was 4.42 hours and the median was 3.75 hours.[12] To the contrary, in his deposition, LaLonde testified that he

---

[11]Defendant also complains that DiPrete's use of the time class members received a CB number to begin measuring the time of detention reflects a "self-serving" selection by plaintiffs' counsel. As explained above, however, the court agrees with plaintiffs that issuance of a CB number is a meaningful indicator of when class members' eligibility for release was established, and that it is therefore a rational starting point for DiPrete's calculations.

[12]Plaintiffs also cite the finding that 75% of the arrests resulted in a detention time of four or more hours from arrest to release. This finding is irrelevant to plaintiffs' claims, however, and its consideration only stands to obscure what the court understands to be plaintiffs' theory of the case.

was able to replicate all of DiPrete's calculations and found them to be accurate. The court deems these statistics undisputed.

<u>Fourth Amendment Violations</u>

The factual landscape thus established, the court turns to the legal question of whether detention in excess of two hours after an individual has been has been found eligible for release violates the Fourth Amendment. Both the Supreme Court and the Seventh Circuit have had occasion to address the limits that the Fourth Amendment places upon detention of individuals subject to arrest. In <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975), the Supreme Court established that the Fourth Amendment allows a person suspected of a crime to be arrested and held "for a brief period of detention to take the administrative steps incident to arrest." <u>Id</u>., at 113-114. The Court has never said, however, how long the "brief period" may be. <u>See</u> <u>Gramenos v. Jewel Companies, Inc</u>., 797 F.2d 432, 437 (7th Cir. 1986). Nevertheless, <u>Gerstein</u> is unequivocal on this point: at the end of the brief period–whatever it may be–the police must let the suspect go. <u>Id</u>.

In <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44 (1991), the Court established a presumptively reasonable forty-eight hour window between an arrest and a probable cause hearing. In <u>Chortek v. City of Milwaukee</u>, 356 F.3d 740 (7th Cir. 2004), however, the Seventh Circuit clarified that the <u>County of Riverside</u> presumption did not justify lengthy (but less than forty-eight hour) police processing times in cases such as this, where no probable cause hearings were contemplated. The <u>Chortek</u> court noted that under <u>County of Riverside</u>, unreasonable delays even within the forty-eight hour period may be "constitutionally troublesome." <u>Chortek</u>, at 746. Indeed, at least since <u>Moore v. Marketplace</u>, 754 F.2d 1336, 1350-51 (7th Cir. 1985), the

Seventh Circuit has made clear that the court must examine the circumstances to determine whether pre-trial detention is unreasonably lengthy. In <u>Gramenos</u>, the Seventh Circuit observed that, "if the police choose to perform time-consuming tasks after an arrest, perhaps they must do so on their own time rather than the suspect's," and remanded so that the lower court could consider whether the administrative tasks carried out incident to arrest justified the length of the challenged detention. <u>Gramenos</u>, at 437.

While these cases have analyzed, in different factual scenarios, what duration of time can appropriately be considered "brief" under <u>Gerstein</u>, none has examined <u>Gerstein</u>'s separate and distinct requirement that pre-trial detention must also be "incident to arrest." In particular, neither <u>Gerstein</u> nor the cases in its wake contemplated whether administrative steps that take place after probable cause has been established and after a detainee has been determined eligible for release can properly be characterized as "incident to arrest." As a matter of first impression, the court holds that they cannot.

This holding is consistent with the rationale articulated by both the Supreme Court and the Seventh Circuit. In <u>Gerstein</u>, the Court acknowledged that allowing police officers to make summary arrests based upon their on-the-scene assessment of probable cause, and to detain individuals arrested in this manner for a brief processing period, is a "practical compromise" between individual rights and the realistic demands of law enforcement. <u>Id</u>., at 113-14. The Court cautioned, however, that because "the consequences of prolonged detention may be more serious than the interference occasioned by arrest," detention following a warrantless arrest must be no longer than necessary to achieve legitimate law enforcement objectives. <u>See id</u>. And if the Seventh Circuit's admonishment in <u>Gramenos</u> that police must consider undertaking time-

consuming tasks "on their own time" means anything, it means that the administrative steps performed while an arrestee is in custody must be limited to those that are reasonably necessary to balance legitimate law enforcement needs with individual liberty interests. Any steps taken by the City that lengthened detention after class members had become eligible for release fail this balancing test.

If Gerstein and its progeny set limits to the time that law enforcement officials may take to complete the administrative steps incident to arrest, then this holding sets limits to the time those officials may take to complete the administrative steps incident to release. Indeed, once the watch commander had determined probable cause and established that the class members were eligible for release, there was nothing (or next to nothing) left to do but to release them.[13] The court need not decide whether, under the City's practice, some time of detention that is less than two hours may be justified following the issuance of the CB number. Plaintiffs have argued that two hours is excessive under the Fourth Amendment, and as a matter of law, the court agrees.

Liability Under *Monell*

Having found that the practice described by plaintiffs violates the Fourth Amendment, it is only a short step, on the undisputed facts of this case, to hold the City liable for these violations. Plaintiffs argue that the City is liable under Monell v. Dep't of Soc. Serv. Of New York, 436 U.S. 658 (1978), on the ground that the City's practice of detaining class members in excess of two hours after issuing CB numbers represents a "widespread practice that, although

---

[13]The court takes this opportunity to note that the efficiencies achieved by eliminating unnecessary processing steps would seem to maximize law enforcement interests as well by conserving resources.

not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). This is, indeed, the only reasonable conclusion to draw from the statistical analysis of plaintiffs' expert Dr. DiPrete, which, as discussed above, is based on the City's own statistics. Defendant urges the court to discount DiPrete's findings because, in defendant's words, "statistics are not irrefutable." But while this caveat may be sound in principle, it rings hollow here, since defendant has not offered any evidence to refute DiPrete's findings.

Defendant's substantive arguments against liability under Monell are equally without merit. Defendant first focuses on the purported factual dispute over whether the issuance of a CB number necessarily follows the determinations of probable cause and eligibility for release of class members. As discussed above, there is no genuine dispute on this issue. Defendant next claims that differences in processing times across districts defeats Monell liability. But what DiPrete's analysis shows is that regardless of any variation across districts, as a result of the manner in which the City's various police districts implemented the GOs, nearly 80% of all arrestees were detained in excess of two hours after receiving CB numbers. This is sufficient to demonstrate a widespread pattern or practice and to distinguish cases such as Jones v. City of Chicago, on which defendant relies.

In Jones, the Seventh Circuit held that the City was not liable for the misconduct of a physician employed by the City who was charged with assaulting two of his patients. The court noted that, "by all accounts, [the physician's] assault on [the first plaintiff] was the first of its type ever brought to the City's attention," and likened the case to others in which the acts alleged were found to be "isolated act[s] of an employee." Jones, at 203-04. The Jones court declined to

20

hold the City liable under <u>Monell</u> because the plaintiffs "clearly present[ed] no facts that tend to show [the physician's] misconduct 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the City.'" Id., at 204 (<u>citing Monell</u>, internal brackets omitted).

By contrast, the violations in the instant case resulted from the City's implementation of the GOs and were, as demonstrated by Dr. DiPrete's undisputed statistical analysis, systemic and widespread throughout the City. The <u>Jones</u> court specifically distinguished such situations from the one then under scrutiny, observing that "where the injury is caused by 'faults systemic in nature,'" <u>Monell</u> liability is appropriate. <u>Jones</u>, at 204 (internal citations omitted).

Similarly, the City's argument that plaintiffs must prove that a specific policymaker had actual knowledge of the violations but was "deliberately indifferent" to them is meritless. The cases defendant cites for these propositions, including <u>Jett v. Dallas Ind. Sch. Dist</u>., 491 U.S. 701 (1989), <u>Gable v. City of Chicago</u>, 296 F.3d 531 (7th Cir. 2002), and <u>McNabola v. Chicago Transit Auth</u>., 10 F.3d 501 (7th Cir. 1991), are unavailing.

In <u>Jett</u>, the issue was whether the decision by a school district's superintendent to reassign a particular high school teacher and coach could be imputed to the municipality. That question is patently distinct from the issue of whether widespread violations that result from the day-to-day implementation of a specific policy are properly attributable to the City. In <u>Gable</u>, the plaintiffs' <u>Monell</u> claims were doomed because the court found that the plaintiffs had failed to identify any municipal policy relating to the handful of violations they alleged.

Finally, in <u>McNabola</u>, the Seventh Circuit held that the City was liable under <u>Monell</u> based on its constructive knowledge of a pattern of discriminatory employment decisions taken

by the Chicago Transit Authority. <u>McNabola</u> supports, rather than undermines, plaintiffs' position. Indeed, the court noted that "the longstanding or widespread nature of a particular practice would support the inference that policymaking officials 'must have known about it but failed to stop it.'" <u>McNabola</u>, at 511 (internal citations omitted). Because defendant has failed to offer any evidence to refute plaintiffs' proof that the practice of detaining class members in violation of the Fourth Amendment is systemic and widespread, that is the only reasonable inference that can be drawn in this case.

## CONCLUSION

For the reasons set forth above, plaintiffs' renewed motion for summary judgment of liability is granted. This motion is set for a status report on September 23, 2008, at 9:15 am, to set procedures for determining damages and concluding this litigation.


**ENTER:** **September 9, 2008**

Robert W. Gettleman
United States District Judge

22