IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD PORTIS AND MARDRIC E. LANCE,<br><br>                Plaintiffs,<br><br>vs.<br><br>CITY OF CHICAGO,<br><br>                Defendant. | Case No. 02 C 3139<br><br>Judge Thomas M. Durkin |

**THE CITY OF CHICAGO'S MEMORANDUM SUPPORTING ITS MOTION FOR JUDGMENT AS A MATTER OF LAW**

The City of Chicago respectfully moves this Court for judgment as a matter of law under Fed. R. Civ. P. 50(a) because: (1) plaintiffs have failed to put forth evidence sufficient to show that the length of their detentions from arrest to release were unreasonable in violation of the Fourth Amendment; and (2) plaintiffs have not established that a City official policy or custom caused any deprivation of plaintiffs' Fourth Amendment rights through its deliberate indifference to the known and obvious consequences of its official policy. For these reasons, set forth below, plaintiffs' claims fail as a matter of law, and judgment should be entered in favor of the City.

**LEGAL STANDARD**

Fed. R. Civ. P. 50 allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 745-46 (7th Cir. 2007) (quoting Fed. R. Civ. P. 50(a)). The standard for granting judgment as a matter of law "mirrors" the standard for granting summary judgment. *See Murray v. Chi. Transit Auth.*, 252 F.3d 880, 886 (7th Cir. 2001). In deciding a Rule 50 motion, the court does not make

credibility determinations or weigh the evidence. *See Waite v. Bd. of Trustees of Ill. Comm. College Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005). But when no reasonable jury could find in favor of the non-movant based on the evidence presented at trial, judgment as a matter of law should be granted. *See Waters v. City of Chicago*, 580 F.3d 575 (7th Cir. 2009) (reversing and remanding with instructions to enter judgment as a matter of law in favor of the City where the plaintiff "presented no evidence that a final policymaker caused his alleged constitutional deprivation" under the *Monell* standard); *Timas v. Klaser*, 23 Fed. App'x 574, 579 (7th Cir. 2001) (affirming grant of Rule 50(a) judgment as a matter of law because the evidence at trial could not have supported a jury finding that an officer used excessive force in arresting the plaintiff).

## ARGUMENT

In order to prove that the City of Chicago violated each plaintiff's Fourth Amendment right, each must separately prove, by a preponderance of the evidence, that: (1) their detentions were not reasonable because they respectively were held too long from arrest to release; and (2) some official policy of the City was the "moving force" behind the constitutional violation through the City's deliberate indifference to the known and obvious consequences of its policy. Plaintiffs have proven neither required element, and consequently, the City is entitled to judgment as a matter of law.

    A.    **Plaintiffs' Detentions Were Constitutionally Reasonable; No Evidence Has Been Offered From Which A Reasonable Juror Could Conclude Otherwise.**

Plaintiffs have not offered sufficient evidence for the jury to find that the length of any plaintiff's detention was constitutionally unreasonable. A police officer has probable cause to arrest an individual if the officer believes the person has committed even a very minor offense. *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010). Individuals arrested for such minor offenses may be taken to the stationhouse for booking and detained while officers carry out "the administrative steps incident to arrest." *Ray v. City of Chicago*, 629 F.3d 660, 663 (7th Cir.

2011). Once arrested, individuals "need not be released as quickly as possible," or even "at the earliest moment that each [processing] step can be accomplished. What the Constitution requires is that the *entire process remain reasonable*." *United States v. Childs*, 277 F.3d 947, 953-54 (7th Cir. 2002) (en banc) (emphasis added). "What is reasonable, or not, is how much time passes between arrest and release, in relation to the reasons for detention." *Portis*, 613 F.3d at 705. Both "needless delay" and "delay deliberately created so that the process becomes the punishment" violate the Fourth Amendment. *Id*. But no evidence has been presented by plaintiffs establishing that either were present in these cases.

    **1.    Plaintiffs' Detention Times, From Arrest to Release, Were Reasonable.**

In determining what is reasonable, the Seventh Circuit has found that, at the very least, "times ranging from three to fourteen and one-half hours [are] not constitutionally unreasonable absent any evidence that the delay in releasing the arrested individuals was motivated by an improper purpose." *Ray*, 629 F.3d at 663-64 (dismissing unlawful detention claim because plaintiff detained for "several hours" failed to show release was delayed for an improper purpose); *Doyle v. Vill. of Wilmette*, 2013 WL 5304101, at *6-7 (N.D. Ill. Sept. 19, 2013) (granting summary judgment because, absent evidence of an improper purpose for the length of detention, a reasonable jury could not find that detention was unreasonable); *Bass v. Hansen*, 2010 WL 5069690, at *16-17 (N.D. Ill. Dec. 7, 2010) ("For Fourth Amendment purposes, it is clear that Defendants were free to hold Plaintiff [for nine hours and forty minutes] while they completed administrative tasks incident to arrest, regardless of whether Illinois law gave them the discretion to release Plaintiff.") (citing *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)); *Chortek v. City of Milwaukee*, 356 F.3d 740, 747-48 (7th Cir. 2004) (finding detention of ordinance violators lasting "substantially longer than four hours" reasonable as a matter of law "given the natural backlog at processing").

Here, the evidence shows that, following their lawful arrests, Portis was detained for 10 hours and 35 minutes, and Lance was held for 16 hours and 15 minutes. Plaintiffs offered no evidence that an officer needlessly or purposefully delayed a plaintiff's release, or that any delay in processing was motivated by ill will or improper purpose. Portis's detention falls well within the time prescribed by the Seventh Circuit in *Ray*. And while Lance's detention was one hour and forty-five minutes outside the period referenced in *Ray*, the *Ray* court did not limit its holding to this range, and Lance has offered nothing to show this extra time made his detention unreasonable. Therefore, plaintiffs' detention times, from arrest to release, must be found to be reasonable as a matter of law. *Portis*, 613 F.3d at 705 (holding that "reasonableness" is based on the time "between arrest and release," not "for a particular *part* of the process").

### 2. The City's Processing Procedures Did Not "Needlessly Delay" Plaintiffs' Release.

Unable to show their detention times were unreasonable, plaintiffs carve out a portion of their detention in an attempt to show that the City's processing procedures created needless delay *after* the time plaintiffs were transferred to a lockup cell—8.5 hours for Portis, and 15 hours for Lance—because, they claim, all administrative steps incident to arrest had been completed at that time. To support this theory, plaintiffs offered evidence that each plaintiff had a name check run, and initial probable cause was approved prior to plaintiffs' placement in lockup. Plaintiffs claim that placing them in lockup needlessly delayed their release because post-lockup processing steps were unnecessary.

Plaintiffs' "needless delay" theory fails as a matter of law. As introduced at trial, General Order ("GO") 92-05 required plaintiffs' placement into lockup while CPD performed a number of administrative steps incident to arrest. *See* GO 92-05II(L) (defining "Lockup" as the area "set aside for the custody and processing of arrestees"). For example, "after the arrestee is received in lockup," the CPD's procedures required additional name and warrant checks for ordinance

4

violators. GO 92-05(VII)(B)(2); *id.* at (IV)(B)(1) (desk sergeant responsible for name check). And only after CPD personnel completed all name checks were charges against the arrestee approved and eligibility for release on bond determined. *Id*. at (III)(A) ("Arrested persons will be booked, charged, and made eligible for release in that order."); *id.* at (II)(D) (defining "Booking" as "[a]ll processes involved in the handling of an arrestee prior to the final charging"); *see also* GO 94-09(A)-(B) (non-felony arrestee unable to post cash bond may be released on Individual Bond after identity is established and the desk sergeant ensures arrestee is not wanted for another offense).

These procedures were both necessary and constitutionally reasonable. Federal courts are clear that it was well within the City's authority to determine the procedures for safely and efficiently processing ordinance violators. *See Florence v. Bd. of Chosen Freeholders of Burlington*, 132 S. Ct. 1510, 1519 (2012) (when determining what intake steps are necessary, "deference must be given to the officials in charge" of making these policy decisions). Indeed, courts aim "to get federal judges out of the business of 'making legislative judgments and overseeing local jailhouse operations.'" *Portis*, 613 F.3d at 704. This policy reflects courts' recognition that "[m]aintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence*, 132 S. Ct. at 1515.

This is particularly true where, as here, the law enforcement procedures address processes for identifying arrestees. Courts give law enforcement wide latitude in determining steps to identify arrestees:

> Regardless of when the initial bail decision is made, release is not appropriate until a *further determination* is made as to the person's identity in the sense not only of what his birth certificate states but also what other records and data disclose to give that identity more meaning in the whole context of who the person really is. And even when release is permitted, the background identity of the

5

    suspect is necessary for determining what conditions must be met
    before release is allowed.

*Maryland v. King*, 133 S. Ct. 1958, 1973-74 (2013) (emphasis added). Indeed, the Supreme Court has recognized that determining identity often proves difficult and, given the importance of identifying arrestees, additional, even *duplicative*, steps may be required to establish identity to the satisfaction of police policymakers. *Id*. at 1971 (recognizing "that the perpetrator will take unusual steps to conceal . . . his identity" and "people detained for minor offenses can turn out to be the most devious and dangerous criminals"); *Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006) (explaining that despite the City's double name check policy, "Emiliano Hernandez" was mistaken for "Enrique Hernandez" and wrongfully detained on outstanding warrant).

    Given the deference paid by courts to law enforcement identification procedures, plaintiffs' theory that their detentions were unreasonable because they believe that the City's procedures after a certain point in the process were unnecessary fails as a matter of law. Courts recognize that the City—through the CPD—is in the best position to determine what processing procedures were necessary to "[m]aintain[] safety and order" at CPD district stations and throughout the City. *Florence*, 132 S. Ct. at 1515. Processes taken by CPD to ensure the safety of those in the lockup, regular citizens visiting the police station, and police officers on duty were reasonable and well within its discretion. Likewise, CPD's policy decision to place arrestees in lockup while it ran multiple name checks, approved final charges, and determined eligibility for bond was constitutionally reasonable, even if some of those processes were duplicative of steps already performed. *See King*, 133 S. Ct. at 1980, 1985 (taking an arrestee's DNA for identification purposes was reasonable, notwithstanding the fact that law enforcement's other identification techniques already established the arrestee's full name, race, sex, height, weight, date of birth, and address); *Hernandez*, 455 F.3d at 775 (noting with approval the City's procedure to double-check an arrestee's identity to ensure the right person is charged and finding

6

that a triple-check policy was not constitutionally required); *Bass v. Hansen*, 2011 WL 528837, at *5 (N.D. Ill. Feb. 03, 2011) (granting defendant's motion for summary judgment where plaintiff was detained in lockup for over 5 and a half hours while officers completed the type of post-lockup "procedures with which the *Portis* Court apparently had no problem").

Consequently, because the total detention times from arrest to release were reasonable, and because the processing procedures utilized by the City did not create "needless delay," plaintiffs have not offered sufficient evidence to show a Fourth Amendment violation, and judgment as a matter of law is proper.

>     B.   **In Any Event, Plaintiffs Failed to Prove a City Official Policy Caused Any Constitutional Violation.**

In addition to proving that the length of plaintiffs' detentions was unreasonable under the Fourth Amendment, plaintiffs must also prove by a preponderance of the evidence that any unreasonable detention was caused by a City official policy. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). To meet this standard, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *See Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). This means "[t]he plaintiff must [] demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id*. at 404 (emphasis in original); *see Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012) ("To establish municipal liability, a plaintiff must show the existence of an 'official policy' or other governmental custom that *not only causes but is* the 'moving force' behind the deprivation of constitutional rights.") (emphasis added).

In addition, to show the requisite culpability, "the plaintiff 'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Rasche v. Vill. of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) (quoting *Brown*,

520 U.S. at 407). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. In other words, "[t]he Supreme Court has defined deliberate indifference in this context to mean that 'a reasonable policymaker [would] conclude that the plainly obvious consequences' of the City's actions would result in the deprivation of a federally protected right." *Gable v. City of Chicago*, 296 F.3d 531, 537-38 (7th Cir. 2002) (quoting *Brown*). "[A] finding of deliberate indifference requires a showing that policymakers 'were aware of a substantial risk' of a constitutional violation and 'failed to take appropriate steps to protect [plaintiffs] from a known danger.'" *Montano v. City of Chicago*, 535 F.3d 558, 570-71 (7th Cir. 2008).

If a plaintiff fails to bring forth evidence of "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority[,]" then judgment as a matter of law is proper in favor of the defendant. *See Waters*, 580 F.3d at 581, 583 (stating that since the plaintiff failed to show evidence of an express policy, a widespread practice, or a decision by someone with final policymaking authority on the matter in question, that "his evidence came up short" and "[t]herefore, the City's motion for judgment as a matter of law should have been granted").

Based on the evidence presented at trial, no reasonable jury could find that a City "official policy" was the "moving force" behind any alleged Fourth Amendment violation through a City policymaker's deliberate indifference. Plaintiffs' sole theory for holding the City liable for plaintiffs' detention is its claim that, because the facially lawful processing steps that CPD completed *after* the arrestee was placed in lockup were unnecessary, the City policymaker—the Superintendent of Police—knew or must have known that placing arrestees

like plaintiffs into lockup would cause unreasonable delays in processing, and yet failed to change its policies. In support, plaintiffs offered evidence of the processing steps completed prior to lockup, Mr. Bishop's testimony that the steps after lockup were unnecessary, and the testimony of plaintiffs' statistics expert, Dr. Thomas DiPrete, regarding the length of time a small subset of non-fingerprinted ordinance violators were detained in 2000 to 2004. This evidence is insufficient, as a matter of law, to prove that an "official policy" of the City was a "moving force" behind any alleged Fourth Amendment violation.

### 1. Plaintiffs Failed to Provide Any Evidence of a City "Official Policy" for Fingerprinted Ordinance Violators Like Mr. Lance.

First, based on the evidence presented at trial, no reasonable jury could find that a City "official policy" was the "moving force" behind any alleged violation of Mr. Lance's Fourth Amendment rights because plaintiffs offered no evidence showing an official policy regarding fingerprinted ordinance violators. Plaintiffs challenge the following alleged City "official policy" in this case: "a custom of putting those arrested for non-jailable ordinance violations *who are not fingerprinted* and have no outstanding warrants into lockup cells after the watch commander determined that the charges were proper, that no outstanding warrants exist, and that fingerprinting was unnecessary." (*See* Parties' Joint Supp. Filing Related to Mot. to Amend Jury Instructions, Dkt. 715, Ex. A at 22 (emphasis added).) Indeed, since its inception as a class action over ten years ago, this case has involved the processing of non-fingerprinted ordinance violators. Plaintiffs have never pursued any claims related to fingerprinted arrestees.

Yet, Mr. Lance testified at trial that he was fingerprinted and photographed while in detention for the February 27, 2002 arrest at issue here. (*See* Oct. 15, 2013, Tr. Trans., Testimony of M. Lance, 358:25-359:2.) When asked again if he was "sure" that he was fingerprinted, Mr. Lance replied that he was "positive" he was fingerprinted. (*Id*. at 359:3-4.) Indeed, Mr. Lance's arrest report indicates that the watch commander signed the portion of the

9

report titled "Results of the Fingerprint Checked Waived." (Joint Exhibit 11, Box 48.) Pursuant to the general orders, the watch commander would not waive the "results" of the fingerprint check, if no fingerprints were taken in the first place. (*See* Joint Exhibit 9, General Order 92-05(C)(5)(b)(1)-(2), at 33 ("The watch commander in charge of a detention facility will waive the *results* of the fingerprint check, *but not the fingerprinting*" by "signing his name and entering the date and time in the box entitled "Results of Fingerprint Check waived" when authorizing the waiver") (emphasis added).

But plaintiffs have presented no evidence at trial that any City "official policy" caused unconstitutional detentions for ordinance violators, like Mr. Lance, who were fingerprinted. Indeed, plaintiffs' statistics expert, Dr. Thomas DiPrete, prepared a report and testified regarding the length of time a specific subset of ordinance violators were detained from 2000 to 2004 in an attempt to prove an unconstitutional official City policy as to that subset of ordinance violators. But Dr. DiPrete's statistical analysis examined *only arrestees who were not fingerprinted incident to their arrest.*[1] In fact, on orders from plaintiffs' counsel, Dr. DiPrete systematically excluded from his analysis arrestees—like Mr. Lance—from whom fingerprints were taken. Therefore, based on the testimony of plaintiffs' own expert, and the official policy plaintiffs challenge in this case, Mr. Lance was not covered by the alleged City-wide policy at issue in this case because he was fingerprinted incident to his arrest.

As a result, Mr. Lance has offered no evidence showing that a City official policy caused his detention through the Superintendent's deliberate indifference, and no reasonable jury could find otherwise. Judgment as a matter of law is proper. *See Waters*, 580 F.3d at 580-81 ("We conclude that the district court erred in denying the City's motion for judgment as a matter of

---

[1] Defendants did not have access to final transcripts with Dr. DiPrete's testimony prior to filing this motion, but can supplement the motion with citations to the final trial transcript, as soon as it becomes available, with leave of the Court.

10

law because Waters presented no evidence that a final policymaker caused his alleged constitutional deprivation."); *see also Heldstab v. City of Milwaukee*, 998 F.2d 1016 (7th Cir. 1993) (granting judgment as a matter of law in favor of defendant on a *Monell* claim "[b]ecause there [was] no evidence of an official policy nor evidence of retaliation").

### 2. Plaintiffs' Evidence Is Insufficient As a Matter of Law for Additional Reasons.

Plaintiffs' evidence is also legally insufficient as a matter of law because it otherwise fails to prove the key elements of a *Monell* claim. First, plaintiffs present no evidence that the Superintendent of Police was "deliberately indifferent" to any unconstitutional consequences of the City's facially constitutional policy. *Rasche*, 336 F.3d at 599 (quoting *Brown,* 520 U.S. at 407). Instead, the evidence shows that the City's facially constitutional policies and procedures required processing ordinance violators like plaintiffs into lockup while CPD personnel ran checks to determine identity and warrant status, determined whether they were eligible for bond, and approved the charges against plaintiffs. Courts will not "make legislative judgments" regarding the manner in which the City chose to process arrestees—including the *number* of name checks necessary to establish identity or *where* arrestees should be placed while certain processing procedures are performed. *Portis*, 613 F.3d at 704. These decisions are left to the City's discretion based on its experience processing arrestees, its knowledge of the technology at its disposal, and its expertise in determining the safest and most efficient ways to process arrestees. *See Florence*, 132 S. Ct. at 1515, 1519 ("deference must be given to the officials in charge"); *King*, 133 S. Ct. at 1980, 1985 (taking an arrestee's DNA for identification purposes was reasonable means of identification, notwithstanding the fact that law enforcement's other identification techniques already established the arrestee's full name, race, sex, height, weight, date of birth, and address); *Hernandez*, 455 F.3d at 775 (noting with approval the City's policy to

11

double-check an arrestee's identity to ensure the right person is charged and finding a triple name-check policy is not required under the Constitution).

Moreover, plaintiffs have offered *no evidence* that the Superintendent knew or must have known that the "plainly obvious consequences" of these entirely proper policies and procedures was unconstitutional detentions. *Brown*, 520 U.S. at 410. Nothing suggests that the Superintendent of Police was "aware of a substantial risk of a constitutional violation and yet failed to take appropriate steps to protect" plaintiffs from any known danger. *Montano*, 535 F.3d 570-71. Indeed, the only evidence even tying the length of plaintiffs' detentions to the City—DiPrete's complex statistical comparison showing the length of detentions of a small subset of ordinance violators who were not fingerprinted, among other criteria (just 4% of all arrestees occurring during the time period DiPrete studied)—was not available until DiPrete created it in 2005: *over three years after* plaintiffs were arrested and processed. So the only "plainly obvious consequences" of the City's processing steps were that the facially constitutional procedures were reasonable and necessary methods of safely and efficiently processing ordinance violators like plaintiffs. As a result, plaintiffs' *Monell* claims fail as a matter of law. *See Rasche*, 336 F.3d at 599 (dismissing *Monell* claims where plaintiff was unable to show that a lawful municipal action had the known or obvious consequence of violating the constitution); *Bishop v. Dart*, 2012 WL 4739101, at *6-7 (N.D. Ill. Oct. 3, 2012) (same); *Michael v. Letchinger*, 2011 WL 3471082, at *14-15 (N.D. Ill. Aug. 5, 2011) (same).

Finally, plaintiffs' own evidence shows that the City's policies could not have been the moving force behind these detention times. Dr. DiPrete testified about the mean time it took to process certain ordinance violators pursuant to the CPD's processing procedures from 2000 to 2004. In particular, Dr. DiPrete testified that the average detention time for DiPrete's subset of ordinance violators was 6.27 hours or less from arrest to release, and 75% were processed in less

than 7.60 hours under the City's processing procedures. DiPrete also testified that the mean book to bond time for ordinance violators was 4.42 hours, and 90% of ordinance violators spent 8 hours or less in custody after the CB number was issued under the City's processing procedures.[2]

But plaintiffs' detention times were far outside of the mean detention times for ordinance violators pursuant to the CPD's processing procedures. Based on Dr. DiPrete's statistics, the average detention time for DiPrete's subset of ordinance violators was significantly faster (6.27 hours) than the 10.5 to 16 hours plaintiffs were detained from arrest to release. Similarly, Portis's (8.5 hours) and Lance's (15 hours) CB number to release times are significantly outside of the normal detention times (4.42 hours) for processing ordinance violators from the time the CB number is issued to release. Thus, based on their own statistics, plaintiffs' detentions were clearly outliers – over 90% of ordinance violators were processed through lockup faster than plaintiffs. This means the City's processing procedures themselves could not have been the moving force behind these detentions. *See Hernandez*, 455 F.3d at 775 ("*Monell* establishes that an operational error does not support municipal liability."). *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007) ("The 'official policy' requirement for liability under § 1983 is to 'distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the

---

[2] This Court has recently found the mean detention times in Dr. DiPrete's statistics reasonable as a matter of law. *See Bass*, 2011 WL 528837, at *5. In *Bass*, the plaintiff was arrested by Chicago police officers for "reckless conduct" and detained 9 hours and 40 minutes before being released on bond. *Id*. The plaintiff, who was processed through the same "types of procedures" as those used in this case, was detained about 7 hours from arrest to release (less one to three hours spent receiving medical care), and 5 hours and 35 minutes from the time she hit lockup until release – during which time officers determined warrant status, approved charges, and released on bond. *Id*. The Court found these detention times reasonable as a matter of law based on the processing procedures used by the City. Thus, DiPrete's mean detention times—both from arrest to release (6.27 hours) and from lockup to release (4.42 hours)—are well-below what courts have found constitutionally reasonable using the processing procedures at issue here.

municipality is actually responsible.'") (emphasis added). As a result, each plaintiff's *Monell* claim fails as a matter of law.

### C. Plaintiffs failed to provide any evidence of damages.

Plaintiffs have provided no evidence to sustain their claim for damages in this case, and therefore it fails as a matter of law. Damages "must be proved in order to be recovered; a plaintiff who wants substantial damages can't just ask for them." *Knapp v. Eagle Property Mgmt. Corp.*, 54 F.3d 1272, 1281 (7th Cir. 1995). The law is clear: bare, unsupported statements of damages "are insufficient to establish damages for emotional distress or pain and suffering." *Scott v. Peterson*, 2010 WL 3173001, at *5 (N.D. Ill. Aug. 11, 2010) (holding that plaintiff "failed to prove his damages for emotional distress and pain and suffering with the reasonable certainty required" because plaintiff did not provide "medical bills, psychological visits, or testimony . . . to corroborate his statements"); *Denius v. Dunlop*, 330 F.3d 919, 929 (7th Cir. 2003) (stating that "conclusory statements," by themselves, are insufficient to prove pain and suffering damages).

The record in this case reflects no proper basis for plaintiffs' request for damages. Indeed, plaintiffs admit that they have not suffered any physical or emotional injury, or lost wages, as a result of the detentions at issue. (*See* Oct. 15, 2013, Tr. Trans., Testimony of M. Lance, 389:12-25). They also admit that they have each been arrested several times before the arrests in question, further proving that any claim of emotional distress due to these arrests is unsubstantiated. (*Id.* at 377:9-16.)[3] Finally, plaintiffs have not provided evidence showing any other type of damages suffered as a result of the detentions in this case. Based on the complete

---

[3] Defendants did not have access to final transcripts with Mr. Portis's testimony prior to filing this motion, but can supplement the motion with citations to the final trial transcript, as soon as it becomes available, with leave of the Court.

14

lack of evidence to support a claim for damages, plaintiffs' claim fails as a matter of law. *See Knapp*, 54 F.3d at 1281.

## CONCLUSION

For the reasons explained above, and based on the evidence set forth in the record, the City of Chicago respectfully requests that this Court grant its motion for judgment as a matter of law and enter judgment in its favor.

Dated: October 16, 2013

Respectfully submitted,

*s/ Matthew C. Singer*
June K. Ghezzi, Bar No. 6185506
 jkghezzi@jonesday.com
Brian J. Murray, Bar No. 6272767
 bjmurray@jonesday.com
Morgan R. Hirst, Bar No. 6275128
 mhirst@jonesday.com
Mark W. DeMonte, Bar No. 6282734
 mdemonte@jonesday.com
Matthew C. Singer, Bar No. 6297632
 mcsinger@jonesday.com
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601-1692
(312) 782-3939

ATTORNEYS FOR THE DEFENDANT

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 16, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following at their e-mail address on file with the Court:

Thomas G. Morrissey
10249 S. Western Avenue
Chicago, Illinois 60643
(773) 239-0387

Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-4878

Robert H. Farley, Jr.
1155 S. Washington Street
Naperville, Illinois 60540
(630) 369-0195

Judson H. Miner
Miner, Barnhill & Galland
14 West Erie Street
Chicago, IL 60610
(312) 751-0438

Michael Kanovitz
Loevy & Loevy
312 N. May St., Suite 100
Chicago, IL 60607
(312) 243-5902

                                              *s/ Matthew C. Singer*
                                              Matthew C. Singer