**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| RONALD PORTIS and MARDRIC E. LANCE, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 02 C 3139 |
| | ) | |
| v. | ) | The Honorable Thomas M. Durkin |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

Plaintiffs, Ronald Portis and Mardric Lance, respectfully move this Honorable Court to enter judgment in their favor on liability for their express policy claim against the City of Chicago pursuant to Fed. R. Civ. P 50(b) or, in the alternative, to grant a new trial pursuant to Fed. R. Civ. P. 59. The Court should grant this relief for the reasons that follow.

## INTRODUCTION

The prior appeal in this case establishes the law governing Plaintiffs' claims: Ordinance arrestees are entitled to be released on an I-Bond in a reasonable amount of time after the watch commander approves probable cause, while needless delay in completion of the bond is unreasonable. Portis v. City of Chicago, 613 F.3d 702, 705 (7th Cir. 2010). Further, because one detainee's circumstances differ from another's, a plaintiff must prove that the delay was needless in light of the events that occurred during their particular detentions. Id.

Plaintiffs offered ample evidence of these facts and as well as the fact that the needless delay in their particular detentions was caused by the City's policy itself. That should have been enough. But the Court erroneously tacked on a requirement for more: it

required Plaintiff to show that the policymaker was deliberately indifferent to the risk that the policy would cause a constitutional violation (here, needless delay) when followed.

There was no basis to impose that burden. The record establishes a standard, "according to Hoyle" express policy claim. It was undisputed that the City's official policy required male ordinance arrestees to go through lockup processing and to be placed into a cell before the desk personnel complete the steps needed for their I-bonds. Also undisputed was the fact that this lockup phase was mandatory for the men, even when the desk personnel were available to complete their I-bonds immediately. And Plaintiffs connected this policy to needless delay in their particular detentions with proof that the desk personnel were in fact available and could have completed their I-bonds at the desk (in the same manner as for women ordinance arrestees and traffic arrestees) at the time of their specific detentions.

Deliberate indifference is not an element of that type of claim. Deliberate indifference is needed for municipal culpability when an employee chooses the conduct that violates the Constitution, not when an express policy mandates that conduct. There was no evidence of employee choice here. Rather, the Court expanded the law, an expansion that does not withstand scrutiny. Not only is the expansion untethered from the only purpose of <u>Monell</u>[1] -- there is no risk of imposing *respondeat superior* liability when an employee is following City' policy -- the expansion contravenes Supreme Court rulings that deny qualified immunity to municipalities under Section 1983. The constitutional violation at issue here was a direct result of actions that the City instructed its employees to take. Shielding the City from liability unless the policymaker was deliberately indifferent to the

---

[1] <u>Monell v. Dept. Social Services</u>, 426 U.S. 658 (1978).

illegality of that conduct, as the Court did, is nothing but a grant of qualified immunity, and at a much higher level of protection than the "reasonable mistake" immunity that individuals enjoy.

So the verdict for the City must be set aside. Plaintiffs certainly have the right to a new trial; but putting the parties and the judicial system through that expense would only compound the Court's error because the trial record already created requires granting Plaintiffs judgment as a matter of law. Denuded of the erroneous deliberate indifference requirement, there is no question of fact for a jury to decide: the policy for male ordinance violators was undisputed and the City offered nothing but speculation to rebut Plaintiffs' showing that the desk personnel were in fact available to complete their I-bonds on the shifts when they were detained. The standard at this stage is no different than at summary judgment. Speculation is not permitted. And without speculation, there was but one reasonable conclusion from the evidence. The Court must enter judgment for Plaintiffs.

### FACTS

Plaintiffs' right to relief on their express policy claim is based upon three points: (1) the policy undisputedly required putting them into lockup, (2) Plaintiffs offered ample evidence that desk personnel were available to complete the bonding process in the circumstances of their specific detentions, and (3) there was no proof to raise a non-speculative inference of busyness at the relevant time. Plaintiffs explain as follows.

**I.     Undisputed evidence: the City's official policy requires male ordinance arrestees to go to lockup after the watch commander approves probable cause even when desk personnel are available to complete the name checks for their release**

By way of background, the CPD requires three name checks before releasing an ordinance arrestee on bond. The arresting officers conduct the first name check prior to

presenting the arrest paperwork to the watch commander for his determination of probable cause.  Trial Transcript ("TT") 819:18-820:13.[2]

The second and third name checks -- the fax name check and the Desk Sergeant name check, respectively -- are completed by desk personnel after the watch commander makes the probable cause determination.  TT 821:9-823:20; 945:7-16.  This fact is the same for both men and women ordinance arrestees.  Id.  But for men there is a lengthy intervening step.  The policy requires a trip to lockup as a prerequisite for the second two name checks (and subsequent completion of the bond).  The point of Plaintiffs' express policy claim  was that this requirement mandates needless delay in those circumstances when desk personnel are available once the watch commander approves probable cause.

The pertinent facts were undisputed at trial.  The City's witness, Commander Sodini testified on direct that General Order 92-05 requires all male ordinance arrestees to go into lockup after the arresting officers complete the name check and the watch commander approves probable cause. TT 815:24 -824:4 (explaining processing steps under G.O. 92-05).  Importantly, he explained that the requirement applied even if the desk personnel are available immediately to complete the name checks and to release the arrestee.  Id.; see also id. at 829:9-832:1 (exception for females), 832:7-833:8 (no exception for men); 943:13-945:16 (policymaker's decision not to extend the exception to men), 954:10-955:19 (same).  These facts were also demonstrated by the General Orders themselves -- JX-9, G.O. 92-05, at 9-10 (women not sent to lockup unless desk personnel cannot complete the bond); as well as by the jointly called witness Sergeant Miceli.  TT at 450:9-23 ("[Q. B]ecause Mr. Portis was a man arrested on those ordinance violations, regardless of

---

[2] Plaintiffs have filed a separate appendix containing the Transcripts and the Exhibits cited in this motion. Dckt. 767.

whether you had time to bond, he goes to the jail cell in the lockup, correct? A. Yes. Q. Automatic. 23 A. Yes."); 471:19-25 (admitting that "the official policy of the City of Chicago required that he go to lock-up").

As to female arrestees, the policy instructs the desk personnel to complete the steps needed for release at the desk if they are able to do so.  JX-9, G.O. 92-05, at 9-10.  However, for male ordinance arrestees the rule is the opposite.  The policy instructs the desk personnel to wait until the man has been put through lockup admission steps and placed into a cell before commencing the steps needed for release -- the fax name check, the Desk Sergeant name check and the bond paperwork. JX-9, G.O. 92-05, at 15-16 (lockup personnel complete medical questions and other portion of the arrest report before faxing for the name check), at 26 (fax name check occurs after the arrestee is received in lockup); TT 821:9-824:4 (Defendant's witness Sodini confirming that fax name check occurs after arrestee placed in cell and lockup keeper brings paperwork back to the desk for faxing, Desk Sergeant name check occurs after fax name check), 916:19-917:25 (same).

The lockup admission steps that men must go through before the desk will attend to their bond include: transfer of custody from arresting officer to lockup personnel, review of the arrest paperwork by the lockup personnel, visually inspecting the arrestee before accepting him into custody, physically searching him for contraband, interviewing him about a series of medical questions, seizing and storing his belt and shoelaces, seizing and inventorying his property, preparing related paperwork and receipts, completing portions of the arrest report required of lockup personnel, placing him into the cell, and returning the arrest report to the desk area for faxing.  Id.  Plaintiff's expert, former Deputy

Superintendent Ed Bishop[3] testified without contradiction that these steps were time consuming. TT 612:19-25.

## II. Undisputed evidence: on a normal shift, desk personnel are available to complete the bond for ordinance arrestees without need to put them into lockup

The evidence was also undisputed that the desk personnel usually have time to bond ordinance arrestees at the desk without putting them into lock-up. Both Mr. Bishop and the jointly called witness, former Sergeant Mary Miceli, testified that there is ample time on a normal shift for the desk personnel to bond ordinance arrestees at the desk without need to put them into lockup. TT 470:9-471:25 (Miceli); TT 595:5-600:11 (Bishop). This fact about normal operations was inherent in the General Orders' requirement to bond women and traffic arrestees at the desk unless specific circumstances necessitate putting them in a lockup cell. JX-9, G.O. 92-05, at 9-10 (women); PX-1, G.O. 99-12-05, at 3 (traffic).

## III. No material dispute: desk personnel were available to complete Plaintiffs' name checks once the watch commanders approved probable cause

Finally, Plaintiffs "closed the loop" between the requirements of the express policy and needless delay in their release with evidence that the desk personnel were in fact available to complete their bonds once the respective watch commanders approved probable cause. Although the City claimed to dispute this fact, it did not rebut Plaintiffs' evidence on this score and it failed to offer any non-speculative countervailing proof.

Plaintiffs proved that the activity on the relevant shifts was normal -- *i.e.*, the type of shift when desk personnel can bond an ordinance arrestee without need for lockup. Mr. Bishop reviewed the depositions of the people who were working during those shifts and

---

[3] Mr. Bishop served in the Chicago Police Department for 33 years, working his way through the ranks from patrolman until he was selected for a position in the CPD's command structure and ultimately became one of five deputy superintendents. TT at 574-76.

all of the available documentation from those shifts (including the Watch Commander Logs, the Rosters of Persons in Custody, the Lockup Inspection Logs, Lockup Population Reports, and all the Arrests Reports). That evidence all demonstrated that the desk personnel had ample availability to complete the bonding process without sending the Plaintiffs through the lock-up procedures. TT 586:4-15 (availability to bond Lance), 586:17-592:19 (explaining support in documents reviewed for Lance's detention: JX4, JX6, JX8, and PX3), 597:17-25 (availability to bond Portis), 597:17-598:21 (explaining support in the documents reviewed for Portis's detention: PX2, JX5 and JX7).

In addition, Sgt. Miceli testified that the documents showed normal activity in the district, the level at which when she can bond ordinance arrestees without lockup. Going through them, she agreed that they showed average numbers of detainees coming in on the two shifts before hers as well as on her shift, meaning that she inherited an average population of arrestees and dealt with an average number of new detainees. TT 468:18-21 (Miceli admitting "average busyness on the watch before you, below average busyness on the watch before that, and about average busyness on your watch"). As a result, she also agreed that there was no reason why the desk personnel could not have completed Mr. Portis's bond after the watch commander approved probable cause without sending him to lockup:

A.  So we had 14, and then we took in 11 during the tour.

Q.  And 14 is not an abnormal number, is it?

A.  No, not necessarily.

Q.  Okay. So, I mean, the fact that there's 14 in custody is quite consistent with the idea that there was normal business going on, right?

A.  Well, the way you're putting it, yes.

7

Q.     Okay.  And so if it's a normal night, you have the opportunity to bond someone who's arrested on traffic at the desk, correct?

A.     Yes.

Q.     And bond a woman who's there on an ordinance violation at the desk on a normal night, right?

A.     Yes.

*  *  *

Q.     Isn't it true that you're not aware of anything that would have prevented you from bonding Mr. Portis at the desk that night instead of him going to lockup other than the fact that the official policy of the City of Chicago required that he go to lockup?

A.     Yes. I have no recollection as to anything that would have prevented me from bonding him had it not been procedure.

TT 470:14-471:25; JX7, Lockup Log (showing 14 people in custody at the outset of the shift); JX17, Lockup Population Report for August 2001 (showing average number of persons admitted to lock-up on both the forgoing shift and on Miceli's shift).  Although that admission was conclusive, Sgt. Miceli further testified that she had no recollection of any event during the shift that was not included in the documents, TT 401:25-402:2; 507:6-508:23, and admitted that she was able to take care of the bonding for seven arrestees during the shift, TT 530:25-531:2.  In short, all of the available evidence showed that the desk personnel were in fact available to complete the bond and release for Mr. Portis.

The City did not rebut Mr. Bishop's or Sgt. Miceli's testimony nor the fact in the documentary evidence.  Rather, it tried to prove that there were additional events, not reflected in the documents, which would have prevented the desk personnel from attending to Mr. Portis's bond.  But the City had no sufficient proof to tie it up.  All it offered

was Miceli's testimony that there are things which are not recorded in documents that can take priority over bonding ordinance arrestees. TT 499:18-501:16. Nevertheless, even accepting that such events do occur, Sgt. Miceli stated repeatedly that she has no recollection that any of those circumstances actually came to pass while Portis was in custody. TT 404:20-23; 413:12-13 ("I can't testify to something that happened 11 years ago. I don't know what was going on that day."), 428:14-17, 503:10-20, 507:6-12, 530:21-23 (Miceli admitting that all she can offer is "hypotheticals" -- *i.e.*, speculation).

As to Mr. Lance, the City did not even call a watch commander or desk sergeant on duty while he was in custody. The only employee it called who was on duty at all during Mr. Lance's detention was a lockup keeper, Aaron Cobb. Cobb had no knowledge of whether there was some event not reflected in the documents to prevent the desk personnel from bonding Mr. Lance once the watch commander approved probable cause. Indeed, Cobb did not even come on duty until some seven hours later. TT 1028:2-9.

## **ARGUMENT**

### I. **The Court erred by requiring deliberate indifference on Plaintiffs' express policy claim**

There is an established legal framework for determining when a municipality is liable for a constitutional violation. When an express policy statement requires the conduct that violated the Plaintiff's rights, that fact alone establishes municipal liability. Monell, 435 U.S. at 690 ("Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement . . . promulgated by that body's officers.") By contrast, when the unconstitutional conduct was chosen by an employee without policymaking authority, a plaintiff must show culpable inaction in the form of a

policymaker's deliberate indifference.  Bd. Of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 406-07 (1997) (attempt to hold municipality liable when employee used force technique not contained in policy); see also id. at 415 ("In the broadest sense, every injury is traceable to a hiring decision. Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability."); 7th Cir. Civ. Pat. Instr. No. 7.19-7.20 (no requirement for deliberate indifference in instructions for official policy claims); compare 7.21 (deliberate indifference required to hold municipality liable where an employee's constitutional violation resulted from a failure to train).

Despite this established framework for municipal liability, the City argued that a policymaker must be shown to be deliberate indifferent to the risk that an express policy required an unconstitutional act, at least when the policy is broad enough to be enforced constitutionally in some of its applications.  The City urged, and the Court accepted, the following flawed reasoning: if a policy does not produce unconstitutional conduct *in all of its applications*, the policymaker cannot be presumed to have understood the potential for a constitutional violation in any of its applications, so a plaintiff must prove deliberate indifference to the risk that the policy would cause a constitutional violation when applied in the circumstance at issue (here, the risk that the policy would cause needless delay when there was no impediment to completing the bond). TT at 1232:7-1250:25.  It is true that the policy for male ordinance arrestees does not always cause unreasonable delay -- if the desk personnel are too busy to complete the arrestee's bond, then putting him into lockup is necessary.  But that fact is not meaningful under the applicable law, nor does it justify adding a requirement for deliberate indifference.

Rather the Court's decision to adopt the City's rule contravenes the law in multiple independent ways. Plaintiffs explain below.

### A.     Where the Court went wrong

The City's argument for deliberate indifference turned on the characterization of its policy as "facially constitutional."  But its policy was not facially constitutional.  Rather, the City misused the term and thereby induced the Court to apply the wrong standard.

In the Monell line, a "facially constitutional" policy is one that never results in a constitutional violation when followed. See City of Canton v. Harris, 489 U.S. 378, 386-87 (1989) (written policy required employees to provide medical care, but employees failed to apply it).  Although that term is clear when applied to municipal tort liability under Section 1983, the City muddied it.  In the final moments of the jury instruction arguments the City cited two cases about a court's power to strike down a statute. TT 1235:13-1236:9; 1240:7-1248:19; Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011) (constitutional review prior to striking down an ordinance), and Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers, 335 F.3d 607 (7th Cir. 2003) (APA review of a federal agency rule).  The power to strike down a law is limited to ones that are "facially unconstitutional," which, in that context means a law that can never be constitutionally enforced.  Id.

Having cited these two cases, the City began treating "facially constitutional" in the Monell sense as simply meaning the opposite of "facially unconstitutional" in the statutory review context, TT  1235:13-1236:10, calling its policy was "facially constitutional" because it is not unconstitutional in all of its applications.  It was then a short jump to citing case law requires proof of deliberate indifference because a municipality cannot be held liable for a facially constitutional policy – rather, the plaintiff must show that it was deliberately

indifferent to the risk that an employee would apply the policy in an unconstitutional way, Canton. 489 U.S. at 387. But the argument was based on a fallacy because the City's policy was not facially constitutional under Monell.

Unfortunately, the City prevailed and the result was the birth of a new rule: a plaintiff must show either that the express policy violates the constitutional in all of its applications or else that the policymaker was deliberately indifferent to the risk that it would prove unconstitutional in some of its applications. That new rule lacks any foundation in Monell's rule, which is merely to ensure that municipal liability under Section 1983 does not slip into *respondeat superior*. Pembaur v. City of Cincinnati, 475 U.S. 469, 479-80 (1986) ("The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."). That condition is met so long as the employee was following policy, regardless of whether the required conduct is always unconstitutional or only in some applications.

In fact, the supposed distinction actually conflicts with Monell itself. In that case, New York implemented an express policy requiring women to take an unpaid leave of absence during their third trimester of pregnancy. Id. at 661-662. Forced leave is constitutional if the employee was "medically unable to continue to perform her job" at the time, so the policy did not always cause a constitutional violation, still New York was liable for applying it to all women regardless of medical need. Id. New York's policy was not "facially unconstitutional" as the City uses that term; it caused a constitutional violation only "as applied" to women who remained medically fit in the third trimester. So, under

the City's proposed rule, Ms. Monell should have been tasked to prove deliberate indifference. But we know she was not. The City's rule must be wrong.

Similarly, the City's rule does not follow from the jurisprudence on municipal liability since Monell. In explaining municipal liability under Section 1983, Bryan County makes clear that the only intent requirement in Section 1983 is the intent to act, the actor need not intend to infringe a constitutional right. Id. at 405. ("Section 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right") (citation omitted).[4] Conduct required by an express policy is "*deliberate* conduct" of the municipality; and if that conduct infringes the plaintiff's constitutional rights, then the municipality has committed the constitutional tort. Id. ("The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.").

Deliberate indifference, on the other hand, is required when an employee chooses unconstitutional conduct not required by municipal policy. In that circumstance the municipality cannot be said to have intended the employee's action, so the plaintiff must point to some other municipal conduct that is both culpable and causative. The policymaker's deliberate indifference to the risk of the employee's misconduct supplies that link:

---

[4] Thus Bryan County recognizes that specific intent may be required by the underlying constitutional provision – for example the Eighth Amendment requires intent to harm before the force used on a prisoner will violate its provisions, but that sort of intent was not the basis of this Court's deliberate indifference ruling. And, more importantly, there is no specific intent requirement under the Fourth Amendment. Richman v. Sheahan, 512 F.3d 876, 882 (7th Cir. 2008) ("The officers' intent in using force is irrelevant in a Fourth Amendment case. Only its reasonableness matters—which means whether it was excessive in the circumstances"). In short, neither the Fourth Amendment element of Plaintiffs' claim nor its municipal liability element carried the need to prove deliberate indifference.

> Sheriff Moore's hiring decision was itself legal, and Sheriff Moore did not authorize Burns to use excessive force.  Respondent's claim, rather, is that a single facially lawful hiring decision can launch a series of events that ultimately cause a violation of federal rights.  Claims *not involving an allegation that the municipal action . . . directed or authorized the deprivation of federal rights*, present much more difficult problems of proof.  That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably. . . . [Rather] a plaintiff seeking to establish municipal liability on the theory that a *facially* lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.

Bryan County at 406-07 (emphasis added).  Note the juxtapositon of absolute terms:

"facially lawful municipal action" is not "municipal action that directs the deprivation of

federal rights."  A policy that directs a constitutional violation in any of its applications –

which the City's policy clearly does, cannot be characterized as "facially lawful."

Canton, illustrates the line where deliberate indifference is required.  The policy

there was facially lawful because it simply required employees to attend to arrestee's

medical needs by getting them to a hospital. Id. at 387.  Rather, the plaintiff's complaint was

that the employee failed to recognize that she needed medical care and thus failed to get

her to the hospital.  Because the medical care policy did not require the challenged conduct

it was not the locus of the constitutional violation -- the employee's choice about how to

implement the policy was the locus.

To summarize, the City used a hybrid to distort the meaning of "facially

constitutional" and, improperly, fit its policy within it.  The result was that the case law for

policies that never violate the constitution was misapplied to a policy that does violate the

constitution in some of its application.  Hence this Court's decision was to require

deliberate indifference where it should not have done so.

**B.    The City's rule violates the Supreme Court's qualified immunity decisions**

Further proof of the error, is that the new rule provides municipal qualified immunity for a constitutional violation that its express policy required. That is a result the Supreme Court has rejected repeatedly.  According to the City, a municipality is not liable for acts required by its policies unless the policymaker had some reason to know that those acts would be illegal.  And while the City presumes that policymakers recognize the illegality of a so-called "facially unconstitutionality" policy—a necessary but unexplained assumption which is debunked below—it states that deliberate indifference must be affirmatively proven when the policy's requirements are unconstitutional only "as applied" in certain circumstances.

Requiring a showing that the City was aware that its express policy might violate the constitution is qualified immunity by another name.  Usually qualified immunity protects individuals from liability when their actions taken in good faith violate the Constitution. The immunity applies unless a reasonable person would have recognized that his conduct was unlawful in the circumstances he confronted.  Hernandez v. Cook County Sheriff's Office, 634 F.3d 906, 915 (7th Cir. 2011) ("The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") (citing Saucier v. Katz, 533 U.S. 194, 202 (2001)).  The City's rule is the same: the municipality is shielded from liability for an actual constitutional violation caused by its express policy unless the policymaker ignored a substantial risk that the policy's requirements would be unlawful in a particular situation to which it applied.

 But the Supreme Court has been clear that municipalities have no qualified immunity defense.  Leatherman v. Tarrant County, 507 U.S. 163, 166 (1993) ("[U]nlike

various government officials, municipalities do not enjoy immunity from suit -- either absolute or qualified -- under § 1983"); <u>see</u> <u>also</u> <u>Owen v. City of Independence</u>, 445 U.S. 622 (1980); <u>Thayer v. Chiczewski</u>, 705 F.3d 237 (7th Cir. 2012) (where it is unclear that arrest lacked sufficient grounds in the situation confronting the individual officers, they were entitled to qualified immunity but City was not because arrest was pursuant to City policy). Thus, by application of a new mental-state requirement, the City obtained an undeserved protection from its own violations of the Plaintiffs' rights. The City's rule must be wrong.

### C.   The Seventh Circuit has not addressed the City's rule but plainly does not follow it, while Sister Circuits have expressly rejected the City's position

Although the Seventh Circuit has never been presented with the argument that City raised, the City's rule is completely at odds with the Seventh Circuit's reasoning in highly analogous Fourth Amendment express policy cases. For example, the policy in *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1266 (7th 1983), "required a strip search and a visual inspection of the body cavities of all women arrested and detained in the City lockups . . . without regard to whether the arresting officers or detention aides had reason to believe that the women were concealing weapons or contraband on their persons." The Court recognized that this policy was not always unconstitutional because the Fourth Amendment permits a strip search if police reasonably suspect a specific woman of harboring contraband. <u>Id.</u> Thus it was not a "facially unconstitutional" policy in the City's parlance, only one that required unconstitutional conduct "as applied" in some situations. That did not cause the Seventh Circuit any pause. Rather, the Court applied the usual rules for express policy liability: "[O]ur task is to decide whether the strip search policy of the

City *as applied to these plaintiffs-appellees* was unreasonable under established fourth amendment principles." Id. at 1271 (emphasis added).

The City's rule also cannot be squared with the Seventh Circuit's reasoning in Willis v. City of Chicago, 999 F.2d 284 (7th Cir. 1993). The official policy in Willis allowed police to delay the plaintiff's bond hearing in order to investigate him for other crimes, a *per se* unconstitutional delay under County of Riverside v. McLaughlin, 500 U.S. 44 (1991). The City tried to fend off municipal liability by arguing that the policy also allowed for constitutional delays to investigate facts relevant to the bond court's decision, but the Seventh Circuit rejected the argument. The fact that the policy could be constitutionally enforced in some circumstances did not save the City from liability when the policy caused a constitutional violation in other circumstances. Id. at 289 n. 4 ("We cannot accept the City's suggestion that the extended detention policy was written to permit delay only when it was necessary to make informed charging and bail decisions. The very broad language of the policy belies such an interpretation. It allows detention of an arrestee for an unspecified period whenever Criminal Investigation Personnel believe that an investigation ought to continue.").

Finally, the same argument the City made here has been squarely presented to and expressly rejected by several sister circuits. E.g., Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1280 (10th Cir. 2009) ("The injury to Mr. Christensen . . . was caused by a straightforward enforcement of the ordinances, and not by any additional discretionary actions by the officers. . . Accordingly, if the ordinances are unconstitutional *as applied*, the City is liable.") (emphasis added); Kostrzewa v. City of Troy, 247 F.3d 633 (6th Cir. 2001) (requiring handcuffs was excessive as to plaintiff even though it was constitutional as to

most arrestees); <u>Garner v. Memphis Police Dep't</u>, 8 F.3d 358, 364 (6th Cir.1993) ("Having identified the policy and connected it to the defendants, plaintiff need only show that the policy caused the injury complained of, the death of plaintiff's son.").

### D. Additional flaws and inconsistencies in the City's rule

Another flaw with the City's rule is that its underlying premise is not based on any reason at all: the City just assumes that a policymaker has inherent awareness that a "facially unconstitutional policy" causes constitutional violations, but not with a policy that only causes constitutional violations in some circumstances. That is a leap at best, and definitely an unsupported one.

Policymakers often pass a "facially unconstitutional" policy while having little or no reason to suspect that it is constitutionally infirm: for example, the policy that allowed shooting fleeing felons in the back before <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985), or the policy that allowed police to delay arraignment for less than 48-hours while investigating the arrestee for other crimes before <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44 (1991). Yet there is municipal liability for Fourth Amendment violations caused by such policies, even for conduct that predates the finding of illegality. <u>See</u> <u>Garner v. Memphis Police Dep't,</u> 8 F.3d 358, 364 (6th Cir. 1993) ("Having identified the policy and connected it to the defendants, plaintiff need only show that the policy caused the injury complained of, the death of plaintiff's son."); <u>Willis v. City of Chicago</u>, 999 F.2d 284 (7th Cir. 1993) (pre-<u>Riverside</u> conduct under policy to delay arraignment for investigative reasons). Contrariwise, there are numerous situations *ala* <u>Mary Beth G</u> where a policy of general applicability calls for conduct that is constitutional in some applications while being plainly unconstitutional under well-established law when applied in other circumstances.

Simply put, the City's characterization of a policy as "facially unconstitutional" versus "as applied" does not carry the weight it has assigned to those terms. Its rule, which is based on that distinction, is flawed as a result. And all of the foregoing is academic anyway. Even in asking the question of whether the policymaker appreciated the illegality of the conduct, the City is invoking a red herring. The law simply does not require that sort of intent for municipal liability on an express policy claim.

### E. The Rasche decision, which is the only Monell case the City advanced to support its position, is inapposite because it fits into the Canton line

Finally, Rasche v. Village of Beecher does not support the City but, rather, accords with all of the forgoing cases Plaintiffs have cited. See 336 F.3d 588, 599 (7th Cir. 2003) (requiring deliberate indifference where employees allegedly engaged in retaliatory enforcement of a valid ordinance). The Rasches' complaint was that Village personnel retaliated against them for political speech by prosecuting them under the city's sign ordnance. Id. There was no contention that the ordinance directed employees to retaliate, nor that a prosecution would violate the Constitution were it not retaliatory. Rather, the ordinance truly was facially constitutional as in Canton.,

The Rasches tried exactly what Harris attempted in Canton, to hold the municipality liable simply because its lawful policy was misused by its employees, ignoring the rule that deliberate indifference must be proven where the unconstitutional conduct was not required by the policy. Id. And they were rebuked for the same reasons, the policy was not at fault so there must be a separate showing of fault – deliberate indifference. Id.

Contrast the Plaintiffs' case. The needless delay here did not involve any choice by a CPD employee. Instead, it was solely a result of CPD employees following an express City policy. So, too, the strip searches in Mary Beth G and the investigative detentions in Willis.

Rasche is simply a different type of case where the alleged violation stems from employee choice divorced from any adherence to an express policy.

## II.     Plaintiffs Are Entitled To Judgment As A Matter Of Law On The Express Policy Claim

Portis lays out the legal framework for Plaintiffs' needless delay claim as well as the evidence needed to prove it.  613 F.3d at 703-705.  Ordinance arrestees are "entitled to be released after a reasonable time during which the arresting authority learns who he is, performs a check for outstanding warrants, and obtains consent to the terms of bond."  Id. Although there are no numerical limits on what constitutes a reasonable time to complete that process, "needless delay" is categorically unreasonable and therefore violates the Fourth Amendment.  Id. at 705 ("Needless delay, or delay for delay's sake—or, worse, delay deliberately created so that the process becomes the punishment—violates the fourth amendment.") (citing McLaughlin, 500 U.S. at 56).  Each arrestee must prove that a delay was needless based on the circumstances of his or her particular detention "because one detainee's circumstances differ from another's."  Portis, 613 F.3d at 704 (giving examples of events that can take precedence over issuing a bond and concluding "McLaughlin tells us that reasonableness must be assessed one case at a time."); see also McLaughlin, 500 U.S. at 57 (giving as examples of justified needs: unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest).

Plaintiffs took these requirements to heart.  They proved that the official policy delayed completion of their bond until they were admitted into a lockup cell as well as the fact that this delay was needless in the circumstances of their particular detentions.  This

evidence, discussed in detail in the facts section above, formed the basis of Plaintiffs' directed verdict motion.  TT 1255:4-1257:9.

Although the Court denied that motion, Federal Rule of Civil Procedure 50(b) requires the Court to grant this renewed motion following an unfavorable verdict where the evidence at trial establishes the elements of Plaintiffs' claims such that there is nothing for a jury to decide, or at least nothing that a reasonably jury could conclude would defeat Plaintiffs' claims.[5]  See, e.g., Lopez v. City of Chicago, 464 F.3d 711 (7th Cir. 2006) (awarding judgment as a matter of law on appeal where undisputed evidence showed delay in arraignment for a prohibited purpose).  That is the case on the record that the parties created at trial.

First, all of the facts about the official policy were undisputed.  The policy required putting male ordinance arrestees through time-consuming lockup admissions procedures and placing them in a cell before the second two name checks would commence.  This occurred automatically after the watch commander approved probable cause, even when the desk personnel were available to complete those name checks at the desk.  Thus, once the issue of deliberate indifference by the policymaker for maintaining that policy is taken out of contention, there is nothing about the policy that a jury needs to decide except

---

[5] The standard on the present motion is essentially the same as at summary judgment. Ekstrand v. School Dist. of Somerset, 683 F.3d 826, 829 (7th Cir. 2012).  The Court "must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict…. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed."  Anderson v. Liberty Lobby, 477 U.S. 242, 250–51 (1986).  To be clear, reasonable minds may not base a conclusion on speculation or conjecture. Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008) ("[O]ur favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." ) (internal quotations and alterations omitted).

whether it caused needless delay for these two particular Plaintiffs.  Portis, 613 F.3d at 705 ("[R]easonableness must be assessed one case at a time.").

On this point, it was undisputed that desk personnel are available to complete the name checks without need to put the arrestees into lockup on a normal shift. Plaintiffs offered multiple pieces of testimony and documents proving this fact, and the City did not even attempt to rebut it.  Finally, Plaintiffs offered unrebutted testimony and documentary evidence proving that the two shifts when they were detained, respectively, were normal shifts.  As is explained in the facts section, both Mr. Bishop and Sgt. Miceli testified to the facts and the available documents showed an average number of arrests.  In fact, Sgt. Miceli reluctantly admitted that she could not find a single reason why Mr. Portis had to go to lockup were it not for the policy itself:

> Q.  Isn't it true that you're not aware of anything that would have prevented you from bonding Mr. Portis at the desk that night instead of him going to lockup other than the fact that the official policy of the City of Chicago required that he go to lockup?
>
> A. Yes. I have no recollection as to anything that would have prevented me from bonding him had it not been procedure.

TT 471:19-25.

As discussed above, the City did not rebut Mr. Bishop's or Sgt. Miceli's testimony about what the documents showed nor the documents themselves.  All it offered was testimony from Sgt. Miceli that events which are not recorded in documents often take priority over bonding ordinance arrestees.  TT 499:18-501:16.  No evidence of such events was offered with regard to the particular detentions of Mr. Lance and Mr. Portis themselves.

The City's evidence was the essence of conjecture. Accepting, as the Court must, Sgt. Miceli's testimony that such events do occur, Sgt. Miceli's testimony does not demonstrate that they did occur at the time that the watch commanders approved probable cause for these two men, and Sgt. Miceli stated repeatedly that she has no recollection that any of those circumstances actually came to pass while Mr. Portis was in custody. TT 404:20-23; 413:12-13 ("I can't testify to something that happened 11 years ago. I don't know what was going on that day"); 428:14-17; 503:10-20, 507:6-12, 530:21-23 (admitting that all she can offer is hypotheticals). Thus, there was no non-speculative link between that testimony and the need to place the Plaintiffs into a lockup.

A mere hypothetical possibility that those circumstances occurred at the relevant time (and Sgt. Miceli admitted she had nothing to offer but hypotheticals) is not sufficient to support a jury finding and thus does not raise a question of fact as to Plaintiffs' documentary showing that the desk personnel were available. See McCann v. Mangialardi, 337 F.3d 782 (7th Cir. 2003) (concluding that where plaintiff remembered that a conversation took place but could not remember when it occurred, it would be too speculative to find that the conversation provided notice by the date in question); see also Davis v. Carter, 452 F.3d 686, 697 (7th Cir. 2006) ("[W]hen the evidence provides for only speculation or guessing, summary judgment is appropriate.").

That left only one fact that Sgt. Miceli could point to that was tied to a relevant shift. She stated that her usual practice was to tour the lockup twice but that she signed the lockup log only once. From that she inferred that the reason was very likely that she became too busy to tour a second time. TT 496:11-21. But as applied to the facts of Mr. Portis's detention, the testimony does not change the forgoing analysis.

The evidence was that the watch commander approved probable cause for Mr. Portis sometime before 22:40. See JX-12, Portis Arrest Report at Box 47 (received in lockup time); TT 821:9-823:5 (Sodini testimony that arrestee is sent to lockup after the watch commander approved probable cause). By contrast, Sgt. Miceli's testimony is that she toured the lockup at 23:30, but not later in the shift. See JX-7, Portis Inspection Log at 2; TT 496:17-21. Even if the fact that she did not tour the lockup later in the shift supports a non-speculative inference that something happened which would also have prevented the desk personnel from bonding an ordinance violator, the inference would not defeat Plaintiff's showing that there was no need to put him into the lockup because 23:30 was well *after* the watch commander's approval of probable cause, which occurred not later than 22:50. Whatever may have occurred after 23:30, no reasonable jury could conclude that it retroactively made the desk personnel too busy on or before 22:50.

For Mr. Lance, the City's showing was even weaker because it offered no evidence. The City did not even call the desk sergeant from when Mr. Lance was detained, and so no one even speculated that the desk personnel might not have been available to complete his bonding once the watch commander approved probable cause. There was evidence that a fingerprinting mistake occurred after he was received in lockup, TT 797:21-24, but that later event did not retroactively necessitate putting him into lockup. Rather it is a result of putting him there unnecessarily.

* * *

The fundamental holding of Portis is that the reasonableness of each person's detention must be analyzed based on the circumstances of that person's detention, not others' detentions. 613 F.3d at 705 (decertifying the class because "McLaughlin tells us

that reasonableness must be assessed one case at a time" and "one detainee's circumstances differ from another's").  The only circumstances that were proved about Plaintiffs' detentions are those that the documents show for the shifts in question.  None of the events that Miceli testified can happen in a police station was ever proved to have occurred while Plaintiffs were detained.  Accordingly, under Rule 50(b) the court must grant Plaintiffs judgment notwithstanding the verdict .

## III.    Plaintiffs' Conditional Motion for a New Trial

If the Court does not grant Plaintiffs a directed verdict, then it must order a new trial on liability.  Several, independent grounds support this relief.

### A.    The Court's erroneous requirement for proof of deliberate indifference mandates a new trial on Plaintiffs' express policy claim

The Court erred by requiring Plaintiffs to prove deliberate indifference on their express policy claims.  The jury could very well have found that Plaintiffs proved everything required under Portis, but still found for the City if the policymaker was not deliberately indifferent to the illegality of the delay -- a very high hurdle of scienter.  Under those circumstances, the error cannot be harmless and so a new trial on that claim is necessary.  Wilson v. Williams, 83 F.3d 870 (7th Cir. 1996).

### B.    Additional instructional error mandates a new trial on both the express policy and the widespread practice claims

The jury instructions in this case did not inform the jury of the City's obligation to proffer some explanation for Plaintiffs' continued detention. It is axiomatic that jury instructions must "correctly and *completely* inform[] the jury of the applicable law." Javier v. City of Milwaukee, 670 F.3d 823, 828 (7th Cir. 2012) (emphasis added).  The law in this Circuit requires the City to offer a justification for the extended detention of an individual

arrested for a fine-only ordinance violation, as shown in the line of cases culminating in

Portis. Here, the instruction given that was drawn from Portis stated: "What is reasonable,

or not, is how much time passes between arrest and release, in relation to the reasons for

detention." In isolation, that instruction did nothing to inform the jury of the City's burden

to offer some evidence concerning the justification for Plaintiffs' particular detentions. The

failure to inform the jury of this burden rendered the jury instructions incomplete and

prejudiced Plaintiffs, requiring a new trial. See, e.g., Javier, 670 F.3d at 831-32 (reversing

for new trial where legally correct, but misleadingly incomplete, instruction was given);

Schmitz v. Canadian Pac. Ry. Co., 454 F.3d 678, 682-84 (7th Cir. 2006) (failure to instruct

jury on defendant's duties in negligence case prejudiced plaintiffs and required new trial);

Byrd v. Illinois Dep't of Pub. Health, 423 F.3d 696, 708-09 (7th Cir. 2005) (incomplete jury

instruction warrants new trial even where accurate statement of the law might have

yielded the same result).

      Seventh Circuit case law provides in plain terms that even very short delays of fine-

only ordinance violators must be justified.  As was stated in Portis itself, "[D]etentions as

brief as four hours could be excessive and must be justified[.]"  613 F.3d at 705.  Without

some explanation for the delay, liability must follow because "[n]eedless delay, or delay for

delay's sake . . . violates the fourth amendment."  Id.  Prior cases confirm the obligation of

the government to proffer an explanation for even a short delay.  See, e.g., Chortek v. City of

Milwaukee, 356 F.3d 740, 747 (7th Cir. 2004) ("All but one of these plaintiffs was held for

longer than four hours at PPS. Many were held substantially longer than four hours. Under

Moore and Gramenos, we require an explanation for the length of the plaintiffs'

detentions."); Gramenos v. Jewel Companies, Inc., 797 F.2d 432, 437 (7th Cir. 1986) ("We

held in <u>Moore</u>, 754 F.2d at 1350-52, that four hours requires explanation. . . . On remand the police should explain what must be done after an arrest for shoplifting and why reasonably diligent officers need more than four hours to do it."). While Plaintiffs maintain "the burdens of proof and persuasion on the contention that any particular detention was excessive," <u>Portis</u>, 613 F.3d at 705, the cases make clear that once Plaintiffs demonstrate that a non-de minimis detention has occurred, the detention "must be justified," <u>id.</u> at 704.

Plaintiffs sought to include in the jury instructions the Seventh Circuit's holding that detentions as brief as four hours must be justified. Regardless of whether an instruction with a specific four-hour limitation was given, the jury needed *some* guidance regarding the City's obligation to provide specific justifications for Plaintiffs' detentions. Nothing in the instructions placed any burden whatsoever on the City to produce evidence of such justifications even in the face of Plaintiffs' substantial showings of delay.

At trial, the City offered nothing more than conjecture and statements about the general operation of police lockups, as outlined above. No specific justification for the detention either Mr. Lance or Mr. Portis was given. The absence of an instruction informing the jury that the City was required to proffer such a justification prejudiced Plaintiffs, as it allowed a verdict to be rendered in the City's favor even where the City failed to make the showing required of it by <u>Portis</u>, <u>Chortek</u>, <u>Gramenos</u>, and <u>Moore</u>. As a result, Plaintiffs should be granted a new trial.

### C. Defendant's inflammatory statements during its examination of Lance necessitate a new trial on all of the Plaintiffs' claims

Third, Plaintiffs are entitled to a new trial because of defense counsel's inflammatory reference to gang membership, followed closely by his insinuation that Plaintiffs' counsel solicited Plaintiffs' involvement. TT 370 (stating to Mr. Lance: "[Y]ou

were also a member of the Black Gangster Disciple Nation and the Device Lords gangs"),

379 (referring to receiving a "lawyer advertisement" for the case in the mail). The Court

sustained Plaintiffs' objection to both statements, TT 371-72, 385, but denied Plaintiffs'

motion for a mistrial, TT 374-75, 380-82, 546-47.

 The motion should have been granted. The Seventh Circuit has long recognized the

highly inflammatory nature of such questions, noting the "substantial risk of unfair

prejudice" that "a jury's negative feeling towards gangs will influence its verdict." United

States v. Irvin, 87 F.3d 860, 864 (7th Cir. 1996). The Seventh Circuit also recognizes that,

even where objections to inflammatory questions are sustained, the prejudicial effect of the

unanswered question can be so great as to warrant a new trial. See, e.g., United States v.

Meeker, 558 F.2d 387, 390 (7th Cir. 1977); United States v. Dow, 457 F.2d 246, 249-51 (7th

Cir. 1972).

 This is such a case. The City's inflammatory interjection of Mr. Lance's supposed

gang affiliation left Plaintiffs defenseless. The accusation was made and it was left

unanswered, and it is not the type that a juror can be expected to ignore. The resulting

prejudice thus could not be wiped away by simply striking the question. All parties are

entitled to one *fair* trial as a matter of due process. The City deprived plaintiffs of that

constitutional right, and a new trial is the proper relief.

## CONCLUSION

 For the foregoing reasons, the Court should enter judgment in favor of Plaintiffs

Portis and Lance or, in the alternative, grant a new trial on all claims or, in the alternative,

grant a new trial on their express policy claims only.

Respectfully submitted,


/s/ Michael Kanovitz

One of the Attorneys for Plaintiffs


Judd Miner
Miner, Barnhill & Galland, P.C.
14 W. Erie St.
Chicago, IL 60654
(312) 751-1170

Betty Eberle
Miner, Barnhill & Galland, P.C.
44 E. Mifflin St., Suite 803
Madison, WI 53703
(608) 255-5200

Mark G. Weinberg
3612 N. Tripp Ave.
Chicago, IL 60641
(773) 283-3913

Thomas G. Morrissey, Ltd.
10249 S. Western Ave.
Chicago, IL 60643
(773) 233-7900

Robert H. Farley, Jr., Ltd.
1155 S. Washington St.
Naperville, IL 60540
(630) 369-0103

Michael Kanovitz
Rachel Steinbeck
Loevy & Loevy
312 N. May St.
Chicago, IL 60607
(312) 243-5902

## CERTIFICATE OF SERVICE

I, Michael Kanovitz, an attorney, certify that on November 20, 2013, I caused the

foregoing Plaintiffs' Renewed Motion for Judgment As A Matter of Law Or, In the

Alternative, For A New Trial to be filed using the Court's CM/ECF system, which effected

service on all counsel of record.

/s/ Michael Kanovitz

One of the Attorneys for Plaintiffs

Judd Miner
Miner, Barnhill & Galland, P.C.
14 W. Erie St.
Chicago, IL 60654
(312) 751-1170

Betty Eberle
Miner, Barnhill & Galland, P.C.
44 E. Mifflin St., Suite 803
Madison, WI  53703
(608) 255-5200

Mark G. Weinberg
3612 N. Tripp Ave.
Chicago, IL 60641
(773) 283-3913
Thomas G. Morrissey, Ltd.
10249 S. Western Ave.
Chicago, IL 60643
(773) 233-7900

Robert H. Farley, Jr., Ltd.
1155 S. Washington St.
Naperville, IL 60540
(630) 369-0103

Michael Kanovitz
Rachel Steinbeck
Loevy & Loevy
312 N. May St.

Chicago, IL 60607
(312) 243-590